## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____ :

**UNITED STATES SECURITIES** :
**AND EXCHANGE COMMISSION,** :
:
**Plaintiff,** :
:
**v.** :
:
**STEFAN H. BENGER, SHB CAPITAL, INC.,** :  **CASE NO.**
**JASON B. MEYERS, INTERNATIONAL** :
**CAPITAL FINANCIAL RESOURCES, LLC,** :  **JURY TRIAL DEMANDED**
**PHILIP T. POWERS, HANDLER, THAYER &** :
**DUGGAN, LLC, FRANK I. REINSCHREIBER,** :
**and GLOBAL FINANCIAL MANAGEMENT,** :
**LLC,** :
:
**Defendants,** :
:
**CTA WORLDWIDE SERVICES, SA, and** :
**STEPHAN VON HASE,** :
:
**Relief Defendants.** :
_____ :


## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission")

alleges as follows:

### NATURE OF THE ACTION

1.     The Commission brings this emergency law enforcement action to halt an

ongoing international boiler room scheme run by and through Defendants from their

residences and offices in Chicago.  Since March 2007, Defendants' scheme has raised at

least $44.2 million from more than 1,400 foreign investors, primarily through the sales of

U.S. penny stocks.  The success of Defendants' scheme depends on the concealment from

investors of a critical fact: that more than 60% of the investor funds are used to pay sales commissions.

2.      Defendants' scheme is simple. Defendants Stefan H. Benger, Jason B. Meyers, SHB Capital, Inc. and International Capital Financial Resources, LLC (collectively, the "Distribution Agent Defendants") enter into distribution agreements with companies that issue shares of "Regulation S stock," which is stock that is exempt from registration with the Commission because it is offered solely to investors who are located outside the United States. In these agreements, the Distribution Agent Defendants agree to solicit investors for such stock in exchange for sales commissions that exceed 60%. The Distribution Agent Defendants then retain overseas boiler room operators to sell the inventory of such stock through phone solicitations. The boiler room sales agents prey upon less sophisticated foreign investors – including elderly Europeans. In their cold calls, the sales agents employ high pressure sales tactics and myriad misrepresentations.

3.      After an individual agrees to invest in the boiler room stock, Defendants handle the rest of the transaction. Investors receive a share purchase agreement ("SPA") documenting their purchase with instructions on where to fax their signed SPA, and wiring instruction for their investment funds. In most instances, investors send their investment funds and signed SPA's to Defendants Philip T. Powers, Handler, Thayer & Duggan, LLC, Frank I. Reinschreiber and Global Financial Management, LLC (collectively, the "Escrow Agent Defendants"). The Escrow Agent Defendants then disburse more than 60% of the investor proceeds to the parties who receive sales commissions -- including the boiler room sales agents -- with less than 40% going to the

issuers of the stocks. The Escrow Agent Defendants have disbursed to foreign accounts nearly $29 million of the $44.2 million raised from investors in the boiler room scheme. After dividing up the investor proceeds in this manner, the Escrow Agent Defendants often send share certificates to investors.

4.      Throughout the sales process, investors are deceived about the sales commissions. The boiler room agents oftentimes lie outright about their exorbitant commissions to prospective investors, falsely claiming that the agent will only make money on the investment if the investor makes money on the investment. The SPA's provided to investors misrepresent that investors pay no sales commissions. The SPA's create the misimpression that the investor's entire investment amount goes to the stock issuer, with the investor paying nominal "transaction fees" amounting to 1% or less of the amount invested.

5.      By their conduct, Defendants are participating in an unconscionable fraud on investors. The Distribution Agent Defendants, obviously aware of their massive sales commissions, have employed investor offering documentation that falsely indicates that investors pay no sales commissions.   In addition, Defendants Philip T. Powers, Frank I. Reinschreiber and Global Financial Management, LLC have provided knowing and substantial assistance to the Distribution Agent Defendants' fraud. As escrow agents, they receive and process investors' signed SPA's, take custody of investor funds (which they primarily disburse as exorbitant sales commissions), then issue share certificates to investors. Defendants Philip T. Powers, Frank I. Reinschreiber and Global Financial Management, LLC have provided this substantial assistance with either knowledge of the material misrepresentations and omissions concerning commissions, or with a reckless

disregard of the fraud. Further, all of the Defendants are acting as securities brokers even though they have not registered with the Commission as brokers as they are required to do.

6. The Commission brings this lawsuit to put an immediate halt to Defendants' ongoing misconduct, to prevent further harm to investors, and to hold Defendants accountable for their flagrant and repeated violations of the federal securities laws.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 [15 U.S.C. § 77t(b)] ("Securities Act") and Section 21(d)(1) of the Securities Exchange Act of 1934[15 U.S.C. §§ 78u (d)(1)] ("Exchange Act").

8. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9. Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77u(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants, directly or indirectly, have made and are making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein in the Northern District of Illinois.

## THE DEFENDANTS

10. **Stefan H. Benger** is a 42 year-old resident of Chicago. On September 25, 2008, Benger became a United States citizen. He is now a dual citizen of Germany and the United States. Throughout his employment history, Benger has been associated with

4

various broker-dealer firms.  According to the Central Records Depository ("CRD"), a database compiled and maintained by the Financial Regulatory Authority that provides information concerning broker-dealers registered with the Commission and their registered representatives, Benger is not currently associated with a registered broker-dealer.  Benger is currently the president of Defendant SHB Capital, Inc., through which he has acted as a distribution agent for several of the boiler room stock offerings.

11.     **SHB Capital, Inc.** ("SHB Capital") is a Delaware corporation based in Chicago.  On its website, SHB Capital claims to be "one of the premier buyout companies," specializing in "the acquisition and management of small businesses."  It purports to have an investment banking division that helps U.S. and international companies become "listed on the NASDAQ, OTCBB or Pink Sheets."  SHB Capital also purports to sell public shell companies and to assist in placing issuer shares with domestic and international investors.  SHB Capital is not registered with the Commission as a broker-dealer.  SHB Capital has actively recruited Regulation S sales agents through its website.  SHB Capital, through Defendant Benger, has acted as a distribution agent for several of the boiler room stock offerings.

12.     **Jason B. Meyers** is a 48 year-old resident of Chicago.  From 1988 through November 2000, Meyers was associated with various securities and commodities firms.  According to CRD records, Meyers is not currently associated with a registered broker-dealer.  Meyers previously was a vice president of A-Street Capital, a Chicago-based firm that touted its ability to "arrange the sale of Reg S exempt common stock to retail investors in Europe and Asia through our affiliated regulated broker-dealers."  Meyers is currently the president of Defendant International Capital Financial Resources,

LLC, through which he has acted as a distribution agent for several of the boiler room stock offerings.

13.     **International Capital Financial Resources, LLC** ("International Capital") is an Illinois corporation with its principal place of business listed as Meyers' personal residence in Chicago.  On its website, International Capital claims that it is a "leading provider of specialized and traditional investment banking services to micro, small, and mid-cap companies."  International Capital's website also claims that it has "the international contacts to place Regulation S offerings."  Through Defendant Meyers, it has acted as a distribution agent for several of the boiler room stock offerings. International Capital is not registered with the Commission as a broker-dealer.

14.     **Philip T. Powers** is a 61 year-old resident of Chicago and a licensed attorney in the State of Illinois.  Powers currently holds the position of "senior counsel" at Defendant Handler, Thayer & Duggan, LLC.  According to the firm's website, he focuses his practice on "business, corporate and securities law with an emphasis on domestic and international private equity formation and related transactions."  Powers' biography on the firm's website also states that he has prior experience as a "general counsel to broker-dealers and other financial services firms, focusing on domestic regulatory compliance."  In addition to his position with Handler Thayer, Powers is a principal of Defendant Global Financial Management, LLC.  Through these affiliations, Powers has acted as an escrow agent for several of the issuers of the stock sold through the boiler room scheme.  According to CRD records, Powers is not currently associated with a registered broker-dealer.  Prior to joining Handler Thayer, Powers was chief administrative officer and general counsel of A-Street Capital.

15.     **Handler, Thayer & Duggan, LLC** ("Handler Thayer"), an Illinois corporation based in Chicago, is a law firm of approximately 20 attorneys specializing in business and corporate law services.  Handler Thayer, through Powers, has acted as an escrow agent for several of the issuers of stock sold through the boiler room scheme. Handler Thayer is not registered with the Commission as a broker-dealer.

16.     **Frank I. Reinschreiber** is a 52 year-old resident of Chicago. Reinschreiber is currently a principal of Defendant Global Financial Management, LLC, through which he has acted as an escrow agent for several of the issuers of stock sold through the boiler room scheme.  Global Financial Management, LLC's website states that Reinschreiber has thirty years of experience in accounting, tax and financial planning.  According to Reinschreiber's biography on Global Financial Management, LLC's website, he was formerly the CFO of A-Street Capital.  According to CRD records, Reinschreiber is not associated with a registered broker-dealer.

17.     **Global Financial Management, LLC** ("Global Financial") is an Illinois corporation based in Chicago.  On its website, Global Financial portrays itself as a "finance management company" offering "a complete line of escrow services including the ability to receive and send funds in any foreign currency."  Defendants Reinschreiber and Powers control Global Financial, which has acted as an escrow agent for several of the issuers of stock sold through the boiler room scheme.  Global Financial is not registered with the Commission as a broker-dealer.

**RELIEF DEFENDANTS**

18.     **CTA Worldwide Services, SA** ("CTA Worldwide") has received more than $2.2 million of investor proceeds in an account held at First Caribbean International Bank in Nassau, Bahamas.

19.     **Stephan Gottfried von Hase** ("von Hase") has received more than $292,000 of investor proceeds in an account held at the Berner Kantonalbank in Berne and Biel, Switzerland.  Von Hase is currently the president of Marblehead Financial Group, a Chicago-based firm registered with the State of Illinois as an investment adviser.  Von Hase maintains a residence in Chicago.  According to CRD records, from January 1998 until November 2001 von Hase was associated with the Chicago office of Professional Market Brokerage, Inc.  During the time von Hase was associated with Professional Market Brokerage, Benger was the chief executive officer of the firm. According to CRD records, from May 1997 until February 2001 von Hase was a managing director of CTA Worldwide.  As recently as July 2008, von Hase maintained an e-mail address associated with CTA Worldwide.

**FACTS**

**The Structure of the Scheme**

20.     Defendants' scheme involves the offer and sale of stock in at least eight penny stock issuers: China Voice Holding Corp., Integrated Biodiesel Industries Ltd., Biomoda, Inc., Pharma Holdings Inc., World Energy Solutions, Inc., Revolutions Medical Corp., Earthsearch Communications, Inc., and Essential Innovations Technology Corp. (together the "Issuers").  All but one of these companies are based in the United States.  With the exception of Integrated Biodiesel and Pharma, the stock for each of the

8

Issuers is quoted through the OTC Bulletin Board or "Pink Sheets." The stock of Integrated Biodiesel and Pharma is not yet listed on any stock exchange or quoted through a service like the OTC Bulletin Board. The stock of most if not all of the Issuers trades at prices under $5 per share and otherwise meets the definition of a "penny stock" under the federal securities laws.

21.     SHB Capital and International Capital, through Benger and Meyers, have entered into agreements to distribute the shares of the Issuers. These distributions purport to comply with Regulation S of the Securities Act, which provides an exemption for securities offerings in which (among other things) all of the investors are located outside the United States.

22.     SHB Capital and International Capital, through Benger and Meyers, have retained sales agents located outside the United States to make "cold calls" to individuals soliciting investments in the Issuers' stock. Many of the sales agents retained by the Distribution Agent Defendants work for firms that appear on a warning list -- compiled and published by the United Kingdom's Financial Services Authority -- of firms unauthorized to do business in the United Kingdom, and which are suspected of boiler room activity. Several of the agents retained by the Distribution Agent Defendants falsely claim to work for legitimate brokerage firms operating in the United Kingdom.

23.     Handler Thayer and Global Financial, through Powers and Reinschreiber, have agreed to act as escrow agents for the distributions of the Issuers' stock. The escrow agents receive and process investor SPA's; receive investor funds into escrow accounts; disburse investor funds to the Issuers and to parties receiving sales

commissions; and send share certificates to investors to finalize their purchases of Issuer stock. In exchange, the escrow agents receive a share of the commission payments.

24. The SPA is generally the only documentation provided to investors in connection with their purchases of the Issuers' stock. The SPA's provided to investors in each of the Issuers are substantially similar to one another.

<strong><u>China Voice: An Illustration of the Scheme</u></strong>

25. The offer and sale of stock in China Voice illustrates how Defendants' scheme operates in practice. In early 2007, China Voice entered into distribution agreements with SHB Capital, International Capital, and one other entity. The distribution agreements designate Benger and Meyers as the authorized signatories on behalf of distribution agents SHB Capital and International Capital, respectively.

26. Each distribution agreement calls for the distribution agent to solicit foreign investors for China Voice's Regulation S offering of common stock in exchange for commissions. The distribution agreements include an attachment allocating investor proceeds from the offering. According to China Voice's distribution agreements with SHB Capital and International Capital, China Voice receives a mere 34% of the investor proceeds; the distribution agent and escrow agent collectively receive 66% of the proceeds.

27. An exemplar of the SPA is attached to the SHB Capital distribution agreement with China Voice and to the International Capital agreement with China Voice. These exemplars are substantially similar to the SPA's provided to individuals who have invested in China Voice's Regulation S offering.

28.     On the first page of the SPA for China Voice, there is a grid presenting "Transaction Information – Price and Shares."  This is an example of such a grid:

**Transaction Information – Price and Shares**

| Purchase Price per share | USD$ | $0.56 |
|---|---|---|
| Number of Shares being purchased | | 122,000 |
| Transaction fee to cover certificate and mailing costs | USD$ | 50.00 |
| Total Consideration for shares | USD$ | 68,370 |

29.     The first page of a SPA exemplar states that "[a] certificate representing the Shares will be issued by [China Voice] within 21 days of acceptance of this agreement and will be deposited with the Escrow Agent for transmittal to the [investor] **upon transfer of the Total Consideration to [China Voice].**" (emphasis added).

30.     In the body of an exemplar SPA, the following provision appears:

> Brokers or Finders.  No person has or will have, as a result of transactions contemplated by this Agreement any right, interest or valid claim against or upon [the investor] for any commission, fee or other compensation as a finder or broker because of any act or omission by [China Voice], and/or its agents.

31.     The exemplar SPA makes no disclosure of the commissions exceeding 60%.

32.     Rather, the exemplar SPAs represent that the transaction fees will be limited to a nominal fee of $50 or "1% of cost of shares to cover certificate and mailing costs."

33.     The China Voice distribution agreements also include an escrow agreement outlining the role of the escrow agent in the Regulation S offering.  SHB Capital's distribution agreement provides for Handler Thayer to act as escrow agent. Handler Thayer's escrow agreement names Powers as the law firm's authorized agent for

purposes of the distribution agreement. The distribution and escrow agreements provide that Handler Thayer will obtain custody of investor funds and SPA's; distribute investor proceeds according to the terms of the distribution agreement; maintain China Voice share certificates; and distribute share certificates to investors.

34.     International Capital's distribution agreement with China Voice designates Equinox Administration, Inc. ("Equinox") as International Capital's escrow agent. At the time that International Capital executed its distribution agreement with China Voice, Equinox was a Florida-based company controlled by Paul Gunter. In March 2008, Gunter was arrested by federal law enforcement agents. Gunter was subsequently indicted on mail and wire fraud charges by a grand jury convened by the United States Attorney's Office for the Middle District of Florida. The charges against Gunter, which are still pending, relate to his role in various Regulation S and "pre-IPO" offerings of penny stocks. On information and belief, following Gunter's arrest, Global Financial stepped in to replace Equinox as International Capital's designated escrow agent.

35.     To sell Regulation S shares of China Voice, the Distribution Agent Defendants retain foreign-based boiler room sales agents. The sales agents pitching China Voice typically claim to work for established UK-based brokerage houses. They employ high pressure sales pitches. At least one sales agent bullied an investor by threatening to sue when the investor decided not to purchase the full amount of shares they initially discussed.

36.     The sales agents make material misrepresentations and omissions to convince individuals to invest in China Voice. One sales agent procured an investment by falsely claiming that China Voice's stock price was about to rise sharply in the wake

of the company's selection as the 2008 Olympic Games' chief network communication provider.

37. The sales agents never provide China Voice investors with truthful disclosures of the commissions paid by the investors. When prospective investors have asked about commissions, the sales agents have claimed that the investor only pays a commission if the investor sells his shares of China Voice for a profit.

38. Once an individual agrees to invest in China Voice, the investor receives a SPA for review and signature. Aside from the share certificate, the SPA is generally the only document provided to an investor reflecting the investment in China Voice. The SPA's provided to investors are substantially similar to the form SPA's attached to the China Voice distribution agreements with SHB Capital and International Capital. The SPA instructs the investor to wire the investment funds to a particular U.S. account in the name of the designated escrow agent. It also instructs the investor to fax the first page and the executed signature page of the agreement to a particular U.S. phone number. Neither the sales agents nor the SPA's disclose the name of the party receiving the fax. In fact, the fax numbers were established by one or more of the Defendants through an e-fax service. Once an investor faxes his signed SPA to the designated fax number, the e-fax service e-mails it one or more of the Defendants.

39. The China Voice SPA's direct investors to wire their investment funds to U.S. accounts maintained in the name of the designated escrow agent. Originally, Equinox was the designated escrow agent for International Capital's China Voice investors. Within weeks after Gunter's arrest, Global Financial stepped in to take his place. As a result, Equinox, Global Financial and Handler Thayer have each received

China Voice investor funds. In regards to the China Voice offering, the Handler Thayer escrow accounts are under the control of Powers and the Global Financial escrow accounts are under the control of Powers and Reinschreiber. Since March 2007, the escrow agents have received at least $6.9 million in investor funds from China Voice investors.

40. The escrow agents periodically disburse investor proceeds to China Voice and to numerous accounts for the payment of sales commissions. Most of the accounts to which Powers and Reinschreiber wire commission payments are offshore, located in countries known for their strong bank secrecy laws, such as Switzerland and Cyprus.

41. After receiving a China Voice investor's proceeds, the escrow agent finalizes the transaction by causing a share certificate to be issued to the investor. Some China Voice investors received their share certificates with an accompanying cover letter on Handler Thayer stationery signed by Powers as "Escrow Agent." The letter recites the number of shares purchased by the investor, but makes no mention of sales commissions. On information and belief, Global Financial Management has sent investors their China Voice share certificates with a cover letter falsely indicating that the letters were sent by China Voice. These letters, like those sent by Powers, omit any disclosure of the massive sales commissions.

**Other Boiler Room Offerings**

42. The offer and sale of stock in the other Issuers follows the pattern illustrated by the China Voice offering. Investors receive high pressure solicitation phone calls from boiler room sales agents regarding the stock of the Issuer. Although the solicitations vary from investor to investor and from agent to agent, they uniformly

14

involve typical boiler room sales tactics targeting elderly British and European citizens. The boiler room operators generally use high pressure sales pitches to create a false sense of urgency about the investment. They frequently present the Issuer's stock as an opportunity to obtain high returns in a short period of time. In some instances, they urge prospective investors to liquidate savings and legitimate investments in order to purchase the Issuer's stock. In other instances, they purport to offer "discounted pricing" on the Issuer's stock, which they claim they can offer because of their firm's bulk purchase of such shares.

43.     After an individual agrees to invest in the stock of an Issuer, he is provided with a SPA similar to the SPA provided to China Voice investors. The SPA's falsely state that investors pay no commissions; falsely assert that the investor's "Total Consideration" is provided to the Issuer or maintained on the Issuer's behalf; and falsely represent that "transaction fees" are limited to no more than 1% of the investment. On information and belief, these SPA's are provided to investors through the Distribution Agent Defendants.

44.     As with China Voice, investors in the other Issuers are told to fax the first page and executed signature page of their SPA's to certain phone numbers within the United States. There is generally no individual or entity associated with the fax numbers. In fact, the fax numbers are established by one or more of the Defendants through an e-fax service that converts investor faxes into PDF's that are automatically e-mailed to the e-mail addresses designated by the customer, typically one or more of the Defendants.

45.     Investors in the stock offered by the Issuers other than China Voice have wire-transferred their investment funds to bank and brokerage accounts maintained in the

names of the designated escrow agents, Handler Thayer and Global Financial, and controlled by Powers and Reinschreiber. The escrow agents, through Powers and Reinschreiber, are then responsible for the disbursement of investor funds to the Issuers and the various parties receiving commissions.

46. The escrow agents regularly send share certificates for Issuer stock to the investors. In many cases, the share certificate is accompanied by a letter from the escrow agent. Powers regularly sends share certificates to investors with a cover letter on Handler Thayer stationery and signed by Powers as "Escrow Agent." On information and belief, Global Financial Management also sends share certificates to investors with a letter that falsely indicates that it comes from the Issuer. The letters sent to investors make no disclosure of the commissions unknowingly paid by the investors.

47. The disbursement of investor proceeds for the other Issuers is substantially similar to the breakdown of investor proceeds reflected in the China Voice distribution agreements. The escrow agents' bank and brokerage account records reflect that more than 60% of the investor proceeds pay sales commissions. These payments are generally made to bank accounts maintained in countries with strong bank secrecy laws. Less than 40% of investor proceeds are directed to the Issuers.

**The Relief Defendants' Receipt of Ill-Gotten Gains**

48. Von Hase and CTA Worldwide have each received a significant sum of investor proceeds through payment made by the Escrow Agent Defendants. These investor proceeds represent undisclosed sales commissions from the boiler room scheme. Neither von Hase nor CTA Worldwide has any legitimate claim to the funds that they have received, nor have they provided any services to justify the receipt of such funds.

**The Scheme Is Ongoing**

49.     Since March 2007, Defendants' scheme has raised at least $44.2 million from more than 1,400 investors.  On information and belief, Defendants began their scheme earlier than March 2007, involving more stocks than those of the Issuers set forth above.

50.     This scheme is ongoing.  Individuals continue to receive solicitation calls and continue to invest their funds in stocks sold by the Distribution Agent Defendants.  In November and December 2008 alone, the scheme raised at least $1.2 million from unsuspecting investors.

## COUNT I

## VIOLATIONS OF SECTION 17(A)(1) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(1)]

### (Against Defendants Benger, Meyers,
### SHB Capital and International Capital)

51.     Paragraphs 1 through 50 are realleged and incorporated by reference.

52.     Benger, Meyers, SHB Capital and International Capital, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, singularly or in concert, directly or indirectly employed devises, schemes or artifices to defraud.

53.     The shares of the Issuers are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78(b)(10)].

54.     Benger, Meyers, SHB Capital and International Capital knowingly or recklessly engaged in the fraudulent conduct described above.

55.     By reason of the foregoing, Benger, Meyers, SHB Capital and International Capital violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

## VIOLATIONS OF SECTIONS 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

### (Against Defendants Benger, Meyers, SHB Capital and International Capital)

56.     Paragraphs 1 through 50 are realleged and incorporated by reference.

57.     Benger, Meyers, SHB Capital and International Capital, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, singularly or in concert, have obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon purchaser of securities.

58.     The shares of the Issuers are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78(b)(10)].

59.     Benger, Meyers, SHB Capital and International Capital knowingly or recklessly engaged in the fraudulent conduct described above.

60. By reason of the foregoing, Benger, Meyers, SHB Capital and International Capital violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT III

**VIOLATIONS OF SECTION 10(B) OF THE
EXCHANGE ACT AND RULE 10B-5 THEREUNDER
[15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]**

**(Against Defendants Benger, Meyers, SHB Capital and International Capital)**

61. Paragraphs 1 through 50 are realleged and incorporated by reference.

62. Benger, Meyers, SHB Capital and International Capital, in connection with the purchase or sale of securities, directly or indirectly, singularly or in concert, by the use of the means or instrumentalities of interstate commerce or of the mails: (a) used or employed a device, scheme, or artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon the purchasers and prospective sellers of such securities.

63. Benger, Meyers, SHB Capital and International Capital knowingly or recklessly engaged in the fraudulent conduct described above.

64. The shares of the Issuers are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78(b)(10)].

65.     By reason of the foregoing, Benger, Meyers, SHB Capital and International Capital violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV

### AIDING AND ABETTING VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]

#### (Against Defendants Powers, Reinschreiber and Global Financial)

66.     Paragraphs 1 through 50 are realleged and incorporated by reference.

67.     Benger, Meyers, SHB Capital and International Capital, have violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

68.     By their conduct described herein, Powers, Reinschreiber and Global Financial each provided knowing and substantial assistance to Benger, Meyers, SHB Capital and International Capital in their unlawful conduct alleged in paragraphs 1 through 50 above.

69.     Powers, Reinschreiber and Global Financial aided and abetted Benger, Meyers, SHB Capital and International Capital's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT V

### VIOLATIONS OF SECTION 15(A) OF THE EXCHANGE ACT [15 U.S.C. § 77o(a)]

#### (Against Defendants Benger, Meyers, Powers, Reinschreiber, SHB Capital, International Capital, Global Financial, and Handler Thayer)

70.     Paragraphs 1 through 50 are realleged and incorporated by reference.

71.     Defendants Benger, Meyers, Powers, Reinschreiber, SHB Capital, International Capital, Global Financial, and Handler Thayer, by the conduct described above, directly or indirectly, singularly or in concert, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without registering with the Commission as a broker or dealer.

72.     The shares of the Issuers are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78(b)(10)].

73.     By engaging in the conduct described in above, Benger, Meyers, Powers, Reinschreiber, SHB Capital, International Capital, Global Financial, and Handler Thayer, violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**COUNT VI**

**EQUITABLE CLAIM WITH RESPECT TO RELIEF DEFENDANTS**

**(Regarding Relief Defendants CTA Worldwide Services, SA
and Stephan Gottfried Van Hase)**

74.     Paragraphs 1 through 50 are realleged and incorporated by reference.

75.     Relief Defendants, directly or indirectly, received funds or benefited from the use of such funds, which are the proceeds, or are traceable to the proceeds, of the unlawful activity alleged above.

76.     Relief Defendants have no legitimate claim to these funds that they received or from which they otherwise benefited, directly or indirectly.

77.     Relief Defendants have been unjustly enriched by their direct or indirect receipt of or benefit from investor funds.

78.     The Commission is entitled to an order requiring Relief Defendants to disgorge all of the proceeds of investor funds that they received or from which they benefited, either directly or indirectly.

### REQUESTS FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Find that each Defendant committed the violations alleged herein;

B.      Enter Orders of Permanent Injunction as to each Defendant, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining:

    1.      Benger, Meyers, SHB Capital and International Capital, from violating Section 17(a)(1), (2) and (3) of the Securities Act, Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5 promulgated thereunder;

    2.      Powers, Reinschreiber and Global Financial from aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and from violating Section 15(a) of the Exchange Act; and

    3.      Handler Thayer from violating Section 15(a) of the Exchange Act.

C.      Enter an Order requiring Defendants to disgorge all ill-gotten gains resulting from their participation in the conduct described above, including pre-judgment interest.

D.      Enter an Order requiring Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

E.      Enter an Order barring Defendants from participating in any offering of penny stock pursuant to 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act [15 U.S.C. §§ 77t(g) and 78u(d)(6)].

F.      Enter an Order requiring Relief Defendants to disgorge all funds they received from Defendants' ill-gotten gains or by which they have been unjustly enriched, including all investor funds transferred to them or used for their benefit, including prejudgment interest thereon.

G.      Enter an Order appointing a Receiver over Benger, Meyers, Reinschreiber, Powers, SHB Capital, International Capital, Global Financial and other entities under these Defendants' ownership or control.

H.      Grant such other and further equitable relief as this Court deems appropriate and necessary.

### JURY TRIAL DEMAND

The Commission requests a trial by jury.

Dated: February 3, 2009

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

_____
By: One of its Attorneys

Jonathan S. Polish (Illinois Bar No. 6237890)
John E. Birkenheier (Illinois Bar No. 6270993)
John J. Sikora, Jr. (Illinois Bar No. 6217330)
Kent W. McAllister (Northern District of Illinois Bar No. 90785656)
Eric A. Celauro (Illinois Bar No. 6274684)
UNITED STATES SECURITIES
  AND EXCHANGE COMMISSION
175 W. Jackson Blvd.
Suite 900
Chicago, Illinois 60604
(312) 353-6884