IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | |
| STEFAN H. BENGER, SHB CAPITAL, INC., ) JASON B. MEYERS, INTERNATIONAL ) CAPITAL FINANCIAL RESOURCES, LLC, ) PHILIP T. POWERS, HANDLER, ) THAYER & DUGGAN, LLC, FRANK I. ) REINSCREIBER, AND GLOBAL ) FINANCIAL MANAGEMENT, ) ) | Case No. 09 CV 676<br><br>Judge Joan H. Lefkow |
| Defendants, ) ) | |
| CTA WORLDWIDE SERVICES, S.A., and ) STEPHEN VAN HASE, ) ) | |
| Relief Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, United States Securities and Exchange Commission ("SEC"), brought this action for violations of the Securities Act of 1933 ("Securities Act"), codified at 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. §§ 78a *et seq.*, and equitable relief in connection with allegedly fraudulent Regulation S securities offerings.[1] CTA Worldwide Services, SA ("CTA") and Stephan Von Hase ("Von

---

[1] Count I alleges violations of Section 17(A)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), against defendants identified in the text below as "Distribution Agents." Count II alleges violations of Sections 17(A)(2) and 17(A)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3), against the Distribution Agents. Count III alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against the Distribution Agents. Count IV alleges aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against defendants identified in the text as "Escrow Agents." Count V alleges violations of Section 15(a)

(continued...)

1

Hase") are foreign citizens alleged to have received in excess of $2.2 million in profits from the offerings. Von Hase and CTA now move to dismiss the complaint for lack of subject matter and personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2). For the following reasons their motion to dismiss [#70] is denied.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction and a motion under 12(b)(2) challenges the court's personal jurisdiction. The burden of proof on jurisdictional challenges, under either Rule 12(b)(1) or 12(b)(2), is on the party asserting jurisdiction. *United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003); *RAR, Inc.* v. *Turner Diesel,* 107 F.3d 1272, 1276 (7th Cir. 1997).

In determining whether subject matter jurisdiction exists, the court must accept all well-pleaded facts alleged in the complaint and draw all reasonable inferences from those facts in the plaintiff's favor. *Sapperstein* v. *Hager*, 188 F.3d 852, 855 (7th Cir. 1999). "When evidence pertinent to subject matter jurisdiction has been submitted, however, 'the district court may properly look beyond the jurisdictional allegations of the complaint . . . to determine whether in fact subject matter jurisdiction exists.'" *Id.* at 855 (quoting *United Transp. Union* v. *Gateway W. Ry. Co*., 78 F.3d 1208, 1210 (7th Cir. 1996) (internal citations omitted).

Similarly, "[i]n considering whether it has personal jurisdiction, the court may review affidavits submitted by the parties." *Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). "[W]hen the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary

---

[1](...continued)
of the Exchange Act, 15 U.S.C. § 77o(a), against the Distribution Agents and the Escrow Agents. Count VI alleges an equitable claim with respect to the parties identified in the text as Relief Defendants.

hearing . . . . the plaintiff 'need only make out a *prima facie* case of personal jurisdiction.'" *Id.* at 782 (quoting *Hyatt Int'l Corp.* v. *Coco,* 302 F.3d 707, 713 (7th Cir. 2002)). "In evaluating whether the *prima facie* standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Id.* (quoting *Nelson* v. *Park Indus.,* 717 F.2d 1120, 1123 (7th Cir. 1983)).

## BACKGROUND[2]

From March 2007 to February 2009, the defendants in this action raised $44.2 million dollars by selling Regulation S[3] securities to more than 1,400 foreign investors. The SEC contends that the offerings were fraudulent because defendants failed to disclose to investors that less than one-third of their investment funds would be used to purchase the securities while two-thirds were to be received by the defendants as a commission.

### I. The Regulation S Offerings[4]

Three sets of defendants are involved in this case: Stefan H. Benger ("Benger"), SHB Capital, Inc. ("SHB"), Jason B. Meyers ("Meyers"), and International Capital Financial Resources, LLC ("International Capital") are collectively referred to as the Distribution Agents. Benger is the president of SHB and Meyers is the president of International Capital. The Distribution Agents are all Illinois citizens who operated out of their offices in Chicago. From

---

[2] The facts in this section are undisputed, except as noted, and taken from the complaint, as well as the parties' written submissions.

[3] Regulation S governs the applicability of the registration requirements of the Securities Act to offshore transactions. It provides that stock is exempt from the registration requirements of Section 5 when (1) the offer or sale is made in an offshore transaction; (2) no directed selling efforts are made in the United States by the issuer, a distributor, any of their respective affiliates, or any person acting on behalf of the foregoing; and (3) certain additional conditions are met. 17 C.F.R. § 230.903.

[4] The complaint alleges that the allegations specific to the China Voice offering are representative of how each of the offerings at issue was structured. Compl. ¶¶ 25-42. Accordingly, the court uses the allegations and evidence submitted by the SEC regarding China Voice offering, where indicated, to generally describe all of the offerings at issue.

3

there, they entered into distribution agreements with certain issuers (not parties to this law suit) to sell stock to foreign investors for commissions in excess of 60 percent of the invested funds. Philip T. Powers ("Powers"), Handler, Thayer & Duggan, LLC ("Handler, Thayer"), Frank I. Reinschreiber ("Reinschreiber"), and Global Financial Management ("Global Financial"), collectively referred to as the Escrow Agents, assisted the Distribution Agents.[5] The Escrow Agents, also Illinois citizens based in Chicago, were responsible for collecting the investors' share purchase agreements and their payments and then distributing the proceeds of the sales. CTA and Von Hase, collectively referred to as Relief Defendants, received some of those proceeds.

The Distribution Agents offered penny stocks[6] issued by China Voice Holding Corp., Integrated Biodiesel Industries, Ltd., Biomoda, Inc., Pharma Holdings Inc., World Energy Solutions, Inc., Revolutions Medical Corp., Earthsearch Communications, Inc., and Essential Innovations Technology (collectively, "issuers"). All of the issuers are incorporated in or have administrative offices within the United States.[7] The Distribution Agents entered into distribution agreements with each issuer. The distribution agreements provided that the Distribution Agents would offer the issuers' stock to foreign investors in exchange for sales commissions exceeding 60 percent of the proceeds of the investment. *See, e.g.*, ¶ 2.2 of the distribution agreement used in the China Voice offering, Docket No. 11, Ex. 8.[8] Each

---

[5] Powers works for Handler, Thayer & Duggan, LLC. Reinschreiber is a principal of Global Financial.

[6] The SEC alleges that penny stock is an equity traded at a price of less than five dollars per share. Compl. ¶ 20.

[7] Integrated Biodiesel purports to be formed under the laws of "St. Vincent Grenadine," but uses Benger's office in Chicago as an administrative office. It has also opened an office in Baltimore, MD. Declaration of Jonathan S. Polish, Exs. 12-13, 18 [Docket No. 93] ("Polish Decl.").

[8] ¶ 2.2 provides in pertinent part

(continued...)

distribution agreement included an escrow agreement between one of the Escrow Agents and issuers that outlined the role of the escrow agent in the Regulation S offering. The escrow agreements provided that the specified escrow agent was to be compensated in the amount of $5,000 or 1% of the gross proceeds of the sale. *See, e.g.*, ¶ 6 of the escrow agreement used in the China Voice offering, Docket No.11, Ex. 8.

The Distribution and Escrow Agents did not offer the issuers' stock directly to foreign investors. Rather, the Distribution Agents retained foreign sales agents to make cold calls to prospective investors and to employ high-pressure tactics to secure their investment. SEC calls them "boiler room agents." The boiler room agents targeted elderly British and European citizens. Although many of the boiler room agents were on warning lists compiled by the United Kingdom's Financial Services Authority, they represented to prospective investors that they worked for legitimate brokerage firms in the United Kingdom. The high-pressure tactics used included falsely representing that the price of the stock being offered was about to rise sharply, urging potential investors to liquidate savings and other investments, purporting to offer discounted pricing, and, on at least one occasion, threatening to sue investors if they did not purchase the full amount of shares initially agreed upon. During the calls, the boiler room agents either failed to disclose that commissions in excess of 60 percent would be charged or told prospective investors that only nominal transaction fees would be charged.

---

[8](...continued)
> The Issuer shall receive an amount equal to 37 ½% of the Proceeds from each accepted offer . . . . and the balance shall be paid to the Distribution Agent. The Issuer shall be responsible for the costs of the Escrow Agent and any other costs and expenses of the Placement. The Distribution Agent shall be responsible for all other costs of the Distribution including the fees of any subagents, introducing parties or finders.

Once the boiler room agents had secured an investment, the investors were sent a share purchase agreement ("SPA") to confirm their stock purchase.[9] Von Hase admitted in his deposition that Escrow Agents in the United States created the SPAs. Von Hase Dep. 103-04, Ex. 1 to Polish Decl. The SPAs did not disclose that the commission charged exceeds 60 percent of the total consideration paid by the investors. For example, the SPAs used in China Voice's Regulation S offering contained two types of charts, both of which are captioned "Transaction Information - Price and Shares." *Id.*; Docket No. 11, Ex. 3. The charts detailed the purchase price per share, the number of shares being purchased, the transaction fee and the total consideration to be paid for the shares. *Id*. One chart indicated that a $50 transaction fee was charged and the other that a transaction fee of "1% of the cost of shares" was charged. *Id*. Both SPAs included the following provision:

> Brokers or Finders  No person has or will have, as a result of transactions contemplated by this Agreement, any right, interest or valid claim against or upon the Purchaser for any commission, fee or other compensation as a finder or broker because of any act or omission by [China Voice], and/or its agents.

*Id*. The SPAs instructed investors to sign and fax the signature page to a phone number in the United States and to wire their payment to a United States bank or brokerage account maintained by one of the Escrow Agents. After an investor's SPA and payment was received, the designated Escrow Agent sent the investor a share certificate. Sometimes the share certificate was accompanied by a letter signed by one of the Escrow Agents. The letters did not disclose the commissions charged.

---

[9] The SEC does not specify who sent the SPAs to the investors. Von Hase indicated during his deposition that the boiler room agents sent them. Deposition of Stephan Von Hase, Feb. 19, 2009, at 101, Ex. 1 to Polish Decl. ("Von Hase Dep.").

### B. The Distribution of Funds

After deducting their fee, the Escrow Agents distributed the payments received from investors pursuant to the relevant distribution agreement. Of the $44.2 million raised in the offerings, the SEC alleges that $29 million (or 74.5%) was paid to the Distribution and Escrow Agents in commission while only $11.3 million (or 25.5%) was invested in the issuers' stock. The Escrow Agents sent the commissions raised to offshore bank and brokerage accounts. Some of these offshore accounts were controlled by the Relief Defendants. At the time the suit was filed, CTA was alleged to have received in excess of $2.2 million dollars in an account held in the Bahamas and Von Hase was alleged to have received in excess of $292,000 in an account held in Switzerland.

## II. The Relief Defendants' Contacts with the United States

### A. Von Hase

Von Hase is a German national and a permanent resident of the Bahamas. He is the sole owner and officer of CTA. Since either 2006 or 2007, Von Hase has maintained a year-round lease on an apartment located at 510 West Erie Street in Chicago. Prior to that time he rented a studio in Marina Towers, also in Chicago. Von Hase asserts that he spends less than 90 days a year in Chicago. Von Hase Decl. ¶ 3. Von Hase currently keeps three cars and two motorcycles in the United States. All but one of the vehicles (a motorcycle registered in Florida) are registered in Illinois and kept at his apartment on West Erie. Von Hase maintains a cellular phone number in the United States with a (312) area code. In a 2007 business proposal, Von Hase stated that he established "permanent residency in Chicago" in 1998, and, from 1998 to 2001, was associated with the Chicago office of Professional Market Brokerage, Inc., an online brokerage company, of which Benger was the Chief Executive Officer. Polish Decl., Ex. 5.

In 1999, Von Hase founded an investment company called Marblehead Financial Group, Inc. ("Marblehead"). Marblehead is incorporated in Illinois, is in good standing with the Illinois Secretary of State, and is registered with the Illinois Department of Securities as an investment advisor. Von Hase is the president of Marblehead but claims that it has been inactive since 2000 or 2001 and was not involved in the sale of any securities at issue in this case. Von Hase Dep. 21-22; Von Hase Decl. ¶ 4. A February 2007 business proposal and an October 2008 email to Reinschreiber requesting that he wire $40,000 (against a sum due CTA) to Marblehead's account with Harris Bank N.A. in Chicago, show, however, that Marblehead was active as recently as 2007 and that it received some of the investor funds at issue in this case from one of the Escrow Agents. Polish Decl., Exs. 5, 15. Because the court must resolve any disputed facts in favor of the plaintiff, the court will accept as true the SEC's allegations regarding Marblehead.

    **B.**     **CTA**

CTA is a Bahamanian financial services corporation with its principal place of business in Nassau, Bahamas. In 2006, CTA purchased a block of stock from Pharma, one of the United States issuers whose stock was sold in the allegedly fraudulent offerings. Paragraph 5.8 of CTA's agreement with Pharma provided that disputes arising between parties to the agreement were to be arbitrated in Illinois and governed and construed according to Florida law. Polish Decl., Ex. 6. CTA offered Pharma stock to at least one potential foreign investor and sent the investor an agreement confirming his stock purchase, even though he had declined to invest. Like the SPAs used in the Regulation S offerings at issue, the confirmation directed the potential investor to wire his payment to Handler, Thayer's account in Chicago.

In March 2008, a division of CTA[10] contracted with Anderson & Associates, A.G.,[11] a Panamanian company, to purchase its distribution agent business[12] with five of the eight issuers involved in this case.[13] Paragraph 7e of the agreement provides that it is to be governed by Illinois law. CTA also sought to retain sales agents to offer their stock. *See, e.g.*, Polish Decl., Ex. 14. In a March 29, 2008 email to a sales agent, Von Hase represented the following regarding CTA's distribution business

1. The admin office is in Chicago. Global Financial Services . . . . coordinates and handle[s] accounting, commission and direct[s] the issuing process. You will have access to Cindy and Sonja working exclusively for CTA, and Frank Reinschreiber CPA, and MD[.]

2. The escrow agent is in Chicago. Duggan, Handler and Thayer, a renown[ed] Law firm, [] assures that everything works professional[ly] and smooth[ly.]

3. The escrow accounts are with US banks in Chicago[.]

*Id.* CTA subsequently entered into escrow agreements with the five issuers for which Anderson & Associates had acted as a distribution agent. Paragraph 11 of each escrow agreement provided that it shall be governed according to Illinois law. *See* Polish Decl., Exs. 8-11, 18.

---

[10] The contract was executed by CTA World Group SA. *See* Polish Decl., Ex. 7. CTA Group SA does nothing distinct from CTA Worldwide. Von Hase Dep. 34-36.

[11] Benger is the president of Anderson & Associates and represented it in contract negotiations with CTA. Von Hase Dep. 74-75.

[12] Pursuant to the contract, CTA World Group S.A. acquired from Anderson & Associates access to international sales agents; all future revenue streams; all client contracts on the issuer side; all goodwill associated with such client contracts; all contracts relating to the performance of escrow and administrative duties by outside third parties; and all revenue streams relating to its current business. Polish Decl., Ex.7.

[13] The five issuers are China Voice, World Energy Solutions, Earthsearch Communications, Essential Innovations and Integrated Biodiesel. Von Hase Dep. 74-76.

# ANALYSIS

## I. Subject Matter Jurisdiction

Subject matter jurisdiction must be addressed at the threshold because "[e]nsuring the existence of subject-matter jurisdiction is the court's first duty in every lawsuit." *McReady* v. *White*, 417 F.3d 700, 702 (7th Cir. 2005). The Relief Defendants contend that subject matter jurisdiction does not exist in this case because the allegedly fraudulent misrepresentations and omissions were made by foreign sales agents to foreign investors and therefore fall outside the ambit of the United States' securities laws. The SEC contends that the securities laws apply to the Distribution and Escrow Agents' conduct because they conceived of and executed their plan to perpetrate the alleged fraud from the United States.

Subject matter jurisdiction is determined solely on the SEC's evidence regarding the conduct of the Distribution Agent and Escrow Agent defendants, as the Relief Defendants, so far, have not been accused of wrongdoing. *See S.E.C.* v. *Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) ("[T]here is no claim against [a nominal defendant] and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established.") (citing *Farmers' Bank* v. *Hayes*, 58 F.2d 34, 36 (6th Cir. 1932) ("A garnishee or stakeholder is a merely nominal party whose citizenship will not effect [*sic*] the question of [diversity] jurisdiction.")).

Both parties rely on *Kauthar SDN BHD* v. *Sternberg*, 149 F.3d 659 (7th Cir. 1998) as authoritative. There the court addressed in a similar context the "the extent to which the antifraud provisions of the securities laws apply to securities transactions that are predominantly extraterritorial in nature but have some connection to the United States." *Id*. The court held that where the foreign plaintiff "alleged that the defendants conceived and planned a scheme to defraud [it] in the United States, that they prepared materials in support of the scheme to solicit the payment in the United States and sent those materials from the United States via the United

States mail, and that they received in the United States the fraudulently solicited payment for the securities–the final step in the alleged fraud," the allegations were sufficient to bring the alleged conduct within the ambit of the securities laws. *Id*. at 667.

*Kauthar* teaches that the court should "focus on whether the activity in question has had a sufficient impact on or relation to the United States, its markets or its citizens to justify American regulation of the situation." *Id*. at 665. To paraphrase *Kauthar*, this entails the joint assessment of the alleged domestic *conduct* and the *effects* on the United States resulting from the foreign conduct relating to the transaction at issue. *Id*. at 665 n.8. As in *Kauthar*, this case does not involve "actions occurring in foreign countries that have caused foreseeable and substantial harm to interests in the United States." *Id*. at 665 (quoted citations omitted). As in *Kauthar*, the inquiry is of the domestic conduct of the Distribution and Escrow Agents occurring in the United States. *Kauthar* states that federal courts have jurisdiction where "the conduct occurring in the United States directly causes the plaintiff's loss in that the conduct forms a substantial part of the alleged fraud and is material to its success."[14] *Id*. at 667. The defendants' domestic conduct "must be more than merely preparatory in nature" but need not "itself satisfy the elements of a securities violation." *Id*. at 667. The rationale behind exercising jurisdiction under the conduct approach is to "ensur[e] that the United States is not used as a 'base of operations' from which to 'defraud foreign securities purchasers or sellers.'" *Id*. (quoting *SEC* v. *Kasser*, 548 F.2d 109, 116 (3d Cir. 1977)). "This interest is amplified by the fact that the we live in an increasingly global financial community." *Id*. at 667.

Like the defendants in *Kauthar*, the Distribution and Escrow Agents are alleged to have conceived of and planned in the United States a scheme to defraud foreign investors, prepared

---

[14] In formulating its rule regarding the type of conduct necessary to support subject matter jurisdiction over transnational securities transactions, the Seventh Circuit endorsed the Second and Fifth Circuits' approaches. *Kauthar*, 149 F.3d at 666-67.

11

materials in support of the scheme in the United States, and received fraudulently solicited payments in the United States. The alleged boiler room scheme began with the Distribution Agents' entering into distribution agreements with the issuers, all but one of which were based in the United States. The Distribution Agents then retained the boiler room agents to solicit foreign investors and instructed them to misrepresent the commission to be charged. Once an investment was secured, SPAs were sent to investors from the United States, signed, and faxed back to the United States. The investment funds were then wired by investors to bank or brokerage accounts maintained by the Escrow Agents in the United States.

The Relief Defendants contend that the domestic conduct alleged in this case is insufficient to support the court's exercise of subject matter jurisdiction because the alleged misrepresentations in this case did not occur in the United States, but overseas, when the boiler room agents solicited foreign investors over the telephone. Although the conversations between the boiler room agents and the investors occurred overseas, the Distribution Agents, who operated out of Chicago, retained the boiler room agents and instructed them to disseminate false information. Thus, those misrepresentations are attributable to the Distribution Agents' allegedly fraudulent conduct which was masterminded in the United States. Similar examples are found in *S.E.C.* v. *Berger*, 322 F.3d 187, 195 (2d Cir. 2003) (affirming district court's assertion of subject matter jurisdiction where fraudulent conduct was carried out by the defendant entirely in New York, even though false monthly account statements were prepared and mailed at the defendant's instruction from Bermuda); *S.E.C.* v. *Wolfson*, No. 03-cv-914, 2003 WL 23356418, at *18 (D. Utah Dec. 10, 2003) (asserting subject matter jurisdiction where some false statements were made by foreign boiler agents to foreign investors because the fraudulent conduct was masterminded by defendants, mostly American citizens, in the United States). *Cf. In re Scor Holding*, 537 F. Supp. 2d 556, 566 (S.D.N.Y. 2008) (granting motion to dismiss claims of foreign plaintiffs against a

Swiss corporation because "the essential acts constituting the alleged fraud and the bulk of all the fraudulent activity took place in Switzerland" and the fraud was "masterminded" in Switzerland, where "[t]he key decisions underlying the misrepresentations were made").

Moreover, the verbal misrepresentations made by the boiler room agents are not the only misrepresentations at issue in this case. The SEC alleges, and the Relief Defendants do not contest, that the SPAs' failure to disclose the 60+ percent commission misled investors to believe that they were paying only a nominal commission fee. *See* Compl. ¶¶ 3-4, 27-32, 43. These key misrepresentations were contained in documents which the Relief Defendants admit were created and prepared by the Escrow Agents in the United States. Thus, based on the allegations of the SEC's complaint and the uncontroverted evidence submitted in opposition to this motion, the conduct of the Distribution and Escrow Agents falls within the ambit of American securities laws and this court's subject matter jurisdiction.

## II.     Personal Jurisdiction

The Relief Defendants contend that their contacts with the United States are insufficient to establish personal jurisdiction. The SEC premises jurisdiction under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, both of which authorize nationwide service of process.[15] Because these sections provide for nationwide

---

[15] 15 U.S.C. § 77v provides, in pertinent part,

> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of offenses and violations under this subchapter . . . . Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and *process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found*.

service of process, they "confer[] personal jurisdiction in federal court over defendants with minimum contacts with the United States, as long as the mandates of constitutional due process are met." *Zurich Capital Markets, Inc.* v. *Coglianese*, 388 F. Supp. 2d 847, (N.D. Ill. 2004) (collecting cases); *see also S.E.C.* v. *Montle*, 65 Fed. Appx. 749, 751 (2d Cir. 2003); *S.E.C.* v. *Knowles*, 87 F.3d 413, 417 (10th Cir. 1996). Accordingly, the court must determine whether exercising personal jurisdiction over the Relief Defendants would offend the due process clause of the Fifth Amendment.

Federal due process limits when a federal court may assert personal jurisdiction over foreign individuals and corporations. *Turner Diesel*, 107 F.3d at 1277. The defendant must have "certain minimum contacts with [the United States] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). This standard has different implications depending on whether the federal government is asserting "specific" or "general" jurisdiction over a defendant. *Id.* at 1277. When the suit "aris[es] out of or [is] related to the defendant's contacts with the forum, the federal government is exercising 'specific jurisdiction'

---

[15](...continued)
    *Id.* (emphasis added). 15 U.S.C. § 78aa provides the same, stating in pertinent part,

> The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter . . . . Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and *process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found*.

    *Id.* (emphasis added).

14

over the defendant." *Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). "To establish specific jurisdiction under the familiar 'minimum contacts' analysis, a plaintiff must show that a defendant has purposefully availed itself of the privilege of conducting activities within the forum." *Jennings* v. *AC Hydraulic A/S*, 383 F.3d 546 (7th Cir. 2004) (citing *Asahi Metal Indus. Co.* v. *Superior Court of California*, 480 U.S. 102, 108, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)). In contrast, when contacts with the forum are "unrelated to the subject matter of the lawsuit, general personal jurisdiction may be established if the defendant's contacts are so continuous and systematic that the defendant could reasonably foresee being haled into court in [the United States] for any matter." *Cent. States* v. *Phencorp Reinsurance Co.*, 440 F.3d 870, 875 (7th Cir. 2006) (citing *Helicopteros*, 466 U.S. at 414).

    **A.**    **Minimum Contacts**

In regard to Von Hase, the SEC has submitted evidence showing that he (1) has maintained a year-round lease on an apartment in Chicago since before 2007; (2) has three cars and two motorcycles registered in the United States; (3) has a cell phone with a (312) area code; (4) was associated with the Chicago office of an online brokerage company run by Benger, an Illinois resident; and (5) is the president of an investment firm that is incorporated and registered in Illinois and that received investor funds derived from the Regulation S offerings at issue in this lawsuit. In regard to CTA, the SEC has submitted evidence showing that it (1) entered into an agreement to purchase stock from one of the issuers involved in this action; (2) negotiated a contract with Benger to purchase the distribution agent business of five of the eight issuers involved in this action, all of which are incorporated or have administrative offices in the United States; (3) entered into escrow agreements with the same five issuers; (4) secured Illinois or

15

Florida governing law provisions in each of the foregoing agreements; and (5) used Chicago escrow agents to facilitate the distribution and sale of the issuers' stock.

These facts show that Von Hase spends a significant amount of time in the United States each year,[16] that both he and CTA continually conduct business in the United States and in doing so, have sought to benefit from its laws. The SEC's evidence is more than sufficient to make a *prima facie* showing that Von Hase and CTA each maintained continuous and systematic contacts with the United States, some of which are related to Regulation S offerings at issue in this case. *See Zurich*, 388 F. Supp. at 858-59 (finding personal jurisdiction existed over corporations that communicated with American citizens regarding the funds at issue, advertised in the United States, dealt with major banks and money managers in the United States, and maintained accounts at brokerage firms in the United States; and finding personal jurisdiction over individuals who communicated with co-defendants in the United States, frequently visited the United States, were licensed to do business in the United States and directed wire transfers to United States' banks); *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 474-79 (S.D.N.Y. 2001) (finding general personal jurisdiction existed over defendants which conducted business within the United States, derived money from funds managed in the United States, regularly communicated with individuals in the United States via telephone and mail, and traveled to the United States at least five times a year); *CFTC* v. *IBS, Inc.*, 113 F. Supp 2d 830, 853-54 (W.D.N.C. 2000) (finding personal jurisdiction existed where plaintiff showed that individual relief defendants owned property and maintained an office in the United States and where the corporate relief defendants were domestic corporations). Accordingly, the court will exercise general jurisdiction over the

---

[16] Von Hase's assertion that he spends less than 90 days per year in Chicago is unavailing. The court considers 90 days, or approximately three months, to be a significant amount of time and Von Hase has presented no legal authority to the contrary. Moreover, Von Hase's s deposition testimony indicates that he spends time in other parts of the United States in addition to the time he spends in Chicago.

16

Relief Defendants if doing so is "reasonable, *i.e.*, comports with traditional notions of fair play and substantial justice." *Mid-America Tablewares v. Mogi Trading Co.*, 100 F.3d 1353, 1362 (7th Cir. 1996) (citing *Asahi*, 480 U.S. at 113).

### B. Fair Play and Substantial Justice

To determine "the reasonableness of the exercise of personal jurisdiction" the court must consider the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and "the shared interest of the several States in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113. Exercising jurisdiction over the Relief Defendants is reasonable. As the SEC argues, the Relief Defendants frequently sought to profit and benefit from United States laws by conducting business in the United States and entering into contracts which provided the parties were to be governed by United States law. It would not be a burden for the Relief Defendants to defend the suit here because Von Hase, the sole owner and officer of CTA, maintains a permanent residence in Chicago. Finally, as discussed above, the United States has a strong interest in enforcing its securities laws to prevent defendants from using it as a base of operations from which to perpetrate fraud on foreign investors. *See supra* at 11. The court therefore has personal jurisdiction over the Relief Defendants.[17]

---

[17] Although the court's decision is premised on finding that the Relief Defendants have minimum contacts with the United States sufficient to support the exercise of general jurisdiction, exercising specific jurisdiction would likely be appropriate should the SEC seek to make them full defendants by amending its complaint to reflect the newly discovered facts regarding their involvement in the Regulation S offerings at issue.

## CONCLUSION

For the foregoing reasons, the Relief Defendants' motion to dismiss for lack of subject matter and personal jurisdiction [#70] is denied.

Dated:  June 29, 2009	Enter:  _____
	JOAN HUMPHREY LEFKOW
	United States District Judge