IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| STEFAN H. BENGER, SHB CAPITAL, INC., JASON B. MEYERS, INTERNATIONAL CAPITAL FINANCIAL RESOURCES, LLC, PHILIP T. POWERS, HANDLER, THAYER & DUGGAN, LLC, FRANK I. REINSCHREIBER, AND GLOBAL FINANCIAL MANAGEMENT, | ) ) ) ) ) ) ) ) ) Case No. 09 CV 676 Judge Joan H. Lefkow |
| Defendants, | ) ) |
| CTA WORLDWIDE SERVICES, S.A., and STEPHEN VAN HASE, | ) ) ) ) |
| Relief Defendants. | ) |

**OPINION AND ORDER**

Plaintiff, United States Securities and Exchange Commission ("SEC"), brought this action to enforce the Securities Act of 1933 ("Securities Act"), codified at 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. §§ 78a *et seq.*, and for equitable relief in connection with allegedly fraudulent Regulation S securities offerings.[1] The SEC's complaint categorizes the defendants into two primary categories: (1) the

---

[1] Count I alleges violations of Section 17(A)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), against defendants identified in the text below as "Distribution Agents." Count II alleges violations of Sections 17(A)(2) and 17(A)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3), against the Distribution Agents. Count III alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against the Distribution Agents. Count IV alleges
(continued...)

1

Distribution Agents – Stefan H. Benger ("Benger"), SHB Capital, Inc. ("SHB Capital"), Jason B. Meyers ("Meyers"), International Capital Financial Resources, LLC ("International Capital") – who are alleged to have masterminded the alleged fraud; and (2) the Escrow Agents – Philip T. Powers ("Powers"), Handler, Thayer & Duggan, LLC ("Handler Thayer"), Frank I. Reinschreiber, and Global Financial Management, LLC ("Global Financial") – who are alleged to have assisted the Distribution Agents. Powers, one of the Escrow Agents, now moves to dismiss Counts IV and V of the complaint under Federal Rule of Civil Procedure 12(b)(6). Also before the court is the SEC's motion to strike a portion of Powers's reply brief. For the reasons set forth below, Powers's motion to dismiss counts IV and V of the complaint [64] is denied, and the SEC's motion to strike a portion of Powers's reply brief [118] is denied as moot.

## BACKGROUND

This opinion assumes familiarity with the facts of this case as set forth in this court's June 29, 2009 Opinion and Order (Docket No. 144). Only the facts relevant to the current motion will be discussed.

### I. The Alleged "Boiler Room" Scheme

The alleged scheme began when the Distribution Agents entered into agreements with various issuers of Regulation S securities.[2] Under the distribution agreements, the Distribution

---

[1](...continued)
aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against defendants identified in the text as "Escrow Agents." Count V alleges violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o(a), against the Distribution Agents and the Escrow Agents. Count VI alleges an equitable claim with respect to the parties identified in the text as Relief Defendants.

[2] Regulation S exempts securities transactions occurring outside the United States from the ordinary registration requirements for domestically sold securities. 17 C.F.R. § 230.901. Regulation S applies where "(1) The offer or sale is made in an offshore transaction; (2) No directed selling efforts are made in the United States by the issuer, a distributor, any of their respective affiliates, or any person acting on behalf of any of the foregoing;" and (3) some additional conditions are met. 17 C.F.R. § 230.903.

Agents were to receive commissions in excess of sixty percent of the investors' proceeds for sales of securities, which the SEC characterizes as "penny stocks."[3] The Escrow Agents assisted the Distribution Agents pursuant to escrow agreements that corresponded to the distribution agreements at issue and outlined the role of the Escrow Agents in the offering. The Escrow Agents were responsible for collecting the investors' share purchase agreements and their payments and then distributing the proceeds of the sales. The escrow agreements provided that the specified escrow agent was to be compensated in an amount equal to the greater of one percent of the gross proceeds from the sale of all shares or $5,000. *See, e.g.,* Escrow Agreement ¶ 6, attached as Ex. 2 to Powers Mem. in Supp.

In order to generate sales of the penny stocks, the Distribution Agents employed sales agents, whom the SEC refers to as "boiler room agents," located outside the United States. The boiler room agents solicited foreign investors by making cold calls to elderly British and European citizens, using high-pressure sales tactics to encourage investment. During these cold calls, the sales agents also made numerous misrepresentations and omissions by failing to disclose that commissions in excess of sixty percent of the investor's consideration would be charged or by telling prospective investors that only nominal transaction fees would be charged.

After prospective investors agreed to purchase shares, they received a Share Purchase Agreement ("SPA") in the mail. The SPA instructed the investors to wire payment to the designated Escrow Agent and informed them that the Escrow Agent would transmit the share certificates to the investor after the Escrow Agent transferred the total consideration paid by the

---

[3] A "penny stock" is "[a]n equity security that is not traded in established markets, represents no tangible assets, or has average revenues less than required for trading on an exchange. Typically, a penny stock is highly speculative and can be purchased for less than $5 a share." Black's Law Dictionary 1457 (8th ed. 2004).

investor to the Issuer. Specifically, the SPA used in the offering of China Voice Holding Corp. ("China Voice") stock, attached to Powers' memorandum in support of his motion to dismiss, provides under Article 1, "Purchase, Sale and Terms of Shares":

> 2) <u>Closing and Closing Agreements</u>. The Buyer has caused the Purchase Price denominated in dollars to be transferred to the Escrow Agent by wire transfer together with this Agreement, properly executed. *The offer to purchase contained in this Agreement once submitted to the Escrow Agent will become irrevocable and binding subject only to acceptance by the company*. A certificate representing the Shares will be issued by the Company with 21 days of acceptance of this Agreement and will be deposited with the Escrow Agent for transmittal to the Buyer upon transfer of the Total Consideration to the Company.

Art. I ¶ 2, SPA, attached as Ex. 3 to Powers' Mem. in Supp. (emphasis added). The SPA's did not disclose that the commission charged exceeds sixty percent of the total consideration paid by the investors. Rather, they represented that the only fee charged the investor was "a nominal fee of $50 or 1% of cost of shares to cover certificate and mailing costs." Compl. ¶ 32. For instance, "Total Consideration," as represented in the China Voice SPA is the sum of the Purchase Price for the shares bought and the $50.00 "Transaction fee to cover certificate and mailing costs." Art. I ¶ 2, SPA, attached as Ex. 3 to Powers' Mem. in Supp.

## II. Powers' role in the alleged scheme

Powers is an attorney and holds the position of senior counsel at Handler, Thayer. Powers practices "business, corporate, and securities law with an emphasis on domestic and international private equity formation and related transactions." Compl. ¶ 14. His previous experience included acting as "general counsel to broker-dealers and other financial services firms, focusing on domestic regulatory compliance." *Id.* Powers, through Handler, Thayer, agreed to act as the Escrow Agent for many of the penny stock transactions that are the basis of this litigation. In addition to his law practice, Powers also serves as a principal of Global

4

Financial, a finance management company that offers a complete line of escrow services. Global Financial served as an escrow agent for some of the Regulation S offerings at issue.

Handler, Thayer was the escrow agent designated in several of the distribution agreements between the Distribution Agents and Issuers, including that between SHB Capital and China Voice. Pursuant to those distribution agreements where Handler, Thayer was the Escrow Agent, Powers was designated as the firm's authorized agent, and as such, maintained control of the bank and brokerage accounts to which investors wired their funds ("Escrow Accounts"). Powers received the signed SPAs and the investment money from the foreign investors and distributed the monies according to the relevant escrow agreement. This resulted in more than sixty percent of the investors' funds being paid as sales commissions to the designated Distribution Agent, and less than forty percent going to the designated Issuer. Powers deposited most of these commissions into bank accounts located in countries known for strong bank secrecy laws, such as Switzerland and Cyprus. Powers was also responsible for sending the share certificates to the foreign investors. He often sent an accompanying letter with the share certificate written on Handler, Thayer stationery and signed by Powers as "Escrow Agent." The letter stated the amount of shares purchased by the investor but did not disclose the sales commissions. As compensation for his duties as escrow agent, Powers received the greater of one percent of the gross proceeds from the sale of all shares or $5,000. At no time while functioning as an escrow agent did Powers register with the SEC as a broker or dealer.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). For the purposes of a Rule

12(b)(6) motion, the court takes as true all well-pleaded facts in plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977-78 (7th Cir. 1999). Factual allegations must, however, be enough to raise a right to relief above the speculative level. *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-236 (3d ed. 2004)); *see also Ashcroft* v. *Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1953, 173 L. Ed. 2d 868 (2009) (*Twombly* expounded the pleading standard for all civil actions). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Allegations of fraud are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means that the plaintiff must plead the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). "Rule 9(b) should be applied with an eye toward fulfilling the Rule's underlying purposes: '(1) to inform the defendants of claims against them and to enable them to form an adequate defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations.'" *Gelco Corp.* v. *Duval Motor Co.*, No. 02 C 5613, 2002 WL 31875537, at *6 (N.D. Ill. Dec. 26, 2002) (quoting *Fujisawa Pharm. Co., Ltd.* v. *Katpoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993)). Where the fraudulent scheme occurred over a period of

time, the requirements of Rule 9(b) may be less stringently applied. *See Gelco*, 2002 WL 31875537, at *6.

## ANALYSIS

### I. Aiding and Abetting Violations of Section 10(b) and Rule 10b-5 (Count IV)

Count IV of the complaint alleges that Powers aided and abetted a violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[4] The SEC alleges that Powers may be held liable under an aiding and abetting theory of liability because he provided "substantial assistance with either knowledge of the material misrepresentations and omissions concerning commissions, or with a reckless disregard of the fraud." Compl. ¶ 5. Powers argues that such allegations are insufficient because they misstate the requisite level of scienter and because the SEC has failed to plead facts sufficient to support the allegation that he acted knowingly or recklessly.[5]

---

[4] Rule 10b-5 provides

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[5] Because Powers does not challenge the existence of a primary violation, a prerequisite for aiding and abetting liability, the court will assume, for the purposes of this opinion, that one occurred and address only the scienter and substantial assistance requirements.

The parties agree that to state a claim for aiding and abetting a securities violation, the plaintiff must allege: (1) a primary violation occurred; (2) the aider and abettor acted with the requisite scienter; and (3) the aider and abettor provided substantial assistance to the primary violator. Accordingly, Section 104 of the Private Securities Litigation Reform Act of 1995 ("Section 104"), Pub. L. 104-67, 109 Stat. 737, provides that the SEC may prosecute any person who "knowingly provides substantial assistance to another person in violation of a provision of [the Exchange Act], or of any rule or regulation issued under [the Exchange Act]." 15 U.S.C. § 78t(e). Congress enacted Section 104 of the PSLRA, which amended § 78t of the Exchange Act, to clarify that the scope of aider and abetter liability under the Exchange Act encompasses enforcement actions brought by the SEC. It did so in response to the Supreme Court's decision in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S. Ct.1439, 128 L. Ed. 2d 119 (1994), which held that private actions for aiding and abetting violations of section 10(b) were not available under the Exchange Act. Prior to *Central Bank*, the Seventh Circuit recognized private and enforcement actions for aiding and abetting violations of section 10(b) even though, at that time, there was "substantial doubt" as to whether such liability existed. *DiLeo*, 901 F.2d at 628. Since the enactment of Section 104, however, the Seventh Circuit has not addressed the standard by which such actions are governed, *i.e.*, it has not interpreted the statute's language. The question therefore becomes whether pre-*Central Bank* case law regarding aiding and abetting liability survived the enactment of Section 104.

The courts to address this issue believe it does. *See Graham* v. *SEC*, 222 F.3d 994, 1004 (D.C. Cir. 2000) (relying on pre-*Central Bank* case law to determine the degree of scienter required for aiding and abetting a violation of Rule 10b-5); *United States* v. *Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996) ("Based on the language of the new Section 104 and its legislative history,

8

we conclude that Section 104 simply restores the *pre-Central Bank* status quo with respect to SEC injunctive actions."); *SEC* v. *Peretz*, 317 F. Supp. 2d 58, 63 (D. Mass. 2004) (same). *But see SEC* v. *KPMG, LLP.*, 412 F. Supp. 2d 349, 383 (S.D.N.Y. 2006) ("[T]he contention that [Section 104 of the PSLRA] was intended to codify existing law is a tenuous one."). Accordingly, in determining whether the SEC has sufficiently alleged that Powers (a) acted with the requisite scienter, and (b) substantially assisted the Distribution Agents, this court will look for guidance from the Seventh Circuit's pre-*Central Bank* dispositions.

  A.  **Whether Powers Acted with the Requisite Scienter**

The parties disagree over the requisite scienter for aiding and abetting liability. Powers contends that "knowingly," as used in Section 104, means that an aider and abettor must have actual knowledge of the primary violation, while the SEC argues that recklessness may suffice, though it acknowledges there is no consensus on the issue. *Compare SEC* v. *DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (the government must prove "knowledge" of the primary violation on the part of the aider and abettor); *Fehn*, 97 F.3d at 1288 n.11, 1295 (language of Section 104 clearly requires knowledge of the primary violation; reckless disregard will not suffice); *with Graham*, 222 F.3d at 1004 (consistent with circuit precedent prior to Section 104's enactment, knowledge or recklessness is sufficient to satisfy scienter requirement for aiding and abetting liability). *See also SEC* v. *Koenig*, No. 02 C 2180, 2007 U.S. Dist. LEXIS 26088, at *25 (N.D. Ill. Apr. 5, 2007) (Andersen, J.) ("After reading these cases we are most persuaded by thoughtful decisions in the Courts of Appeal for the District of Columbia Circuit Court and the Southern District of New York, which have consistently held knowledge or recklessness sufficient to impose aiding and abetting liability."). The court need not decide whether recklessness suffices to satisfy the scienter requirement of Section 104, however, because the SEC has pled sufficient

facts to warrant an inference that Powers had knowledge of the Distribution Agents' assumed fraud.

Prior to the enactment of Section 104, the Seventh Circuit explained that, while Rule 9(b) does not require that the alleged aider and abettor's mental state be pled with particularity, the plaintiff's claim "'may not rest on a bare inference that the defendant must have had knowledge of the facts.'" *DiLeo*, 901 F.2d at 629 (quoting *Barker* v. *Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986)). If the plaintiff does not have direct evidence of scienter, the plaintiff must "'support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.'" *Id*. This may be accomplished where that the aider and abettor is alleged to have had something to gain from the fraud. *Id. DiLeo* and *Barker* are instructive on this point.

In *DiLeo*, the primary violation underlying the plaintiffs' aiding and abetting claim arose in connection with Continental Illinois Bank's making of risky loans and its subsequent failure to increase its reserves fast enough when those loans failed to perform. *DiLeo*, 901 F.2d at 626. The plaintiffs sued the Bank's accounting firm, Ernst & Whinney ("E & W"), alleging that it was liable as an aider and abettor because it had "bec[o]me aware that a substantial amount of the receivables reported in Continental's financial statements were likely to be uncollectible" prior to the time that plaintiffs purchased Continental's stock. *Id*. (quoting complaint). While plaintiffs contended that E &W assisted in the bank officers' perpetration of the fraud by failing to disclose the Bank's risky loans and failure to maintain adequate reserves, the complaint did not provide any factual detail concerning the problem loans plaintiffs contended E & W should have caught, or explain how it did or should have recognized that the reserves were inadequate. *Id.* at 626. Because the complaint lacked any facts supporting the inference that E & W knew

10

that certain loans had gone bad and could not be collected, and because E & W had no financial incentive to assist in the fraud, the Seventh Circuit ruled that plaintiffs' claim failed to adequately plead scienter.[6]  *Id*. at 628-29.

In *Barker*, the primary violation underlying the plaintiffs' aiding and abetting claim arose in connection with a foundation's project to construct and operate a retirement village. To finance the project, the foundation issued unregistered bonds and notes that failed to disclose substantial risks, such as undercapitalization, associated with the project. The plaintiffs argued that the defendant, the law firm which advised the foundation during the period when the notes and bonds were issued (but whose name did not appear on any sales documents and who did not receive sales proceeds), was liable as an aider and abettor because it (1) offered the foundation bad advice by failing to insist that it register the securities, and (2) failed to blow the whistle on the foundation's continued solicitation of funds even though the firm knew of the project's risks. In affirming the district court's grant of summary judgment in favor of the law firm, the Seventh Circuit ruled that the plaintiffs had failed to show scienter because there was no evidence that the firm intentionally or recklessly gave bad advice, or that it stood to gain from the foundation's fraudulent sale of securities. The court further found that the law firm could not be found liable for any of the foundation's wrongdoing because the firm had no duty to disclose its client's wrongdoing; to the contrary, it had a privilege not to disclose.

In this case, the primary violation of Rule 10b-5 alleged is the Distribution Agents' failure to disclose that the commissions charged exceeded sixty percent of the investor's funds,

---

[6] The court also ruled that because the plaintiffs' claim was based on a failure to disclose, E & W could only be held liable if a duty to speak existed under state law. *See DiLeo* at 628-29 ("Although accountants must exercise care in giving opinion on the accuracy and adequacy of firms' financial statements, they owe no broader duty to search and sing."). Because no such duty existed, E & W could not be held liable for its failure to "search and sing." *Id.* at 629.

leading investors to believe that only nominal transaction fees were charged. There are ample facts upon which the court may infer that Powers knew of this fraud while undertaking these acts. Powers knew that more than sixty percent of the investor's funds were being distributed to the Distribution Agents as commission because he personally and repeatedly allocated the investor proceeds to the issuers, distribution agents, and himself in accordance with his obligations under the escrow agreements. At the same time, Powers also knew that the SPAs, which he repeatedly received and processed, did not disclose the rate of commissions but instead stated that only transactional fees of one percent of the proceeds, or $50-75, would be charged. The discrepancy between the terms of the escrow agreements and the SPAs, and his repeated actions in accordance with the escrow agreements' terms, support the inference that Powers was aware of the Distribution Agents' ongoing fraud. Moreover, unlike the accountants in *DiLeo* (or the attorneys in *Barker*), Powers did have a financial stake in the fraud because, pursuant to the escrow agreements, he was to receive the greater of one percent of the gross proceeds from the sale of all shares or $5,000.

Powers relies on the Eighth Circuit's pre-Section 104 decision in *Camp* v. *Dema*, a case in which the court affirmed the district court's grant of summary judgment in favor of the alleged aiders and abettors, to argue that the SEC fails to plead facts supporting an inference that he knew of the primary violation. 948 F.2d 455 (8th Cir. 1991). In *Camp*, the plaintiff was a minority shareholder who had been frozen out of a closely held corporation after vocalizing his concerns about self-dealing by its president. Before the sale of plaintiff's stock was completed, however, the president and vice president were authorized, at a special shareholders' meeting of which the plaintiff was not given notice, to engage in negotiations for the sale of the corporation. After learning that these negotiations commenced prior to the sale of his stock, the plaintiff sued

his co-shareholder, James Kidder.⁷ The Eighth Circuit ruled that Kidder was not liable for aiding and abetting the securities violation because he lacked the requisite scienter. In discussing that requirement, the court stated,

> A party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge. Conversely, a party whose actions are routine and part of normal everyday business practices would need a higher degree of knowledge for liability to attach.

*Id*. at 459 (citations omitted). The plaintiff failed to show Kidder had at least a "general awareness" that the improper negotiations had occurred because Kidder's actions as a shareholder, such as authorizing the president and vice president to pursue negotiations to sell the company, were "not so atypical as to make them suspect." *Id*. at 462 (citations omitted).

Powers' actions are distinguishable from the defendants' in *Camp* because they were atypical for a person of his position. The complaint supports the inference argued by the SEC that it was highly unusual for senior counsel at a law firm, whose practice focused on securities law and advising broker-dealers on domestic regulatory compliance, to act as an escrow agent in connection with overseas Regulation S offerings. Powers' decision to hold himself out as an agent of Handler, Thayer while conducting some of his Escrow Agent business, *e.g.*, by sending letters on the firm's stationery to investors, is especially curious given that he was also a principal of Global Financial Management, LLC, a company offering a complete line of escrow services. Furthermore, considering Powers' own expertise in compliance with securities laws, it

---

⁷ The plaintiff also sought to hold Alexander Mitchell, an attorney who had been hired to represent the corporation in connection with the enforcement of the plaintiff's non-compete agreement and the potential future sale, liable as an aider and abettor. The court ruled that plaintiff had failed to show that Mitchell had a "general awareness" of the improper negotiations because, upon discovering them, he disclosed the information to the plaintiff's attorney. *Camp*, 948 F.2d at 463. His failure to review documents from which he would have learned of the improper negotiations earlier, while grossly negligent, did not satisfy the scienter requirement.

may also be inferred that Powers himself would have known that charging commissions in excess of sixty percent in connection with the sales of securities was not customary. Lastly, it is significant that Powers, unlike the defendant in *Camp*, is alleged to have been involved in an ongoing scheme to violate securities laws, not just a one-off transaction. Because it is easily inferred from the complaint that Powers conduct as an escrow agent was atypical for a man of his position, his reliance on *Camp* is unavailing.

The atypical nature of Powers' ongoing conduct as an Escrow Agent, his awareness of the discrepancy in terms between the SPAs and the escrow agreements, and his financial benefit from acting as an escrow agent support the inference that Powers knew of the Distribution Agents' failure to disclose the massive commissions.

B. **Whether Powers Substantially Assisted the Distribution Agents in the Fraud**

As a threshold matter, Powers argues that he cannot have substantially assisted the Distribution Agents because he was not involved until after the investors' commitments to purchase stock had become "irrevocable." Powers's Reply at 7-8 (quoting SPA, attached as Ex. 3 to Powers' Mem. in Supp. (Dkt. No. 75).[8] In other words, Powers appears to argue that he cannot be held liable for conduct which occurred after the decision to invest was made because such conduct is not "in connection with the purchase or sale of securities," within the meaning of Section 10b and Rule 10b-5, 15 U.S.C. § 78j(b). To establish the substantial assistance element, the plaintiff must show that "'the aider and abettor proximately caused the harm to [the victim] on which the primary liability is predicated.'" *DiBella*, 587 F.3d at 566 (quoting *Bloor* v. *Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985)); *Robin* v. *Arthur Young & Co.*, 915 F.2d 1120, 1125 (7th Cir. 1990) ("[B]ut-for causation is not sufficient to state a claim

---

[8] The court assumes Powers is referring to Article I, Paragraph 2 of the SPA. *See supra* at 4.

for aiding and abetting."). While secondary liability requires some showing of proximate cause, the secondary violator's conduct need not directly influence the purchasing decision. "Secondary liability or liability for aiding and abetting differs from primary liability in that secondary liability can attach to one who has not actually purchased or sold a security." *Arthur Young & Co.*, 915 F.2d at 1124 n.4 (citations omitted). Powers' temporal argument conflates the requirements of primary and secondary liability.[9] The SEC need not allege that Powers' conduct influenced the investment decision because it does not seek to hold him liable as a primary violator. Rather, the SEC need only allege that Powers substantially assisted the Distribution Agents in perpetrating the fraud. The SEC has done so because Powers is alleged to have played an integral part in the completion of the sale to the investor by, *inter alia*, taking custody of and distributing the investors' funds according to the terms of the escrow agreements, which were corollaries to the distribution agreements; receiving and processing the signed SPAs, which failed to disclose the exorbitant commissions; communicating the receipt of those SPAs to the issuers; and sending the investors their share certificates, which, as far as the investors' knew, meant that their total consideration have been transmitted to the issuer. Thus, Powers' actions were, as the SEC contends, essential to the completion of the sales at issue. Powers reliance on *Manela* v. *Gottlieb*, No. 91 Civ. 5510, 1993 WL 8176, at *7 (S.D.N.Y. Jan 4, 1993), is therefore unavailing because, in that case, the complaint contained no allegations of conduct which occurred at or prior to the closing of the allegedly fraudulent sale. Accordingly, the fact that

---

[9] To state a claim for a primary violation of Rule 10b-5, the SEC must allege that the primary violators "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *See McConville* v. *SEC*, 465 F.3d 780, 786 (7th Cir. 2006) (citations omitted).

15

Powers role in the alleged scheme occurred after the investors had committed to buying the shares is irrelevant.

Powers argues that even if he can be held liable for actions performed after the investment decision is made, the complaint fails to allege that he substantially assisted the Distribution Agents because the only affirmative acts he is alleged to have undertaken were "indisputably routine, ordinary, and ministerial tasks." Powers' Mem. in Supp. at 11. Thus, Powers contends that the SEC's theory of his offensive conduct constitutes nothing more than a failure to blow the whistle on the Distribution Agents' scheme – a failure which Powers contends is untenable because he had no duty to disclose. Powers is correct that

> [w]hen the nature of the offense is a failure to 'blow the whistle,' the defendant must have a *duty* to blow the whistle. And this duty does not come from 10(b) or Rule 10b-5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside the securities law.

*Barker*, 797 F.2d at 496. The SEC argues that Powers had a duty to disclose because he was acting as a broker within the meaning of the Exchange Act such that he had a duty to disclose the commissions charged. *See* SEC's Resp. in Opp. at 11-12. The court need not decide whether Powers had a duty to disclose the Distribution Agents' fraud, however, because the nature of the offensive conduct alleged by the SEC is not merely a failure to blow the whistle. As discussed *supra* at 12-14, Powers rendered atypical assistance to the Distribution Agents. Moreover, the SEC has alleged that Powers engaged in affirmative conduct which violated the securities laws by, *inter alia*, distributing the investors' funds according to the terms of the escrow agreements rather than the terms of the SPAs. As the SEC argues, by sending the investors their share certificates, Powers was representing that he had transmitted the total consideration paid by the investor to the issuer, *i.e.*, that only a nominal transaction fee had been charged, when, in fact,

16

sixty percent of the investors' proceeds were to be allocated to the Distribution Agents. Because the SEC has sufficiently alleged that Powers undertook affirmative acts to satisfy the substantial assistance requirement, and because it has pled facts from which the court may infer that Powers knew of the Distribution Agent's assumed fraud, his motion to dismiss Count IV is denied.

## II. Failing to Register as a Broker or Dealer (Count V)

Section 15(a)(1) of the Exchange act provides, in relevant part

> a) Registration of all persons utilizing exchange facilities to effect transactions; exemptions.
>    (1) It shall be unlawful for any broker or dealer which is a person other than a natural person or a natural person not associated with a broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security. . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1). Section 15(a)'s registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the SEC "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *Celsion Corp.* v. *Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (citing *Regional Props*. v. *Financial & Real Estate Consulting, Co.*, 678 F.2d 552, 562 (5th Cir. 1982)). It is undisputed that neither Powers nor Handler, Thayer registered as brokers during the course of the alleged boiler room scheme. Nevertheless, Powers argues that Count V should be dismissed because the registration requirements for broker-dealers do not apply to him given that he was an employee of Handler, Thayer, and thus an "associated person" within the meaning of Section 15(a). To support this argument, Powers cites to select portions of the SEC's "Guide to Broker-Dealer Registration," which states in full,

17

> 1. "Associated Persons of a Broker-Dealer
>
> We call individuals who work for a registered broker-dealer "associated persons." This is the case whether such individuals are employees, independent contractors, or are otherwise working with a broker-dealer. . . . Although associated persons usually do not have to register separately with the SEC, they must be properly supervised by a currently registered broker-dealer.

Guide to Broker-Dealer Registration, Division of Trading and Markets (April 2008), *available at* http://www.sec.gov/divisions/marketreg/bdguide.htm#II. Powers argues that because associated persons "usually do not have to register," he is exempt for the registration requirements. As the SEC argues, however, the very text of the Guide on which Powers relies contradicts his position: associated persons are not exempt from the registration requirements if they are not supervised by a registered broker-dealer. Because Handler, Thayer was not registered as a broker-dealer, Powers may not avail himself of the associated person exemption.

Powers next argues that even if he was required to register as a broker-dealer, he acted only as a "clearing" broker. Reply at 12. Such brokers, he argues, "do not owe fiduciary duties to introducing brokers' customers and cannot be held liable for the acts or omissions of their introducing brokers." *Id*. This argument, however, conflates the elements of SEC's aiding and abetting claim alleged in Count IV and the primary violation of Section 15(a) alleged against Powers in Count V. The proper inquiry is whether Powers acted as a broker within the meaning of Section 15(a), *i.e.*, whether he was engaged in the business of "effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Because the Seventh Circuit has yet to address this issue, the court looks to several decisions from the Southern District of New York for guidance. "In determining whether a particular individual or entity falls within th[e] definition [of a broker-dealer], courts consider whether the individual may be characterized by 'a certain regularity of participation in securities transactions at key points in the chain of

distribution.'" *SEC* v. *Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (quoting *SEC* v. *Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)). In *Hansen*, the court considered whether the defendant

> 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.

*Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984). Were the court to rely exclusively on these factors in the instant case, Powers might not be considered a broker because, while he was not employee of the issuer and received commissions, the remaining factors are inapplicable. The factors articulated in *Hansen*, however, are not binding on this court, and, in any case, were not designed to be exclusive. Even though Powers is not alleged to have been involved in the design of the boiler room scheme, or the solicitation of investors, the SEC may still maintain a claim against Powers for failing to register. *See SEC* v. *Margolin*, No. 92 Civ. 6307, 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992) (ruling that SEC had demonstrated a substantial likelihood of success on the merits of its Section 15(a)(1) claim where the defendant "provided clearing services" for many transactions, "receiv[ed] transaction-based compensation, advertis[ed] for clients, and possess[ed] client funds and securities."). The SEC sufficiently alleges that Powers was "effecting transactions in securities for the account of others" because he received transaction-based compensation up to one percent of the gross proceeds of the sale or $5,000, collected the investors' funds which he held in escrow before distributing

in accordance with the distribution and escrow agreements,[10] received and processed documents relating to the sale of the securities, communicated with the issuer regarding the receipt of the funds and documents, and sent the investors' their share certificates. In short, as discussed above, Powers facilitated the consummation of the sales. Accordingly, the SEC has pled sufficient facts to state a claim under Section 15(a). Because the court denies Powers' motion to dismiss Count V, the SEC's motion to strike portions of his reply brief dealing with the broker-dealer issue is moot.

## CONCLUSION AND ORDER

For the foregoing reasons, defendant Powers's 12(b)(6) motion to dismiss counts IV and V of the complaint [64] is denied, and SEC's motion to strike a portion of Powers's reply brief [118] is denied as moot.

Dated: March 10, 2010          Enter: _____
                                      JOAN HUMPHREY LEFKOW
                                      United States District Judge

---

[10] Powers's reliance on *SEC* v. *M & A West, Inc.*, No. C-01-3376, 2005 WL 1514101 (N.D. Cal. June 20, 2005) is unavailing because the facts are distinguishable; there, the court found it particularly persuasive that "no assets were entrusted" to the defendant. *Id.* at *9.