IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : MAG. JUDGE <br> : JEFFREY COLE |
| STEFAN H. BENGER, SHB CAPITAL, INC., JASON B. MEYERS, INTERNATIONAL CAPITAL FINANCIAL RESOURCES, LLC, PHILIP T. POWERS, FRANK I. REINSCHREIBER, GLOBAL FINANCIAL MANAGEMENT, LLC, CTA WORLDWIDE SERVICES, SA, and STEPHAN VON HASE, | : <br> : <br> : CASE NO. 09-CV-676 <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : |

---

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE EXPERT TESTIMONY OF DOUGLAS BRANSON

In his capacity as a self-anointed "experienced securities professional,"
Douglas Branson sounds the alarm that the SEC's case against defendant Philip
Powers is "unrealistic, far-fetched, and extreme." (Ex. 1 hereto, ¶ 43.) Everything
Powers did was copacetic, Branson assures the Court, both legally and relative to
Branson's take on industry custom – which it is fair to surmise he cuts from whole
cloth. Branson apparently believes his self-proclaimed musings about the securities
profession trump the securities laws themselves. Just in case those laws maintain
any lingering currency, Branson has that angle covered too. He holds – sorry,

opines – that the Court does not have jurisdiction over one of the offerings, and that a legally viable exemption applies to another.

This is expert testimony run amuck. A mishmash of legal arguments, spin on snippets of the evidentiary record, and heretofore unwritten principles of escrow agency, Branson's testimony quite literally has no redeeming value or qualities. The law is crystal clear that legal arguments have no place in an expert report. As for his insights as a securities practitioner, "Even assuming that Mr. Branson is qualified and that his testimony is reliable, his testimony has little, if any, relevance to the issues in this case," one court held while excluding Branson's testimony. "Unlike the standard of care at issue in a negligence case, none of the elements of Lead Plaintiff's securities-fraud claim depend on what the 'reasonable securities practitioner' would do under the circumstances. Therefore, Mr. Branson's testimony has no relevance to Lead Plaintiff's case in chief." (Ex. 2 hereto, p. 7; citation omitted.) So it is here. For this and other reasons, Branson's testimony should be excluded in its entirety.

## OPINIONS OF DOUGLAS BRANSON

Branson opines that:

- This Court does not have jurisdiction with respect to the IBI offering.[1]

- The Pharma offering was exempt pursuant to the Securities Act of 1933.[2]

- An escrow agent is typically a "functionary who performs administrative tasks" rather than an "integral part" of an offering.[3]

- It is not the escrow agent's job to field or respond to investor complaints.[4]

---

[1] *Id.,* ¶ 24.
[2] *Id.,* ¶ 25.
[3] *Id.*, ¶¶ 23-24, 27, 30, 43-44.
[4] *Id.,* ¶¶ 37-38.

2

- Powers' actions were consistent with that of a typical escrow agent.[5]

- Powers reasonably relied on issuers' representations.[6]

- Powers "neither knowingly nor recklessly rendered assistance to scheme which he should have known to be illegal."[7]

- Powers did not provide "substantial assistance" for purposes of violations of the securities laws.[8]

- The escrow agent is not meant to provide any assurances to buyers.[9]

- The compensation Powers received does not make him an unregistered broker or dealer.[10]

- Such compensation was typical for an escrow agent.[11]

- There was nothing unusual about the disclosures in the documentation that investors received.[12]

- Such documentation is not supposed to include substantive disclosures.[13]

- "[T]he SEC's apparent contention in this case that the SPA is the equivalent of a disclosure document is inaccurate."[14]

- Anything important was disclosed to investors in public filings or publicly-available information.[15]

- There was nothing material about any failures to disclose information to investors about compensation or otherwise.[16]

---

[5] *Id.,* ¶¶ 23, 29-30, 43-44.
[6] *Id.,* ¶¶ 35, 39-40.
[7] *Id.,* ¶ 40.
[8] *Id.,* ¶ 44.
[9] *Id.,* ¶ 28.
[10] *Id.,* ¶¶ 26, 31, 43-44.
[11] *Id.*
[12] *Id.,* ¶¶ 32-33, 35-36, 41.
[13] *Id.*
[14] *Id.,* ¶ 33.
[15] *Id.,* ¶ 42.
[16] *Id.,* ¶¶ 34, 42.

## ARGUMENT

### The Court as Gatekeeper

The admissibility of expert testimony and the qualifications of a witness to testify as an expert are preliminary questions for the district court.[17] The trial judge is the "gatekeeper" for such testimony, charged with ensuring the reliability and relevance of the expert testimony admitted into evidence.[18] The proponent of the proposed expert testimony bears the burden of demonstrating by a preponderance of the evidence that such testimony is admissible.[19] Expert opinion testimony is admissible only if it will assist the trier of fact to understand the evidence or to determine a fact in issue.[20]

### Branson's Improper Legal Arguments

Championing Powers' cause, Branson "opines" that this Court lacks jurisdiction over an offering (¶ 24); that one offering qualifies for an exemption under the Securities Act (¶ 25); that the failure to disclose certain information to investors is not "material" under the securities laws (¶ 34); that Powers' had no duty to inquire under the securities laws (¶¶ 37-38); that Powers did not act with the requisite scienter (¶ 40); that the issuers' public disclosures sufficiently complied with the securities laws (¶ 42); that Powers was not a broker or dealer under

---

[17] *In re Ocean Bank,* 481 F. Supp. 2d 892, 897 (N.D. Ill. 2007); *Amakua Development LLC v. Warner,* No. 05 C 3082, 2007 WL 2028186, at *1 (N.D. Ill. July 10, 2007).

[18] *Id.*

[19] *Amakua Development LLC,* 2007 WL 2028186, at *6.

[20] *Id.*

Section 15 of the Securities Act (¶ 43); and that Powers did not provide "substantial assistance," an element of the claims against him (¶ 44).

Such testimony invades the province of the Court to determine the applicable law and, in the context of a jury trial, to convey it to a jury.[21] Such testimony is unhelpful to the Court in carrying out its legitimate functions.[22] Moreover, "Permitting such testimony as to legal conclusions gives cogent meaning to the 'apprehensions that jurors will turn to the expert, rather than to the judge, for guidance on the applicable law.'"[23]

"The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle.' In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law."[24] Federal appellate courts routinely hold that the admission of such testimony may constitute reversible error – even under the "harmless error"

---

[21] *United States v. Scop,* 846 F.2d 135, 140 (2d Cir. 1988).

[22] *Id.* (citations omitted).

[23] *Adalman v. Julia M. Walsh & Sons, Inc.,* 807 F.2d 359, 366 (4th Cir. 1986) (citing 3 Weinstein and Berger, *Weinstein's Evidence,* 704-14 (1985)).

[24] *Amakua Development LLC v. Warner,* No. 05 C 3082, 2007 WL 2028186, at *9 (N.D. Ill. July 10, 2007) (Rule 704(a) allows the expert to offer factual conclusions to aid the jury, not legal conclusions); *In re Initial Public Offering Securities Litigation,* 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted). Federal Rule of Evidence 104(a) does not undermine this "axiomatic principle." *See United States v. Scop,* 846 F.2d 135, 140 (2d Cir. 1988); *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 368 (2d Cir. 1986).

applied to evidentiary rulings.[25] This Court has repeatedly and unequivocally reaffirmed the vitality of this fundamental evidentiary precept.[26]

This prohibition applies with full force to securities law.[27] In this regard, the Second Circuit presciently warned decades ago that "care must be taken lest, in the field of securities law, [an expert] be allowed to usurp the function of the judge. In our view, the practice of using experts in securities cases must not be permitted to expand to such a point[.]"[28]

---

[25] *See Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir. 1995); *Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 919 (6th Cir. 1991); *United States v. Scop,* 846 F.2d 135, 140 (2d Cir. 1988); *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 512 (2d Cir. 1977).

[26] *See Amakua Development LLC,* 2007 WL 2028186, at *9; *In re Ocean Bank,* 481 F. Supp. 2d at 897.

[27] *See The Police Retirement System of St. Louis v. Midwest Investment Advisory Service, Inc.,* 940 F.2d 351, 357 (8th Cir. 1991) (improper expert testimony regarding the reach and meaning of the Exchange Act); *United States v. Scop,* 846 F.2d 135, 140 (2d Cir. 1988) (improper expert testimony about the meaning of the terms "manipulation," "scheme to defraud," and "fraud" under the securities laws); *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 368 (4th Cir. 1986) (improper expert testimony about "the meaning and applicability of the securities laws to the transactions" in the case); *Molecular Technology Corp. v. Valentine,* 925 F.2d 910, 918-19 (6th Cir. 1991) (improper expert testimony about the requirements of the federal securities disclosure laws); *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 510-12 (2d Cir. 1977) (improper expert testimony about whether certain trading constituted illegal manipulation under Section 9 of the Exchange Act); *Livingston v. Wyeth Inc.,* No. 1:03CV00919, 2006 WL 2129794, at *6 (M.D.N.C. July 28, 2006) (improper expert testimony about whether certain disclosures were protected under Sarbanes-Oxley Act of 2002); *United States v. Stewart,* No. 03 CR 717, 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004) (improper expert's opinion about whether a particular application of the securities law is unusual or unprecedented).

[28] *Marx & Co., Inc.*, 550 F.2d at 512.

Branson's testimony crosses this line.[29] It should therefore be excluded.

### Branson's Improper Testimony About How Things Are Done Among "Securities Regulation Professionals"

Branson's opines about the pattern-and-practice among "experienced securities regulation professionals," a group on whose behalf he takes the liberty of speaking. He opines that there is a big difference between escrow agents and brokers/dealers (¶ 23); that the manner in which Powers was compensated does not make him a broker/dealer (¶¶ 26, 32); that escrow agents serve solely for the convenience of sellers and issuers (¶ 28); that subscriptions or stock purchase agreements <u>never</u> (the emphasis is his) contain substantive disclosures about the securities to be purchased, the issuer, or information about commissions or the use of proceeds (¶¶ 32, 41); that escrow agents typically do not receive sales confirmations (¶ 35); that buyers do not regard letters from the escrow agent as constituting substantive disclosures (¶¶ 36, 41); that escrow agents are not supposed to receive or process complaints (¶ 37); and that escrow agents are not supposed to engage in due diligence about the broker-dealers (¶ 38).

Branson leaves to this Court's imagination his qualifications to opine about standard operating procedure for penny stock offerings. Equally suspect is the broad brush with which he paints. To Branson, the scope, context, and specifics of

---

[29] Branson reserves his most unvarnished legal conclusions for the end of his report, when he argues "that securities professionals would regard an escrow agent's treatment as a broker-dealer to be unrealistic, far-fetched, and extreme." (¶ 43.) As one court held in the course of excluding such testimony: "Any characterization of the securities fraud charge in Count Nine as 'novel' is irrelevant to the jury's consideration of the indictment in this case. The defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws. Such evidence improperly invites the jury to make legal determinations. Those determinations are the exclusive province of the court." *United States v. Stewart,* No. 03 CR 717, 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004).

any given transaction is irrelevant. It could be Wachtell Lipton holding a billion dollar escrow in the Continental/United merger, or Handler Thayer receiving the small nest egg of a UK-based grandmother targeted by a Spanish boiler room. As far as Branson is concerned, the same generalities apply. The grandmother should have known (for reasons known only to Branson) that the escrow agent exists solely to serve the issuer (¶ 28). The grandmother also should have known (again, for reasons known only to Branson) that she could not rely on disclosures contained in a stock purchase agreement (¶ 35).

But Branson's opinions suffer from an even greater infirmity: They're irrelevant. "Unlike the standard of care at issue in a negligence case," Judge Teilborg held while striking Branson's testimony, "none of the elements of [plaintiff's] securities-fraud claim depend on what the 'reasonable securities practitioner' would do under the circumstances." *See* Ex. 2 hereto, *In re Apollo Group Inc. Securities Litig.*, 2:04-cv-02147, Docket No. 382 (D. Ariz. Nov. 9, 2007).

So it is here. Even if escrow agents generally are not "integral parts" of offerings (whatever that means), that in no way lessens Powers' culpability for *these* offerings. Even if stock purchase agreements generally don't contain "substantive disclosures" (whatever that means), that in no way marginalizes material misrepresentations contained in *these* stock purchase agreements. Thus, such testimony is irrelevant, and must be excluded.

## Branson's Irrelevant, Improper
## Characterization of Certain Evidence

Branson opines that based upon his review of some evidence, "I am of the opinion that Mr. Powers neither knowingly nor recklessly rendered assistance to schemes which he should have known to be illegal." (Ex. 1, ¶ 40.) He further opines that the offerings "contained sufficient earmarks for an escrow agent to conclude that he was not assisting or turning a blind eye to an offering or scheme involving possible violations of the securities law." *Id.* Branson opines that Powers performed only "ministerial, administrative, and after-the-fact" functions. *Id.,* ¶ 44.

Branson's anointment of Powers' conduct is meaningless. While an expert obviously may rely on facts or data in formulating opinions, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."[30] Branson's application of legal elements or principles to the facts of the case is inadmissible because it usurps the fact-finder's role in finding the facts and applying those facts to the law.[31] His opinion that Powers acted properly does nothing to help the jury understand an issue in this case, but instead serves only to invade the province of the jury, since "it is the jury's role both to credit or discredit any testimony from [defendant], and to determine whether it finds his actions to have been reasonable in light of the circumstances." *SEC v. Shanahan,* No. 4:07-CV-270, 2010 WL 415267, at *5 (E.D. Mo. Jan. 26, 2010). Branson's attempt to appropriate this role from the jury must be rejected.

---

[30] *Highland Capital Management, L.P. v. Schneider,* 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (citation omitted).

[31] *Id.* at 471. *See also Ebbert v. Nassau County,* No. CV 05-5445, 2008 WL 4443238, at *3 (E.D.N.Y. Sept. 26, 2008).

## CONCLUSION

For these reasons, the testimony of Douglas Branson should be excluded in its entirety.

Dated: May 9, 2011

                                                        Respectfully submitted,

                                                        **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

                                                        /s/ Jonathan S. Polish
                                                        By: One of its attorneys

Jonathan S. Polish
Daniel J. Hayes
Eric Celauro
**UNITED STATES SECURITIES
 AND EXCHANGE COMMISSION**
Chicago Regional Office
175 W. Jackson Blvd., Suite 900
Chicago, Illinois 60604
(312) 353-6884

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>STEFAN H. BENGER, SHB CAPITAL, INC., JASON B. MEYERS, INTERNATIONAL CAPITAL FINANCIAL RESOURCES, LLC, PHILIP T. POWERS, HANDLER, THAYER & DUGGAN, LLC, FRANK I. REINSCHREIBER, and GLOBAL FINANCIAL MANAGEMENT, LLC. CTA WORLDWIDE SERVICES, SA, and STEPHAN VON HASE,<br><br>                    Defendants | No. 09 CV 676<br><br>Magistrate Judge Jeffrey Cole |

REPORT OF PROFESSOR DOUGLAS M. BRANSON ON BEHALF
OF DEFENDANT PHILIP T. POWERS

**Qualifications**

1.     I am the W. Edward Sell Chair in Business Law at the University of Pittsburgh School of Law and have occupied that position since September 1, 1996.

2.     Prior to September 1, 1996, I was a Professor of Law at Seattle University, Seattle, Washington. I have also been a visiting professor of law at, inter alia, Arizona State University, University of Oregon, Cornell University, and Washington University (St. Louis, Mo.). I was the Charles Tweedy Distinguished Visiting Professor in Business Law at the University of Alabama School of Law in 1993 and again in 2003. I was the Condon Falknor Distinguished Visiting Professor at the University of Washington School

1

of Law (Seattle) in 2010.

3.     I reside at 810 St. James Street, Pittsburgh, Pennsylvania 15232.

4.     I am a member of the bars of Ohio (1970), Illinois (1970), Washington (1989), and Pennsylvania (2002).  I am also admitted to practice before the United States Supreme Court and various federal circuit courts of appeal and district courts.

5.     I teach, lecture continuing legal education groups, and consult extensively in the area of business organizations, business planning, corporate finance, mergers and acquisitions, corporate governance, comparative corporate governance, and securities regulation.  From time to time, I have also taught the courses in advanced securities regulation, bankruptcy and accounting for lawyers.

6.     I received my Bachelor of Arts *cum laude* (Economics) from the University of Notre Dame in 1965, my Juris Doctor *cum laude* from Northwestern University in 1970, and my Master of Laws from the University of Virginia in 1974, where I ranked first in my class.

7.     I am the author of several books and treatises on corporate law, corporate governance, and securities regulation, including DOUGLAS M. BRANSON, CORPORATE GOVERNANCE (Lexis Law Publishing 1993)(with annual supplements); DOUGLAS M. BRANSON, PROBLEMS IN CORPORATE GOVERNANCE (Cathedral Press 1997); DOUGLAS M. BRANSON, UNDERSTANDING CORPORATE LAW (Matthew Bender Co. 1999)(2d ed. 2004)(3r ed. 2009)(with A. Pinto); QUESTIONS AND ANSWERS ON BUSINESS ORGANIZATIONS (LexisNexis 2004); DOUGLAS M. BRANSON, NO SEAT AT THE TABLE - How

2

Corporate Governance and Law Keep Women Out of the Boardroom (NYU Press 2007); DOUGLAS M. BRANSON, BUSINESS ENTERPRISES: LEGAL STRUCTURES, GOVERNANCE AND POLICY (with J. Heminway et al)(LexisNexis 2009); DOUGLAS M. BRANSON, THE LAST MALE BASTION – Gender and the CEO Suite at America's Public Companies (Routledge Press 2010); THE SAGE HANDBOOK OF CORPORAYE GOVERNANCE (forthcoming 2011)(Douglas Branson and Thomas Clarke, editors).

    8.     I am the author of approximately seventy law review articles in the areas of corporate governance and securities regulation, including articles in <u>Arizona State Law Journal</u>, <u>Cornell Law Review</u>, <u>Tulane Law Review</u> (2), <u>Vanderbilt Law Review</u> (2), <u>Emory Law Journal</u>, <u>Northwestern University Law Review</u> (2), <u>Minnesota Law Review</u>, <u>Journal of Corporate Law</u>, <u>Nebraska Law Review</u>, <u>Fordham Law Review</u>, <u>Corporate Practice Commentator</u> (3), <u>Maryland Law Review</u>, <u>University of Pittsburgh Law Review</u>, <u>Cornell International Law Journal</u>, <u>Case Western Reserve Law Review</u>, <u>Pepperdine Law Review</u>, <u>South Carolina Law Review</u>, <u>University of Cincinnati Law Review</u>, <u>Southern Methodist Law Review</u>, <u>Wake Forest Law Review</u>, <u>Arizona State Law Journal</u>, <u>South Carolina Law Review</u>, <u>Washington University Law Quarterly</u>, <u>Oregon Law Review</u>, <u>Securities Regulation Law Review</u>, <u>The Business Lawyer</u>, <u>University of Virginia Business Law</u> Review, and other legal periodicals and journals.

    9.     My legal periodical publications from the previous ten years are:

           "A Business Judgment Rule for Incorporating Jurisdictions in Asia?," <u>National University of Singapore Law Review</u> (forthcoming 2011).

"Holding Multinational Corporations Accountable? Achilles Heels in Alien Tort Claims Act Litigation," Santa Clara International Law Journal (forthcoming 2011).

"Nibbling at the Edges - Regulation of Short Selling: Policing Failures to Deliver and Restoration of an Uptick Rule," 65 Business Lawyer 67 (2010).

"More Muscle Behind Regulation SHO? Short Selling and the Regulation of Stock Borrowing Programs," 5 Virginia Law & Bus. Rev. 1 (2010).

"Trekking Toward *Uber* Regulation: Prospects for Meaningful Change at SEC Enforcement?," 71 Univ. of Pittsburgh L. Rev. 545 (2010).

"Teaching Comparative Corporate Governance: The Significance of 'Soft Law' and International Institutions," 34 Georgia Law Rev. 669 (2000).

"The Uncertain Prospect of 'Global' Convergence in Corporate Governance," 34 Cornell Journal of International Law 321 (2001)

"Corporate Governance Reform and the "New" Corporate Social Responsibility," 61 U. Pitt. L. Rev. 605 (2001).

"Indiana Supreme Court Lecture: The Rule That Isn't a Rule – The Business Judgment Rule," 35 Valparaiso L. Rev. 631 (2003).

"Corporate Social Responsibility Redux," 76 Tulane L. Rev. 1207 (2002).

"The Social Responsibility of Large Multinational Corporations," 33 Transnational Lawyer 121(2002).

"Enron - When All Systems Fail: Creative Destruction or Roadmap to Corporate Governance Reform?," 48 Villanova L. Rev. 989 (2003).

"A Statutory Business Judgment Rule for Hong Kong?," Univ. of Hong Kong Law Review (with C. K. Low) (2004).

"Too Many Bells? Too Many Whistles? Corporate Governance in the Post Enron Post WorldCom Era," South Carolina L. Rev. (2006).

"Still Square Pegs in Round Holes? A Look at ANCSA Corporations, Corporate Governance, and Indeterminate Form or Operation of Legal Entities,' 24 Duke Alaska L. Rev. 203 (2007).

"Global Convergence in Corporate Governance," 54 Keeping Good Companies – the Journal of Chartered Secretaries Australia, 402 (2002).

"Lessons in Diversity," 12 Company Secretary (Hong Kong Institute of Company Secretaries 6 (2002), *reprinted in* The Chartered Secretary – Malaysia, June 2002, at 27.

"Oh Martha!  Don't Ask, Don't Tell," Jurist, October 14, 2002.

"Martha Goes to Washington," Jurist, Oct. 22, 2002.

"Pitt and the Pendulum: The Hard Life and Times of Harvey Pitt at the Securities and Exchange Commission," Jurist, November 8, 2002.

Book Review, Robert A.G. Monks & Nell Minow, "Corporate Governance (2d ed. 2001),  Corporate Governance International (Sweet & Maxwell Asia 2003).

"*Schadenfreude* and Martha Stewart," Jurist, June 6, 2003.

"White Collars and Black Hearts.  Who is the More Blameworthy? Quattrone or Kozlowski?," Jurist, November 3, 2003.

Book Review, "Lawrence Mitchell, Corporate Irresponsibility - America's Newest Export," 15 Bond University Law Review 368 (Australia).

"Criminalization of Corporate Behavior - The Impact on Director and Officer Behavior," 2 Journal of Business & Technology Law (Univ. of Maryland) 85 (2007).

The Credit Crisis: Taking the Long View, *Jurist*, October 21, 2008.

10.     In the last 30 years, I have lectured continuing legal education and business groups on issues, practices, and customs in corporate governance and in the securities field in Hawaii, Alaska, California, Washington, Oregon, Idaho, Colorado, Ohio, Pennsylvania, Florida, Louisiana, Texas, and New York.   Overseas, I have lectured groups on corporate governance issues and securities regulation in, *inter alia*, Spain,

France, Slovakia, Ukraine, England, Ireland, Belgium, South Africa, the United Kingdom, Australia, Indonesia, Malaysia, the Philippines, and Hong Kong.

11.     I hold a permanent appointment as a Senior Fellow at the School of Law, University of Melbourne, Australia, where for the last 17 years I have co-taught the graduate law offerings Corporate Governance and the Duties of Directors (with J. Farrar).

12.     From 1986 to 1994, I served on, and actively participated in the affairs of, the Washington State Bar Association (WSBA) Securities Law Committee.  I also served on the WSBA Corporate Law Revision Committee (1975 to 1995).  I also served on the WSBA Limited Partnership Act Revision Committee (1983-85), and the Not-For-Profit Corporation Law Revision Committee (1979-85).

13.     I am a life member of the American Law Institute.  I was elected to membership in 1981.  From 1981 to 1994, I was an active participant in the American Law Institute Corporate Governance Project ("Principles of Corporate Governance and Structure") and a member of the advisory committee which, periodically, consulted with the Project's reporters.  I was also a member of the Law Professors' Committee in support of adoption of the ALI's Federal Securities Code.

14.     I am a Financial Regulatory Authority (FINRA) arbitrator.  Previously, I was an NASD Arbitrator (since approximately 1997).  I have served as a public arbitrator in approximately 30 broker-dealer or issuer investor disputes.  I have been panel chair in approximately 60% of those cases.

15.     From 2000-2002, I was a United States State Department consultant to the Republic of Indonesia on corporate law, corporate governance, capital markets, and asset

securitization reform   In 2000, I was a Fulbright Scholar at the University of Gent, Belgium, lecturing on corporate law, corporate governance and securities litigation.   In 2003, I was a State Department consultant to Ukraine, assisting on projects regarding corporate law and law firm organization.  In 2006, I was the Paul Hastings Distinguished Visiting Professor at the University of Hong Kong, where I lectured, *inter alia*, at the Hong Kong Futures and Exchange Commission and the Asian Development Bank on securities regulation and corporate governance.  In 2006, I was a consultant on corporate law, corporate governance and securities regulation to US Steel Corp. in Kosice, Republic of Slovakia.

16.     In the ten year period preceding my retention in the instant case, I have been retained and testified as an expert witness in ten court cases or arbitrations, which I list below:

> (A). *Schwartz v. FirstWorld Communications, Inc.,* Judicial Arbiter Group, Denver, Colorado, 2001 (deal structure, disclosure and stock price manipulation issues in multiple mergers or acquisitions of Internet service provider, data storage and other telecommunications corporations).
>
> (B).  *Doe/Roe v. Unocal*, Superior Court, County of Los Angeles, California, 2003 (corporate disregard and enterprise liability issues in suit for human rights violations by multinational constructing natural gas pipeline in Myanmar).
>
> (C). *Interactive Financial Services Group, Inc. v. Gidari*, Superior Court, King County, Washington, 2004 (scope of covenant not to compete,

7

conflicts of interest, voting trust issues, reconciliation of employment agreement with conflicting bylaw provisions and venture capital raising in Internet savings bank startup).

(D).  *Barrinaga v. Paine Webber, Inc.*, NASD Arbitration, Portland, Oregon, 2005 (lack of disclosure, SEC Regulation SHO and other claims against broker-dealer who borrowed 1.7 million shares of technology company shares from claimant for lending to short sellers who conducted a "bear raid").

(E).  *Insurance Corporation of America, Inc. v. Urban Development, Inc.*, Superior Court, Snohomish County, Washington, 2006 (construction of corporate dissolution statute and effect of desultory winding up)(affidavit evidence).

(F).  *McDonald v. Crystal Paradise Holdings, Inc.*, Circuit Court, Blaine County, Idaho, 2006 (lack of inspectors' impartiality and other defects in shareholder vote allegedly approving merger with NASDAQ company) (affidavit evidence).

(G). *Norton v. Troutman Sanders*, Circuit Court, Columbian County, Alabama, 2003 (defense of law firm in high yield note offerings securities law case)(affidavit evidence).

(H). *Alaska Fur Gallery, Inc. v. First National Bank Alaska*, Superior Court, Anchorage, Alaska, 2008 (whether interests in member managed LLC were securities, whether construction loan notes were securities,

8

puffery and opinion versus fact in antifraud violations, collateral participant liability under state law, non integration of exempt transactions, and other alleged registration violations).

(I). *State v. Sheppard*, Lexington County Circuit Court. South Carolina, 2007 (defense of CEO of NASDAQ sub prime mortgage lender against state law securities act fraud and failure to register charges).

(J). *Booth Foundation v. Richard S. Fuld and Lehman Brothers Holding, Inc.*, FINRA Arbitration, Boca Raton, Florida, 2010 (failures to disclose abuse of REPO 105 financing, change of business plan, leverage ratios, and inability to de-leverage in multi billion eventual bankruptcy and previous sale of $22.5 million self-amortizing promissory note).

17.     In the ten year period preceding my retention on the instant case, I have also been retained and testified as an expert at deposition (but not at trial) in twelve additional cases, which I list below:

(A). *Sahara Gaming Corp. v. Francis Miller*, United States District Court, District of Nevada, 2000-01 (due diligence, disclosure, Rule 144A, IPO and governance issues in merger-strategic alliance between Sahara Gaming and Mississippi pirate ship casino ventures).

(B). *Haney v. Zwan & Digital Lightwave, Inc.*, United States District Court, Southern District of Ohio, at Columbus, 2001 (insider trading and fiduciary duty claims in purchase and resale of

9

shares in NASDAQ listed fiber optics technology company).

C).    *Koken v. Lederman*, U.S. District Court, Eastern District of Pennsylvania, at Philadelphia, 2003 (adequacy of directors' oversight and inadequate governance in alleged looting of major medical malpractice insurance company).

(D).    *Kenyon Zero Storage, Inc. v. PF Acquisition Corp.*, U. S. District Court, Eastern District of Washington, at Yakima, 2003 (governance and corporate disregard issues in suit against largest producer of frozen vegetable products in the United States).

(E).    *Cohen v. Berkshire Hathaway and Warren Buffet*, District Court, Polk County, Iowa, 2003 (disclosure and governance process issues in management led buyout of electric and natural gas utility in Iowa and Southern Illinois).

(F).    *Harward v. UBS Warburg, LLC and PricewaterhouseCoopers, LLP*, District Court, 44th Judicial District, Dallas County, Texas (due diligence and investment banking research analysts' conflicts of interest in IPO and subsequent merger in yield optimization software for semiconductor industry).

(G).    *In re WorldCom Securities Litigation*, U.S. District Court for the Southern District of New York, 2004 (corporate governance, due diligence by independent directors and non executive chairman of WorldCom, Inc., and shelf offerings).

10

(H).  *Independent Fisherman's Cooperative v. Schifferin*, Superior Court, King County, Washington, 2005 (suit by founder and general manager against members who attempted takeover and their attorney).

(I).  *Maritz v. Maritz*, Circuit Court, County of St. Louis, Missouri, 2005 (corporate governance internal dispute among family members in $1 billion family company).

(J).  *In re Apollo Securities Litigation*, U. S. District Court for the District of Arizona, Phoenix, Arizona, 2007 (materiality, disclosure and governance issues in class action against large cap NYSE corporation).

(K).  *Gilliland v. Geramita*, U. S. District Court of the Western District of Pennsylvania. Pittsburgh, Pennsylvania, 2007 (securities law issues and failures to disclose on a leveraged buyout of a multi branch medical diagnostic entity).

(L).  *Forte Capital Partners, LLC v. Harris Cramer*, Superior Court, San Francisco, California, 2008 (suit for failure to aid in obtaining an omnibus proxy in takeover of Smart Video by consent solicitation).

18.    I am being compensated at the rate of $375 per hour.

**Materials Considered**

19.    Court Papers.  In connection with this case, I have reviewed the following data and other information:

(A).  *United States Securities and Exchange Commission v. Stefan H. Benger, et al.*, N.D. Illinois, Amended Complaint dated April 1, 2010.

11

(B).   Answer of Powers to the Amended Complaint.

(C).   *Id.*, Memorandum in Support of Defendant Philip T. Powers' Motion to Dismiss Counts IV and V of the Complaint Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, undated.

(D).   *Id.*, Opinion and Order by Judge Joan H. Lefkow, dated March 10. 2010.

20.     Discovery Materials:

(A).  Deposition of Philip T. Powers dated September 2, 2010.

(B).  Deposition of David Ronald Allen, dated February 10, 2009.

(C). Exhibit 19 to Allen Deposition

(D). Declaration of Steven Thayer dated January 6, 2011.

21.     Business Papers (exhibits 83-86, 88-119, & 121 to Powers Deposition, *supra*).

22.     SEC or Pinksheets.com Filings:

(A). China Voice Holding Company, Inc., Interim Financial Report, for the quarter ended September 30, 2007, including unaudited financial statements.  (Voluntary filing on Pinksheets.com)

(B).  Imaging3, Inc., Form 8 K, dated September 13, 2006.

(C). World Energy Solutions, Inc. Form 10Q-SB for the quarter ended March 31, 2008.

(D). Biomoda Inc. Form 8-K dated February 28, 2008.

(E). Biomoda Inc. Form 10Q-SB for the quarter ended September 30, 2007.

12

**Opinions**

23.     Based upon my experience in the securities regulation field, a substantial difference exists between a broker-dealer, who is regarded as one who sells or participates in the selling of a security, and an escrow agent, who is a functionary who performs administrative tasks some days after a sale has been made and any "cooling off" or recession period has expired.   Based upon my review of this case, Philip Powers acted solely as an escrow agent, or the subagent of the Handler, Thayer & Duggan law firm, the actual escrow agent in several cases.   Mr. Powers so acted in only the China Voice Holding , Biomoda and World Energy Regulation S offerings, which are three (3) of the eight (8) offerings which are the subject matter of this action.

24.     Mr. Powers acted also as escrow agent, or subagent, in the International Biodiesel Inc. (IBI) offering.  Because that is a non-U.S. corporation (formed under the laws of St. Vincent & Grenadines), with its principal place of business in Brazil, which sold securities only to foreign investors, I regard the case as a "foreign cubed" action, no longer within the subject matter jurisdiction of a U.S. court.

25.     Mr. Powers also performed limited escrow services in the follow-on offering subsequent to the Pharma, Inc., placement of shares CTA Worldwide, Inc.  Because the follow-on offering was limited to the existing shareholders of Pharma, Inc., the follow-on offering, not involving as it did any general solicitation, was apparently exempt.  Thus, both the original Pharma offering and the follow-on offerings possessed the earmarks of exempt offerings.

26.     The payment of open-ended compensation rather than a fixed fee is not

13

uncommon among escrow agents and firms. Payment of such a fee, or a contractual arrangement of such a fee, does not convert and is not regarded by securities professionals as converting an escrow agent into a broker-dealer. An arrangement of open ended compensation would be essential in an arrangement in which the issuer is to conduct an open ended, rather than fixed, best efforts offering, and the escrow agent acts merely as a transfer agent, as here.

27.     An escrow agent is not, and is never regarded as, "an integral part" of a securities offering, except in one instance, which is not present here, namely, in a proceeds offerings. In the latter type of offerings, which are relatively common in the field of exempt offerings, escrows and escrow agents do play an integral part ("all or none'" and "part or none" offerings) in certifying that the requisite amounts or number of units have been sold. They thereafter "break escrow," disbursing the offering proceeds from the escrow account. <u>None of the cases at bar involve proceeds offerings</u>.

28.     An escrow agent as in the case at bar is used solely for the convenience of the <u>seller/issuer</u>, not to provide any added assurance to buyers, as with a proceeds escrow. Instead, issuers use an escrow agent to avoid the need for numerous simultaneous (face-to-face) closings, which would have exceeded 1400 in number in the instant case. Issuers do not retain and pay fees to escrow agents in open ended offerings solely, primarily, or otherwise to increase the amount of trust or confidence putative investors would have in the transaction.

29.     Attorney Powers' actions in the case at bar are <u>not</u> "atypical for a person in his position" and are <u>not</u> "highly unusual for senior counsel at a law firm." Partners in

14

law firms frequently act as escrow agents in numerous types of business transactions (real estate, mergers and acquisitions, and securities transactions, to name a few).  I personally have drafted, or participated in the drafting of, contractual arrangements involving the use of a named law firm or law firm partner as an escrow agent.

30.    No experienced securities attorney or professional would reasonably conclude that by serving as an escrow agent an attorney had "worked on," "done," or "participated in" a securities offering such as the Regulation S offerings here.

31.    In my opinion, the amounts paid to the sales agents in this case are not "commissions" because they are not added to the cost of the securities purchased. Rather, they are distribution costs paid by the issuers out of the offering proceeds.

32.    Not only is it _not_ customary but a subscription or stock purchase agreement (SPA herein) would _never_ contain any substantive disclosure about the securities to be purchased, or about the issuer thereof, including information about the sales commissions being charged, or paid, distribution costs or the use of proceeds.  In dealer transactions such as those in the case at bar, issuers are not required _per se_ to disclose commissions, distribution costs or use of proceeds.  In my experience, even confirmations in such transactions may not disclose the commissions, distribution costs or use of proceeds.

33.    The SEC's apparent contention in this case that the SPA is the equivalent of a disclosure document is inaccurate.

34.    In the alternative, the failure to disclose the payments to brokers, distributions costs and use of proceeds in the SPA by the issuers in this case for whom defendant Powers served as escrow agent is not material, for the issuers disclosed that information

15

in periodic reports filed with the Securities and Exchange Commission or that were otherwise publically available. Materiality is to be determined by the "total mix" of information available to and affecting the market for such securities. Information on file with the U.S. Securities and Exchange Commission or other reporting forums (such as pinksheets.com or company websites) is always considered part of the "total mix" affecting the market in which securities are bought and sold, even if a particular investor or group of investors may not have seen or may never have seen that information. The SPA's reference to information available on the SEC's website, as well as references in brochures and websites for non-reporting issuers, appears to satisfy any disclosure requirement concerning the distribution costs and use of proceeds from the offerings.

35.    In the ordinary course of things, an escrow agent would not receive copies of the sales confirmation. Instead, he would receive a subscription agreement (a/k/a Stock Purchase Agreement, or SPA), signed by the purchaser, indicating the number of shares to be purchased, the name and address of the purchaser(s), and how the shares were to held (jointly, in the entirities, etc,), along with payment (personal check, bank check, wire transfer, letter of credit, and so on). As aforesaid, a subscription or stock purchase agreement would contain no substantive disclosure. In the instant case, I have neither received information nor had any indication whatsoever that the conformation and subscription process in any way deviated from the normal or ordinary course.

36.    The covering letter an escrow or transfer agent would send accompanying the stock certificate never would, and never would be regarded as in need of, any substantive disclosure whatsoever. Such a covering letter is generally regarded as a covering letter,

and nothing more. Sound commercial practice and polite interpersonal dealings, not some purpose to disclose, or not to disclose, motivates use of covering letters, such as those used by the transfer agent escrow in the case at bar.

37. An escrow agent would not, and never would be expected to be, a primary or secondary recipient of investor complaints, let alone to make any substantive responses to complaining investor letters or emails. In my opinion, defendant Powers became the recipient of several complaints for the reason that his law firm's address was contained on both the covering letters and the envelope which accompanied or contained the share certificates Mr. Powers caused to be sent to investors. Mr. Powers' duties would be limited to forwarding such complain letters to the distribution agents with whom he been in privity of contract. My experience is that in certain offerings escrow agents may use a post office box address along with a nominee name rather than the more forthright methods Mr. Powers used in the case at bar.

38. It is not the escrow agent's province, and no experienced securities professional or attorney would regard it as within the escrow agent's province, to research or produce the identities of selling broker-dealers or broker-dealer firms, to any other person, including investors who had lodged complaints.

**Conclusions**

39. Based upon my experience as an experienced securities regulation professional, my opinion is that, given his role as agent or subagent in a non-proceeds escrow, Mr. Powers was entitled to rely on the representations of the issuers and of the distributions agencies that they would conduct offerings in accordance with applicable

SEC rules and regulations. Mr. Powers was in possession of information sufficient for him to conclude that the issuers were legitimate business entities who either voluntarily filed or were required to make periodic report filings with the SEC, or had sufficiently limited their offering to a pre-screened group of offerees. He thereafter was entitled to rely on further representations.

40. In the alternative, I am of the opinion that Mr. Powers neither knowingly nor recklessly rendered assistance to schemes which he should have known to be illegal. To the contrary, the Regulation S offerings in the case at bar, at least as they pertain to Mr. Powers, contained sufficient earmarks for an escrow agent to conclude that he was not assisting or turning a blind eye to an offering or scheme involving possible violation of the securities laws. Moreover, his duty as escrow agent to make inquiry or seek reassurance would end at that point.

41. Further based upon my experience, I am of the opinion that neither a share purchase agreement (SPA, or stock subscription agreement) nor a covering letter accompanying final delivery of a share certificate would contain any substantive disclosure whatsoever, including disclosure about the commission structure or use of proceeds data.

42. I am further of the opinion that commissions, distribution costs and use of proceeds information was disclosed to the market by virtue of periodic filings issuers made with the Securities and Exchange Commission, and also filed with entities such as Pinksheets.com, and therefore would be regarded as either not material, because in the total mix of information available, or as having been adequately disclosed.

18

43.    I am further of the opinion that it is unreasonable for an experienced SEC lawyer or securities professional to conclude that Mr. Powers' service as an escrow agent would rendered him a broker-dealer for purposes of registration with state and federal authorities.    I am further of the opinion that Mr. Powers' recipient of contingent compensation would not be regarded as extraordinary and would not be regarded as having changed those facts, to wit, that Mr. Powers was an escrow agent, or subagent, and nothing more.    Moreover, I am of the opinion that securities professionals would regard an escrow agent's treatment as a broker-dealer to be unrealistic, far-fetched, and extreme.

44.    I am of the further opinion that it is unreasonable for an experienced SEC lawyer or securities professional to conclude that the assistance Mr. Powers rendered with regard to the subset of transactions in which he was actively involved would be regarded as "substantial assistance".    Rather they would regard such transfer agent functions as purely ministerial, administrative, and after-the-fact.


GIVEN at Pittsburgh, Pennsylvania this 23rd of March, 2011.


Douglas M. Branson

# EXHIBIT 2

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Apollo Group Inc. Securities Litigation, | Master File No. CV 04-2147-PHX-JAT (LEAD) |
| | CV 04-2204-PHX-JAT (Consolidated) |
| | CV 04-2334-PHX-JAT(Consolidated) |
| This Document Relates To: All Actions | CLASS ACTION |
| | **ORDER** |

Pending before the Court are Defendants Apollo Group, Inc. ("Apollo"), Todd S. Nelson, and Kenda B. Gonzales's motions in limine to exclude the expert testimony of Mr. Douglas Branson, Dr. Allan Ingraham, Dr. Jay Finkelman, and Dr. Steven Feinstein. Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago has responded to each of these motions. Having considered each motion and the responses thereto, the Court now rules on the motions.

**I. Background**

This securities-fraud class action centers around a Department of Education ("DOE") program review at the University of Phoenix ("UOP") that began in August 2003 and ended by settlement agreement in September 2004. Lead Plaintiff claims that Defendants made false or misleading statements concerning the status of this program review by failing to disclose the contents of a DOE report. As a result, according to Lead Plaintiff, Apollo's stock price was artificially inflated throughout the class period until the truth was fully disclosed to the market on September 20, 2007, after which Apollo's stock price fell

1 significantly.

2 **II. Legal Standard**

3    Each of the pending motions concerns challenges to the admissibility of expert

4 testimony. Rule 702 of the Federal Rules of Evidence provides:

5    If scientific, technical, or other specialized knowledge will assist the trier of
      fact to understand the evidence or to determine a fact in issue, a witness
6      qualified as an expert by knowledge, skill, experience, training, or education
      may testify thereto in the form of an opinion or otherwise, if (1) the testimony
7      is based upon sufficient facts or data, (2) the testimony is the product of
      reliable principles and methods, and (3) the witness has applied the principles
8      and methods reliably to the facts of the case.

9 In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*"),

10 the Supreme Court held that Rule 702 imposed a special gatekeeping obligation upon a trial

11 judge to make a preliminary assessment of the admissibility of expert scientific testimony.

12 Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all

13 scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* In making

14 this determination, the trial court engages in a two-part inquiry. First, the court must

15 determine whether the expert's testimony reflects "scientific knowledge," that is, "whether

16 their findings are 'derived by scientific method,' and whether their work product amounts

17 to 'good science.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)

18 ("*Daubert II*"). Second, the court must determine whether the proffered expert testimony is

19 relevant, "i.e., that it logically advances a material aspect of the proposing party's case." *Id.*

20 Essentially, under *Daubert*, the trial court's task "is to analyze not what the experts say, but

21 what basis they have for saying it." *Id.* at 1316.

22    *A. Qualification as Expert*

23    "The question of admissibility only arises if it is first established that the individuals

24 whose testimony is being proffered are experts in a particular . . . field." *Id.* at 1315. Thus,

25 as an initial matter, the trial court must determine whether the proffered witness is qualified

26 as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. To

27 satisfy this standard, it is essential that "the proposed witness's qualifying training or

28                                    - 2 -

1  experience, and resultant specialized knowledge, are sufficiently related to the issues and

2  evidence before the trier of fact [such] that the witness's proposed testimony will be of

3  assistance to the trier of fact."  3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's*

4  *Federal Evidence*, ¶ 702[04][1][b], at 702-45 (citing *United States v. Chang*, 207 F.3d 1169,

5  1173 (9th Cir. 2000) (finding proposed expert witness's expertise in international finance

6  insufficient to qualify witness to testify regarding authenticity of security instrument)).

7      *B. Reliability*

8      Next, the trial court must ensure that the proffered expert testimony is reliable.

9  Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must

10  show that the expert's findings are based on sound science, and this will require some

11  objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316.

12  Toward this end, the Supreme Court in *Daubert I* set forth the following factors for the trial

13  court to consider when assessing the reliability of proffered expert testimony.  First, "a key

14  question to be answered in determining whether a theory or technique is . . . knowledge that

15  will assist the trier of fact will be whether it can be (and has been) tested."  509 U.S. at 593.

16  Second, the Court looks at whether the theory or technique has been subjected to peer review

17  and publication.  *Id.*  Because publication in a peer-reviewed journal increases the likelihood

18  that substantive flaws in the technique will be detected, "[t]he fact of publication (or lack

19  thereof) . . . will be a relevant, though not dispositive, consideration in assessing the scientific

20  validity of a particular technique or methodology on which an opinion in premised." *Id.* at

21  594.  Third, "in the case of a particular scientific technique, the court ordinarily should

22  consider the known or potential rate of error . . . and the existence and maintenance of

23  standards controlling the technique's operation." *Id.* (internal citations omitted).  Fourth, the

24  Court considers the degree of acceptance of the method or technique within the relevant

25  scientific community.  *Id.*  In engaging in this analysis, the trial court should be mindful that:

26      The inquiry envisioned by Rule 702 is . . . a flexible one.  Its overarching
        subject is the scientific validity — and thus the evidentiary relevance and
27      reliability — of the principles that underlie a proposed submission.  The focus,

28                                          - 3 -

of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594-95 (footnotes omitted).

It is also well-settled that the four *Daubert* factors — testing, peer review, error rates, and acceptability in the relevant scientific community — are merely illustrative, not exhaustive, and may be inapplicable in a given case. *Daubert II*, 43 F.3d at 1317. For instance, the Ninth Circuit has advised that a trial court may also question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability. *Id.* "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Id.*

Accordingly, "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702." *Id.* at 1318. Failing this, the proponent may attempt to meet this burden through the testimony of its expert. *Id.* at 1319.

> For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source — a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like — to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

*Id.* In other words, "the party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has chosen a reliable scientific method and followed it faithfully." *Id.* at 1319 n.11. Offering the expert's qualifications, conclusions, and an assurance of reliability is insufficient. *Id.* at 1319.

*C. Relevance*

The other component of the trial court's gatekeeping function under Rule 702 is to

1    ensure that the proffered expert testimony is relevant. As articulated in Rule 702, expert

2    testimony is relevant if it assists the trier of fact in understanding evidence or in determining

3    a fact in issue. *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must

4    demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the

5    case. *Id.*[1] "'Expert testimony which does not relate to any issue in the case is not relevant

6    and, ergo, non-helpful.'" *Id.* (quoting 3 Weinstein & Berger, ¶ 702[02], at 702-18). The

7    Court therefore examines whether the proffered expert testimony is "'sufficiently tied to the

8    facts of the case that it will aid the jury in resolving a factual dispute.'" *Id.* (quoting *United*

9    *States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Expert knowledge also assists the

10    trier of fact when it provides knowledge beyond the trier of fact's common knowledge. *Id.*;

11    *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

12       Conversely, expert testimony is inadmissible if it concerns factual issues within the

13    knowledge and experience of ordinary lay people, because it would not assist the trier of fact

14    in analyzing the evidence. In such cases, "[t]he fact finder is . . . fully capable of

15    understanding the evidence and deciding the issues through the use of its common knowledge

16    and common sense." 3 Weinstein & Berger, ¶ 702.03[2][a], at 702-36. In the Ninth Circuit,

17    "[t]he general test regarding the admissibility of expert testimony is whether the jury can

18    receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378,

19    1381 (9th Cir. 1986). Because unreliable and unfairly prejudicial expert witness testimony

20    is not helpful to the trier of fact, the trial court should exclude such evidence. *Jinro Am., Inc.*

21    *v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Likewise, expert testimony that

22    merely tells the jury what result to reach is inadmissible. S*ee, e.g.*, *United States v. Duncan*,

23

---

24    [1]    "In elucidating the 'fit' requirement, the Supreme Court noted that scientific expert

25    testimony carries special dangers to the fact-finding process because it 'can be both powerful

26    and quite misleading because of the difficulty in evaluating it.'" *Daubert II*, 43 F.3d at 1321

27    n.17 (quoting *Daubert I*, 509 U.S. at 595). "Federal judges must therefore exclude proffered
scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly
and directly to an issue in dispute in the case, and that it will not mislead the jury." *Id.*

28                - 5 -

1   42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to

2   reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the

3   expert's judgment for the jury's.").

4         D.  Kumho Tire*'s Expansion of* Daubert I

5        In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held

6   that the trial judge's general gatekeeping obligation outlined in *Daubert I* not only applies

7   to expert scientific testimony, but to all expert testimony.  It reasoned that neither the

8   language of Rule 702 nor the evidentiary rationale supporting the Court's decision were

9   limited to "scientific" knowledge, and that making the trial court's gatekeeping obligation

10  dependent upon a distinction between "scientific" and "other specialized" knowledge would

11  be unworkable.  *Id.* at 148.  Accordingly, the Court made clear that "*Daubert*'s general

12  principles apply to the expert matters described in Rule 702."  *Id.* at 149.  Further, the Court

13  held that in determining the admissibility of proffered expert testimony, and in particular, in

14  assessing the reliability of the grounds for such testimony, the trial court *may* consider one

15  or more of the reliability factors identified in *Daubert I.*  Thus, when assessing the reliability

16  of a nonscientific expert's testimony, the trial court may ask, for example, how often an

17  expert's skill or experienced-based methodology produces erroneous results, whether the

18  method is generally accepted in the relevant expert community, or whether the expert's

19  preparation would be recognized as acceptable in the expert's field.  *Id.* at 151.  While the

20  trial court should consider the *Daubert* factors when they would be reasonable measures of

21  reliability, the trial court retains the discretion to tailor its reliability determination to suit the

22  facts of a particular case.  *Id.* at 152-53 (noting that the law grants the trial judge "broad

23  latitude" in fashioning its reliability inquiry under *Daubert*).

24      **III.  Discussion**

25       With these standards as guidance, the Court now turns to Defendants' motions in

26  limine.

27

28                              - 6 -

1

2     *A.  Testimony of Mr. Douglas Branson*

3         Lead Plaintiff has retained Mr. Branson as an expert on "corporate disclosure norms"

4     to opine on the advice a "reasonable securities practitioner" would give to a client under the

5     facts of this case.  Mr. Branson proposes to testify, among other things, that a "reasonable

6     securities practitioner" under the facts of this case would have advised his client that the

7     issuance and contents of the DOE report are material events that must be disclosed.

8     Defendants argue that Mr. Branson is not qualified to render his opinions and that, in any

9     event, his opinions are unreliable and irrelevant.

10        Even assuming that Mr. Branson is qualified and that his testimony is reliable, his

11    testimony has little, if any, relevance to the issues in this case.  Unlike the standard of care

12    at issue in a negligence case, none of the elements of Lead Plaintiff's securities-fraud claim

13    depend on what the "reasonable securities practitioner" would do under the circumstances.

14    See *Apollo Group Inc. Sec. Litig.*, No. CV 04-2147, 2007 WL 2681795, at *2-6 (D. Ariz.

15    Sept. 11, 2007).  Therefore, Mr. Branson's testimony has no relevance to Lead Plaintiff's

16    case in chief.  Lead Plaintiff, however, argues that the testimony is necessary to rebut

17    Defendants' evidence of the advice they received from their disclosure attorneys.  The Court

18    disagrees.  There are other proper means of rebutting this evidence that pose no danger of

19    misleading the jury as to the ultimate legal issues in this case.  To the extent that Mr.

20    Branson's testimony has any relevance, the Court finds that its probative value is far

21    outweighed by the danger of misleading the jury and confusion of the issues, and thus grants

22    Defendants' motion in limine to exclude this testimony.

23        *B.  Testimony of Dr. Allan Ingraham*

24        Lead Plaintiff has retained Dr. Ingraham as an expert on econometrics and statistical

25    analysis to determine whether the UOP relied on factors other than enrollments in

26    determining the salary of its enrollment counselors.  Dr. Ingraham performed a statistical

27    regression analysis of the potential factors relevant to salary determination at the UOP and

28

concluded that "only enrollments and factors relating to enrollments determined salary" [Defendants' Motions in Limine ("DMIL"), Ex. 121 ¶ 5]. Defendants maintain that Dr. Ingraham lacks expertise in econometrics generally and in the sub-specialty of human capital models in particular, that his statistical regression analysis is unreliable, and that his opinions are irrelevant to the issues in this case.

The Court finds that Dr. Ingraham is qualified as an expert in econometrics. He studied econometrics as part of his doctoral program in economics [DMIL, Ex. 121 app. A]; he has taught econometrics at the university level [DMIL, Ex. 123 at 155]; and he has "provided statistical and econometric analysis for numerous corporate and government clients" [DMIL, Ex. 121 ¶ 8]. Likewise, the Court finds that Dr. Ingraham's methodology and opinions are reliable and relevant to this case. The Ninth Circuit has approved the use of regression analyses as "common statistical tool[s]." *E.E.O.C. v. Gen. Tel. Co. of Northwest, Inc.*, 885 F.2d 575, 577 n.3 (9th Cir. 1989). Moreover, Dr. Ingraham's analysis is related to his prelitigation research in econometrics, and the basic regression model he uses in this case has been subjected to peer review and publication [Lead Plaintiff's Response to DMIL # 19, at 5]. Finally, his opinions are relevant, at the very least, to the materiality of the DOE report. Thus, the Court denies Defendants' motion in limine to exclude Dr. Ingraham's testimony.

The Court does, however, acknowledge that Defendants attack Dr. Ingraham's qualifications and methodology at a more specific level than the Court has addressed. For example, Defendants argue that Dr. Ingraham lacks expertise on human capital models, and they take issue with his choice of variables, especially the use of an enrollments-squared variable. Defendants also claim that his conclusions are not supported by the data generated by his regression. Nevertheless, the Court is satisfied that Dr. Ingraham's published work and expertise in general econometrics meets the requirements of admissibility under *Daubert I* and its progeny. Defendants' specific objections concern matters that go to the weight of the evidence and are appropriately addressed on cross-examination. *Daubert I*, 509 U.S. at

Case: Case 2:v-00676-Document #:319 Filed: 05/09/11 Page 40 of 43 Page ID #:3275

596.

    *C. Testimony of Dr. Jay Finkelman*

    Lead Plaintiff has retained Dr. Finkelman as an expert on human resources management and organizational psychology. From this perspective, he proposes to opine on the risks that Apollo faced after the issuance of the DOE report, the concerns associated with the implementation of a new compensation plan for enrollment counselors,[2] and the effects of these risks and concerns on the UOP's business. Defendants do not challenge Dr. Finkelman's qualifications; instead, they argue that his opinions are "methodologically flawed" and "inherently unreliable."

    The Court finds that Dr. Finkelman's proposed testimony is both reliable and relevant to the issues in this case. Although Defendants attempt to classify Dr. Finkelman's opinions as scientific, the reliability of Dr. Finkelman's testimony depends mainly on his specialized knowledge and experience in human resources management and organizational psychology, both of which are extensive.[3] Before forming his opinions in this case, he reviewed the DOE program review report, deposition testimony, and numerous other relevant company-specific documents [DMIL, Ex. 119 at 30-40]. He also cited references in his expert report to support his opinions [*Id.* at 29-30]. Moreover, Dr. Finkelman's testimony will help the jury understand the business risks the UOP faced and why the DOE report may have added to those risks, issues that are directly relevant to the materiality of the report, which is an

---

[2] Lead Plaintiff contends that the new compensation system was a corrective action that was either required by or adopted in response to the DOE report. Defendants deny any connection between the two events.

[3] For example, he has a Ph.D. in Industrial/Organizational Psychology from New York University, and he has taught, and is currently teaching, doctoral level courses on this topic as well as human resources management; he is a Certified Professional Ergonomist; he spent thirteen years in the staffing and employment industry in upper-management positions; and he currently serves as Interim Systemwide Dean in charge of the Marshall Goldsmith School of Management and Program Director in the Organizational Psychology Division at Alliant International University, which operates in the same for-profit educational sector as the UOP.

- 9 -

1     element of Lead Plaintiff's claim. Based on the foregoing, the Court is satisfied that Dr.

2     Finkelman's expert opinions are both reliable and relevant, and denies Defendants' motion

3     in limine to exclude this testimony. *See United States v. Hankey*, 203 F.3d 1160, 1168-69

4     (9th Cir. 2000) (recognizing that the "*Daubert* factors" do not apply to "testimony whose

5     reliability depends heavily on the knowledge and experience of the expert, rather than the

6     methodology or theory behind it").

7        *D. Testimony of Dr. Steven Feinstein*

8        Defendants' motion in limine to exclude Dr. Feinstein's testimony as unreliable under

9     *Daubert I* involves the same arguments they made and lost at the summary-judgment stage

10    of this litigation. For the reasons stated in the summary-judgment order, this Court finds that

11    Dr. Feinstein's opinions are reliable, i.e., his proposed testimony was "derived by the

12    scientific method" and it "fits" the facts of this case. See *In re Apollo Group Inc. Sec. Litig.*,

13    2007 WL 2681795 at *6-8. Defendants' arguments to the contrary go to the credibility of

14    Dr. Feinstein's testimony, not to its admissibility.

15        Accordingly,

16        **IT IS THEREFORE ORDERED** that Defendants' Motion in Limine No. 18: To

17    Exclude the Testimony of Douglas Branson (Doc. # 305) is **GRANTED**;

18        **IT IS FURTHER ORDERED** that Defendants' Motions in Limine No. 17: To

19    Exclude the Testimony of Steven Feinstein (Doc. # 304), No. 19: To Exclude the Testimony

20    of Allan Ingraham (Doc. # 306), and No. 20: To Exclude the Testimony of Jay Finkelman

21    (Doc. # 307) are **DENIED**.

22        DATED this 9th day of November, 2007.

23

24

25                               James A. Teilborg

26                             United States District Judge

27

28                                      - 10 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**


      I hereby certify that on May 9, 2011, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.


      /s/ Jonathan S. Polish