**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND** | ) | |
| **EXCHANGE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 676** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **STEFAN H. BENGER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

The Securities Exchange Commission ("SEC") claims that the defendants engaged in an international boiler room scheme targeting some 1400 foreign investors. The alleged scheme took in approximately $44 million primarily through the sale of penny stock to foreign purchasers. Of the proceeds, the defendants skimmed 60% as commissions for themselves and the foreign boiler room operators whom they hired. The companies the investors were investing in realized less than 40% of the proceeds. The SEC says that the investors never saw the distribution or escrow agreements that broke down the distribution percentages. They did see the stock purchase agreements, but those documents represented that there were no commissions and that only 1% of an investment didn't go to the companies issuing the stock, but rather was for a nominal transaction fee. The foreign boiler room operators allegedly used high pressure sales tactics, false identities, and fraudulent misrepresentations to make sales while the defendants distanced themselves, concealing the extent of their involvement and claiming ignorance of the sales process.

One of the stocks being sold was Integrated Biodiesel Industries, Ltd. ("IBI"). Sales of IBI stock in this purported scheme accounted for about $15.2 million of the $44 million taken in, or approximately 35%.

The defendants are charged with having violated Section 10(b) of the Exchange Act which make it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe ... .

15 U.S.C. 78j(b).

The problem with the 10(b) charges, according to the defendants, is that the issuers of the stock were foreign, the investors were foreign, and the stock sales transactions were foreign. As a consequence, say the defendants, certain counts against them cannot survive *Morrison v. National Australia Bank Ltd.*, _ U.S. _, 130 S.Ct. 2869 (2010), which held that the reach of Section 10(b) of the Exchange Act is not extraterritorial. The statute protects "only transactions in securities listed on *domestic* exchanges, and domestic transactions in other securities, to which § 10(b) applies." *Id.* at 2884. (Emphasis supplied). The defendants claim these were not "domestic transactions," and have moved for partial summary judgment on those claims relating to IBI.

The defendants also contend that *Morrison* applies to the claim in the Second Amended Complaint that charges that they failed to register as brokers under Section 15(a)'s registration requirement. Hence, they seek summary judgment on Count V.

2

# I.
# FACTUAL BACKGROUND

## A.
## The SEC's Theory of the Case

The facts surrounding this case and the scheme alleged in the SEC's complaint are set forth

above, *supra* at 1, and in Judge Lefkow's earlier opinions. *See SEC v. Benger*, 697 F.Supp.2d 932

(N.D.Ill. 2010); *SEC v. Benger*, 2090 WL 1851186 (N.D.Ill. 2009). The original defendants could

be segregated into three distinct groups. Stefan H. Benger ("Benger"), SHB Capital, Inc. ("SHB"),

Jason B. Meyers ("Meyers"), International Capital Financial Resources, LLC ("International

Capital") were collectively referred to as the Distribution Agents. Benger is the president of SHB

and Meyers is the president of International Capital. The Distribution Agents are all Illinois citizens,

who operated out of offices in Chicago. From there, they entered into distribution agreements with

certain issuers of stock to sell shares to foreign investors. The Distribution Agents hired selling

agents in various foreign countries, who, it is alleged, targeted elderly citizens, and for want of a

better word, scammed them through the use of boiler room tactics. The selling agents operated

outside the United States in the countries where the prospective purchasers lived.

The Distribution Agents were to receive as commissions in excess of 60% of the funds

invested by the foreign purchasers. Philip T. Powers ("Powers"), Handler, Thayer & Duggan, LLC

("HTD"), Frank I. Reinschreiber ("Reinschreiber"), and Global Financial Management ("GFM"),

are collectively referred to as the Escrow Agents.[1] The SEC charges that they assisted the

Distribution Agents by effectuating the sales of stock by serving as a clearing house for the receipt

---

[1] Mr. Powers is a lawyer representing himself and is with the firm of Handler, Thayer & Duggan, LLC in Chicago. Mr. Reinschreiber is a principal of Global Financial.

of the foreign investors' offers to purchase the stock and the payment for those shares and then forwarding the funds (after commissions were deducted) to IBI in Brazil. IBI would then send the stock certificates to the Escrow Agents in Chicago, who in turn would transmit the certificates to the foreign investors. CTA and Von Hase, collectively referred to as Relief Defendants, received some of those proceeds.

The Distribution Agents, through their foreign agents, offered penny stocks issued by China Voice Holding Corp., Integrated Biodiesel Industries, Ltd., Biomoda, Inc., Pharma Holdings Inc., World Energy Solutions, Inc., Revolutions Medical Corp., Earthsearch Communications, Inc., and Essential Innovations Technology (collectively, "Issuers"). All of the issuers are incorporated in or have administrative offices within the United States. The Distribution Agents entered into distribution agreements with each Issuer. The distribution agreements provided that the Distribution Agents would offer the Issuers' stock to foreign investors in exchange for sales commissions exceeding 60% of the proceeds of the investment. Each distribution agreement included an escrow agreement between one of the Escrow Agents and issuers that outlined the role of the Escrow Agent.

The Escrow Agreements provided that the specified Escrow Agent was to be compensated in the amount of $5,000 or 1% of the gross proceeds of the sale.

The Issuer was to receive an amount equal to 37 1/2 % of the proceeds from each accepted offer with the balance to be paid to the Distribution Agent. The Issuer was responsible for the costs of the Escrow Agent and any other costs and expenses of the Placement. The Distribution Agent was responsible for all other costs of the Distribution including the fees of any subagents, introducing parties or finders.

As noted earlier, the Distribution Agents did not offer the Issuers' stock directly to foreign investors. Rather, they retained foreign sales agents to make cold calls to prospective investors and to employ high-pressure tactics to secure their investment. The SEC calls them "boiler room agents." As Judge Lefkow explained in her opinions, the boiler room agents targeted elderly British and European citizens. Although many of the boiler room agents were on warning lists compiled by the United Kingdom's Financial Services Authority, they represented to prospective investors that they worked for legitimate brokerage firms in the United Kingdom. The high-pressure tactics used included falsely representing that the price of the stock being offered was about to rise sharply, urging potential investors to liquidate savings and other investments, purporting to offer discounted pricing, and, on at least one occasion, threatening to sue investors if they did not purchase the full amount of shares initially agreed upon. During the calls, the boiler room agents either failed to disclose that commissions in excess of 60 percent would be charged or told prospective investors that only nominal transaction fees would be charged.

## B.

### The Facts As Revealed In The Summary Judgment Submissions

IBI was formed under the laws of the sovereign country of St. Vincent and Grenadines on February 22, 2007. (*Defendants' Local Rule 56.1 Statement*, ¶ 6; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 6). Its principal place of business is Sao Paulo, Brazil. (*Defendants' Local Rule 56.1 Statement*, ¶ 7; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 7). Its only contact with the United States appears to have been a mailbox in Baltimore, Maryland. (*Plaintiff's Local Rule 56.1 Statement of Additional Facts*, ¶ 5; *Defendants' Reply to Plaintiff's Statement*, ¶ 5). It used the mailbox address in its communications with investors. (*Plaintiff's*

*Response to Defendants' Local Rule 56.1 Statement*, ¶ 7; *Plaintiff's Ex. R*).  IBI announced it would

be opening an office in a January 2008 press release (*Plaintiff's Ex. I*), but it never opened an office

or entered into a lease for space.  (*Defendants' Reply to Plaintiff's Statement*, ¶ 5; *Defendants' Ex.

B*).

      No shares of IBI stock have ever been registered with the SEC, ever traded on any market

or stock exchange in the United States, or ever quoted on any quotation facility, including without

limitation the NASDAQ Bulletin Board or the Pink Sheets.  (*Defendants' Local Rule 56.1 Statement*,

¶ 8; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 6).  None of IBI's shareholders

currently are, or have ever been, citizens or residents of the United States.  (*Defendants' Local Rule

56.1 Statement*, ¶ 9; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 9).

      IBI engaged Handler, Thayer & Duggan, LLC and later Global Financial Management, LLC

to act as its escrow agent in connection with the sale of its shares in 2007 and 2008.  (*Defendants'

Local Rule 56.1 Statement*, ¶ 10; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶

10).  HTD was IBI's escrow agent from about June 2007 until May or June 2008.  Global Financial

Management, LLC became IBI's escrow agent on or about May 20, 2008.  (*Defendants' Local Rule

56.1 Statement*, ¶ 11; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 11).  Offers

to purchase shares of IBI during the period 2007 to 2008 were set forth in a written agreement called

the Stock Purchase Agreement ("SPA").  (*Defendants' Local Rule 56.1 Statement*, ¶ 12; *Plaintiff's

Response to Defendants' Local Rule 56.1 Statement*, ¶ 12). The SPA explained that the share

purchase was "an offshore transaction to be consummated and closed outside the U.S. . . . ."

(*Defendants' Local Rule 56.1 Statement*, Ex. E, §1, ¶ 1).  Under the terms of the SPA, stock

purchases were made as follows:

Price denominated in dollars to be transferred to the Escrow Agent by wire transfer together with this Agreement, properly executed. The offer to purchase contained in this Agreement once submitted to the Escrow Agent will become irrevocable and binding subject only to acceptance by the Company. A certificate representing the Shares will be issued by the Company with 21 days of acceptance of this Agreement and will be deposited with the Escrow Agent for transmittal to the Buyer upon transfer of the Total Consideration to the Company, (emphasis supplied). (Exhibit E - Form of IBI-SPA).

(*Defendants' Local Rule 56.1 Statement*, ¶ 13; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 13).

All offers to purchase shares of IBI were submitted to IBI's escrow agent (HTD or GFM) by buyers from their country of residence which was, in all cases, outside of the United States.

(*Defendants' Local Rule 56.1 Statement*, ¶ 14; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 14). None of the purchasers were parties to the Escrow Agreement between IBI and GFM. The defendants correctly contend that they had no authority to accept or reject an offer submitted by a potential buyer of IBI shares and that all offers to purchase were subject to acceptance by IBI at its offices in Sao Paulo, Brazil. (*Defendants' Local Rule 56.1 Statement*, ¶ 15-16; *Defendants' Ex. C*, Powers Dec. ¶ 10; *Ex. G*, IBI/HTD Escrow Agreement; *Ex. H*, IBI/GFM Escrow Agreement). Of course, the escrow agreement defined the duties and responsibilities of the escrow agent, *Meyers v. Rockford Systems, Inc.*, 254 Ill.App.3d 56, 58, 625 N.E.2d 916, 918 (2nd Dist.1993), who had no discretion to deviate from his instructions. *Home Loan Center, Inc. v. Flanagan,* 2012 WL 1108132, 5 (N.D.Ill. 2012).

The SEC argues that, while the offers were subject to IBI's acceptance, there is nothing in the Share Purchase Agreement that requires acceptance to be made in Brazil. (*Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 16). That, is not quite accurate, but more importantly,

7

is quite beside the point. The question is whether, under the facts of this case, the acceptances were, in fact, made in Brazil. Or more to the point, the question is, were any acceptances made in the United States, and the answer is no. The chairman and chief executive officer of IBI, Marcelo di Miranda Lopes, has declared under the penalty of perjury that reviews of offers to purchase took place in his office in Sao Paulo. (*Defendants' Local Rule 56.1 Statement*, Ex. B, ¶ 12). There is no evidence in the record to contradict that statement.[2]

The SEC adds that, under the terms of the Escrow Agreement and the SPA, the Escrow Agent Defendants were authorized to receive offers and send the stock certificates to investors on behalf of IBI, and that this operated as IBI's acceptance of the offers to purchase contained in the SPAs. (*Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 15; *Defendants' Ex. C*, Powers Dec., ¶ 5). But the evidence the SEC cites in support of this legal argument – *Defendants' Ex. C*, Powers Dec., ¶ 5; *Defendants' Exs. G & H*, Escrow Agreements, Recitals; *Defendants' Ex. E*, SPA, ¶ 2 – says nothing about acceptance being contingent upon or effectuated by the Escrow Agents sending share certificates to the buyers.

The Defendants also contend that neither HTD nor Mr. Powers had any authority to accept or reject any offer to purchase or vary the terms of any such offer and that that right was solely reserved to IBI. Their only roles in the share purchase transactions were to receive each potential purchaser's SPA; maintain an escrow account on behalf of IBI pursuant to a written escrow agreement for funds received from potential purchasers; account for the funds received; disburse

---

[2] The SEC has overlooked the terms of the Stock purchase Agreement, the first page of which states that closing will be outside the United States (Article I,¶2), and the last page of which shows that the offer to purchase is to be accepted by Marcelo Lopes, Chairman and CEO, suite 921 San Paulo Brazil. (Defendants L.R. 56.1 Statement of Material Facts, Ex. H). In short, the escrow agent could only send the offers to purchase to Brazil for acceptance.

funds held in the IBI escrow account as directed by IBI in the escrow agreement and forward the stock certificate for shares purchased by a new IBI shareholder to them at their address which in each case was outside of the United States. While GFM acted as escrow agent, its role was substantially the same as HTD's was.

The SEC adds that Mr. Powers, on behalf of HTD, also worked with Defendants to prepare template contracts used in Defendants' stock offerings, and that he claimed that the Escrow Agents were "charged with protecting the rights of both the new shareholders and the Company." (*Defendants' Local Rule 56.1 Statement*, ¶ 17; *Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶ 17). This, too, is irrelevant under controlling Supreme Court precedent, as we shall see.

The SEC's counter is that HTD and Mr. Powers had authority to receive offers to purchase submitted by investors pursuant to terms of the Escrow Agreements and the SPAs. (*Defendants' Local Rule 56.1 Statement*, ¶ 18; *Response to Defendants' Local Rule 56.1 Statement*, ¶ 18).

### III.
### ANALYSIS

#### A.
#### Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a). While a party moving for summary judgment need not introduce evidence rendering its opponents' claims altogether impossible, the movant "always bears the initial responsibility" of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Seng–Tiong Ho v. Taflove,* 648 F.3d 489, 496–97 (7th Cir.2011); *Stevens v. Housing Authority of South Bend, Indiana,* 663 F.3d 300, 305 (7th Cir.2011). This is done by "identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 324; *Logan v. Commercial Union Insurance Co.,* 96 F.3d 971, 979 (7th Cir.1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."). Facts are viewed in the light most favorable to the nonmovant, drawing all reasonable inferences in their favor. *Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir.2012); *Ault v. Speicher,* 634 F.3d 942, 945 (7th Cir.2011).

Once "a properly supported motion for summary judgment is made," the nonmoving party bears the burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks and citation omitted); *Seng–Tiong,* 648 F.3d at 496–97. Notably, any party asserting that a fact is or is not genuinely disputed must cite "to particular parts of materials in the record," or show that "an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). Thus, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." *Anderson,* 477 U.S. at 256; *Seng–Tiong,* 648 F.3d at 497. Additionally, a "court need consider only the cited materials." Fed.R.Civ.P. 56(c)(3).

## B.
## Summary Judgment Under Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for

summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, _ (7th Cir. 2012). The party opposing summary judgment must respond to the movant's statement of proposed material facts, and that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Sojka*, 686 F.3d at _; *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005).

The district court is entitled to expect strict compliance with the rule. *Shaffer v. American Medical Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011); *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 654 (7th Cir. 2011). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered, *see Shaffer*, 662 F.3d at 442 (court need not consider any fact not contained in the parties' Rule 56.1 statements); *Bay Area Business Council*, 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission), and the movant's version of the facts – if compliant with the rule – will be deemed admitted. Local Rule 56.1(b)(3)(C); *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632.

## C.

### The Application Of *Morrison* To The Facts Of This Case

From the foregoing facts, it is clear that IBI shares were not quoted on any domestic exchange; thus, the question is whether, under *Morrison*, the IBI share purchases were "domestic

11

transactions." _ U.S. at _, 130 S.Ct. at 2884. For, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.... Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to 'regulate;' it is parties or prospective parties to those transactions that the statute seeks to 'protec[t].' And...only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies."130 S.Ct. at 2883. (Citations omitted).

*Morrison* offered some guidance as to what constitutes a "domestic transaction." It specifically rejected the argument that the Act extends to cases where – not unlike here – "the fraud involves significant conduct in the United States that is material to the fraud's success." 130 S.Ct. at 2886. Instead, the Court focused on the sale, explaining that "[w]ith regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . 130 S.Ct. at 2885 (emphasis in original). The Court, speaking through Justice Scalia, acknowledged that:

> it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.

130 S.Ct. at 2884. (Emphasis in original).

And there was, indeed, domestic activity aplenty in *Morrison*. The case involved a class action suit by foreign investors brought against an Australian bank alleging securities fraud in connection with foreign transactions. The Australian bank had purchased a Florida mortgage

servicing company whose business was receiving fees for the servicing of mortgages. The investors claimed that the Florida company manipulated its financial models to make its servicing rights appear more valuable than they really were, and that rosy picture appeared in the Australian Bank's financial statements. The Australian bank was aware of the manipulation but did nothing about. Nothing, that is, until later when it wrote down the value of the Florida company's assets significantly thereby causing its stock – which the investors had bought when the picture was rosy – to tumble. 130 S.Ct. at 2875-76. But, even though the deception had its home in the United States, the Act did not apply because the stock purchases occurred outside the country. 130 S.Ct. at 2883-86. Financial finagling in Florida was not enough to cow Judge's Scalia's rottweiler.

**1.**
**The Section 10(b) Claims**

In the SEC's view, the alleged fraud in this case has a lot more domestic moving parts than in *Morrison:* All the movants were in the United States and all of their conduct, which the SEC has charged aided and abetted the fraud (*i.e.* putting together the stock purchase agreements, receiving and distributing the proceeds, etc.), and without which the fraud could not have succeeded, occurred here. If the Second Amended Complaint does not exactly charge that had the investors known of the arguably disproportionately large, secret commissions going to the movants, they would not have purchased the stock, it is surely a reasonable inference. But, the question under *Morrison* is where the stock purchase transaction occurred not the locus of the bulk of the fraudulent activity. Indeed, the Court could not have been clearer in rejecting what is effectively the SEC's central thesis in this case, namely, that there is a violation under Section 10(b) where the charged fraud involves significant conduct in the United States:

13

The Solicitor General suggests a different test, which petitioners also endorse: "[A] transnational securities fraud violates 10(b) when the fraud involves significant conduct in the United States that is material to the fraud's success." Brief for United States as *Amicus Curiae* 16; see Brief for Petitioners 26. Neither the Solicitor General nor petitioners provide any textual support for this test. The Solicitor General sets forth a number of purposes such a test would serve: achieving a high standard of business ethics in the securities industry, ensuring honest securities markets and thereby promoting investor confidence, and preventing the United States from becoming a "Barbary Coast" for malefactors perpetrating frauds in foreign markets. Brief for United States as *Amicus Curiae* 16–17. But it provides no textual support for the last of these purposes, or for the first two as applied to the foreign securities industry and securities markets abroad. It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve.

If, moreover, one is to be attracted by the desirable consequences of the "significant and material conduct" test, one should also be repulsed by its adverse consequences. While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri–La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets.

*Morrison*, 130 S.Ct. at 2886.

In sum, "'Section 10(b)...punishes not all acts of deception, but only such acts in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.' Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of the statute." *Morrison*, 130 S.Ct. at 2887.

The Second Circuit's opinion in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2nd Cir. 2012) is significant. After careful analysis, the Second Circuit arrived at the conclusion that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67. That is, a transaction is domestic if "the purchaser incurred irrevocable

14

liability *within the United States* to take and pay for a security, *or.* . . the seller incurred irrevocable liability *within the United States* to deliver a security." 677 F.3d at 68 (emphasis supplied). *See also S.E.C. v. Tourre,* 2012 WL 5838794, 2 (S.D.N.Y. 2012)("It is undisputed, however, that Loreley did not acquire irrevocable liability to purchase the ABACUS notes in the United States.").

Then, following the Eleventh Circuit in *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada,* 645 F.3d 1307, 1310–11 (11th Cir.2011), the Second Circuit added a third option: a transaction could also be domestic if title to the shares was transferred within the United States. *Id.* at 68. As the Eleventh Circuit put it: "Given that the Supreme Court in *Morrison* deliberately established a bright-line test based exclusively on the location of the purchase or sale of the security, we cannot say at this stage in the proceedings that the alleged transfer of title to the shares in the United States lies beyond § 10(b)'s territorial reach." 645 F.3d at 1310-11.[3]

The first two options in the Second Circuit's transaction test focus on where the buyer and the seller, respectively, incurred irrevocable liability. The answers to those questions in this case are dictated by the terms of the Share Purchase Agreements, which oddly, the SEC has chosen not to examine. (*Plaintiff's Brief in Opposition,* at 8-9). Under the terms of those Agreements, an investor "becomes irrevocabl[y] b[oun]d" when he "submit[s]" to the Escrow Agent what is denominated as the offer to purchase. Under the terms of the SPA, the seller is not irrevocably bound until it accepts the offer after it has been received at its office in Brazil from the escrow agent. It is the movants' position that the Share Purchase Agreement did not hinge irrevocable liability for the purchaser or the seller on receipt by the movants of the SPA – which would have put the locus in

---

[3] The SEC does not argue against the application of the Second Circuit's test for the location of the transaction; in fact, it relies on *Absolute Activist* in its brief. (*Plaintiff's Brief in Opposition,* at 6-7).

Illinois where the escrow agents were located – but on *submission* by the purchaser, all of whom were in foreign countries. And so, the movants say that the *investors* became irrevocably bound outside the United States.

The movants' position on where the *selle*r became irrevocably bound is similar. Under the terms of the SPA, the buyer's offer to purchase was irrevocable when submitted, "subject only to acceptance by the Company." (*Defendants' Local Rule 56.1 Statement*, Ex. E, §1, ¶ 2). That acceptance took place, in all instances, in Brazil. IBI, then, became irrevocably bound outside the United States. IBI would then issue a certificate representing the shares and send it to the Escrow Agent Defendants, who would in turn send it to the investor who, again, was outside the United States. (*Id.*).

While a lot of activity went on in the United States – as was the case in *Morrison* – the only domestic activity that had anything to do with the transaction was the shuttling of documents back and forth by the Escrow Agents. For the SEC, those intermediaries are the domestic specters that must send Judge Scalia's watchdog, tail between its legs, scurrying back to the kennel. To get there, the SEC has to ignore the terms of the SPA, despite the fact that its terms specifically dictate when the parties agreed to become bound, and the terms of the Escrow Agreement. But even if one joins the SEC in turning a blind eye to their terms, nothing changes the conclusion that the stock transactions in this case were not domestic sales, as *Morrison* defines such sales.

The SEC's argument begins like this:

The place of the contract – *i.e.*, where it is formed – is the place where the last act necessary to its completion was done. The general rule is that the place of contracting is the place of acceptance.

16

(*Plaintiff's Brief in Opposition*, at 8 (citations omitted)). Following the SEC's line of reasoning, the contract was formed in Brazil because, as we know from the undisputed facts, that was where all the acceptances occurred. That makes the sales of stock at issue foreign rather than domestic.

But, the SEC goes on:

Under the "mailbox" or "postal" rule, acceptance of an offer occurs and becomes effective upon mailing of the acceptance to the offeror, Thus, a contract is formed in the place where the acceptance is mailed by the offeror, not where it is received by the offeree.

(*Plaintiff's Brief in Opposition*, at 8 (citations omitted)). But if that rule were to be applied, the contract was still formed in Brazil, where IBI put its acceptances in the mail for transmission to the Escrow Agents in Illinois. *See Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004).

Obviously, the SEC's theory doesn't work. That's why it has to wager all on the Escrow Agents, which the SEC says were either agents of IBI or dual agents. But it doesn't matter whether the Escrow Agents were agents of IBI or the investors (doubtful, at best) or both. What matters is whether they had any authority to bind IBI contractually. And the question of authority, whether express or implied, actual or apparent, is not a question the SEC deals with.

In an agency relationship, the principal can be legally bound by action taken by the agent where the principal confers actual authority on the agent. *United Legal Foundation v. Pappas*, 952 N.E.2d 100, 105 (1st Dist. 2011); *Granite Properties Ltd. Partnership v. Granite Investment Co.*, 220 Ill.App.3d 711, 714, 581 N.E.2d 90, 92 (1st Dist. 1991). Actual authority can be express or implied. *Pappas*, 952 N.E.2d at 105. Here, there is nothing to suggest that the Escrow Agents had actual or apparent authority to bind IBI. There is no such grant of authority in the Escrow Agreements. Quite

the opposite is true. *Sphere Drake Ins. Ltd. v. American General Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004)("An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act."); *Cf. Zannini v. Reliance Ins. Co. of Illinois, Inc.*, 147 Ill.2d 437, 451, 590 N.E.2d 457, 463 (1992)(agency agreement provided that agent had authority to bind principal). Mr. Powers – the Escrow Agent Defendant and member of Escrow Agent Defendant HTD – stated that he had no authority to accept or reject offers on IBI's behalf. (*Defendants' Local Rule 56.1 Statement*, ¶18; Ex. C, ¶ 10).

If the Escrow Agents themselves had no authority to bind IBI, and the Escrow Agent Agreements confirm this, the SEC cannot convincingly argue they had implied authority to do so. *See Rasgaitis v. Waterstone Financial Group, Inc.*, 2012 WL 6969748, 11 (2nd Dist. 2012)(implied authority "arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf"); *Curto v. Illini Manors, Inc.*, 405 Ill.App.3d 888, 892, 940 N.E.2d 229, 233 (3rd Dist. 2010)(implied authority "may be . . . based on prior course of dealing of a similar nature between the alleged agent and principal . . . .").

The SEC contends rather conclusorily that because the Escrow Agents sent the share certificates to the investors on IBI's behalf, they were accepting in Chicago the foreign investors' offers. (*Plaintiff's Response to Defendants' Local Rule 56.1 Statement*, ¶18). But, under the terms of the SPA and the Escrow Agreement, all they were doing was forwarding IBI's acceptance, which had occurred previously in Brazil. The Escrow Agents clearly could not decide which offers to accept or reject and that – not sending a share certificate when told to do so – is where the power of acceptance lies. "[A]uthority must be founded upon some word or act of the principal, not on the words or acts of the agent." *Hofner v. Glenn Ingram & Co.*, 140 Ill.App.3d 874, 881, 489 N.E.2d

18

311, 315 (1st Dist. 1985).

Similarly, there is nothing in the record to create a genuine issue of material fact on the question of whether the Escrow Agents had apparent authority to bind IBI or that they were doing so. Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf. *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 406 (7th Cir. 2007); *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill.App.3d 383, 390, 577 N.E.2d 1344, 1350 (1st Dist. 1991). Here, the SPA specifically informed the investors that their offers were subject to acceptance by IBI, not by the Escrow Agents, who were performing ministerial functions under the SPA and the Escrow Agreement. The Escrow Agents' role was to receive the foreign investors' irrevocable offers and payment for the stock shares and send them to IBI in Brazil. Thereafter, their role was to forward the stock certificate to the investors after IBI accepted the offers in Brazil. There was no impression of apparent authority created here. The Escrow Agents did represent IBI for a limited purpose, but that alone does not create apparent authority to bind the company contractually. *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 726 (7th Cir. 2008).

For these same reasons, the SEC's theory regarding where the stock sale closed – where title passed – fails as well. Again, for the SEC, the Escrow Agents have unbridled authority to do everything. They not only have the power to accept offers and bind IBI, but the power to close the sales and pass title to the investors as well. But there is no support in the record for this thesis. In an attempt to show that title passed in the United States, the SEC relies on *Quail Cruises Ship Management Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011). In *Quail Cruises*, the plaintiff alleged it was fraudulently induced to purchase shares in a foreign

19

company that owned the *Love Boat*, of 70s and 80s television fame.  The district court granted the defendant's *motion to dismiss* under *Morrison*, finding that the plaintiff had failed to adequately allege that the sale was a domestic one.

The Eleventh Circuit reversed.  It held that the court had to accept as true the plaintiff's allegation that "[t]he transaction for the acquisition of the Templeton stock *closed in Miami, Florida* on June 10, 2008, by means of the parties submitting the stock transfer documents by express courier into this District . . . ."  645 F.3d at 1310.  Moreover, the court continued, "the purchase and sale agreement confirms that it was not until this domestic closing that title to the shares was transferred to [plaintiff]."  *Id.*  The court concluded that it could not "say at th[at] stage in the proceedings that the alleged transfer of title to the shares in the United States l[ay] beyond § 10(b)'s territorial reach."  645 F.3d at 1311.

Here, of course, we are beyond the pleading stage and we need not accept as true statements in the Second Amended Complaint that the stock transaction at issue closed in the United States.  Indeed, under Rule 56, we cannot accept as true and rely on the allegations in the complaint. *Tullis v. UMB Bank*, N.A. 423 Fed.Appx. 567, 570 (6th Cir.2011).  Unlike the purchase and sale agreement the court relied upon in *Quail Cruise*, the SPA stated that the deal was "an *offshore* transaction negotiated *outside the United Sates (U.S.)  and to be consummated and closed outside the U.S.*" (*Defendants' Local Rule 56.1 Statement*; Ex. E, §1, ¶1 (emphasis supplied)).  The evidence shows that in fact the sale was consummated in Brazil – where IBI became irrevocably bound – or, perhaps, in the investors' home countries where they received their stock certificates.[4]  Nothing suggests that

---

[4] The SPA provided that the agreement was governed by the laws of the Commonwealth of the
(continued...)

the Escrow Agents were invested with the power to transfer or accept title in the manner the complaint in *Quail Cruises* alleged the stock couriers there were.

The SEC also relies on 810 ILCS 5/8-301(a)(2), for the proposition that "delivery of stock certificate to purchaser occurs when third party acquires possession on behalf of purchaser." (*Plaintiff's Brief in Opposition*, at 11). The provision refers to delivery as a means of consummating a transaction, 810 ILCS 5/8-301, cmt. 1, but in this case, that occurred when IBI accepted in Brazil the purchaser's irrevocable offer which had been made in a foreign country. Moreover, when read in full, the provision does not indicate that, in all cases, delivery occurs when a third party acquires possession of the security certificate. Delivery is also said to occur "when . . . the purchaser acquires possession of the security certificate." 810 ILCS 5/8-301(a)(1). There's nothing to suggest that wasn't the case here. The subsection the SEC points to states a general rule that "a purchaser *can* take delivery through another person, *so long as* the other person is actually acting on behalf of the purchaser or acknowledges that it is holding on behalf of the purchaser." 810 ILCS 5/8-301, cmt. 2 (emphasis supplied). Nothing in the record suggests that the Escrow Agents were taking possession of or holding the certificates on behalf of the foreign investors. They were merely intermediaries delivering the certificates to the investors on behalf of IBI – the entity with whom they had the contractual relationship under the Escrow Agreement. The foreign purchasers were not parties to the agreement and, at best, could only be deemed incidental beneficiaries of the Escrow

---

[4](...continued)
Bahamas. (*Defendants' Local Rule 56.1 Statement*, Ex. E, Article VI, ¶7). The parties have not discussed this clause or its effect on the case and have assumed Illinois law governs. Generally, the law applicable to a contract is that which the parties intended, but where the parties assume Illinois law applies the court will do so as well. *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 809 (7th Cir.2011). That principle can conveniently be applied here even though the parties were not signatories to the SPAs, and the SEC was not a signatory to the Escrow Agreement.

Agreement.  *Heritage Insurance Co. of America v. First Nat. Bank of Cicero*, 629 F.Supp. 1412, 1418 (N.D.Ill. 1986).

In the end, this was a sale of shares in a foreign company to foreign investors.  The sale's only connection with the United States was the fact that IBI employed escrow agents in the United States as intermediaries between it and the investors.  Certainly, the SEC's allegations suggest that a good deal of questionable activity "that is material to the fraud's success," occurred in the United States. 130 S.Ct. at 2886.  But in such a case, it is not the location of the fraud that is outcome determinative, but whether the sale was domestic.  Only by a fairly tortured and ultimately faulty analysis can one conclude that it was.

A final note.  The SEC on December 10, 2012, filed a notice of additional authority, citing *S.E.C. v. Tourre*, 2012 WL 5838794, 2 (S.D.N.Y. 2012).  That court rejected the same kind of arguments the SEC makes here:

> In opposition to the motion to dismiss, the SEC (having tacitly conceded that no "irrevocable liability" transferred to IKB in the United States, *SEC v. Tourre*, 790 F.Supp.2d at 158) made two arguments in support of the existence of a domestic transaction. First, the SEC argued that if the Court considered the "entire selling process," it would find sufficient domestic connection to sustain the section 10(b)/Rule 10b–5 claims. *Id.* The Court rejected that argument: *"Morrison* was clear that Section 10(b) 'punishes not all acts of deception' (i.e., the selling process), 'but only such acts "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." ' " *Id.* (quoting *Morrison,* 130 S.Ct. at 2887). In other words, the "entire selling process" was an "invitation" to "return to the 'conduct' and 'effects' tests," which *Morrison* had explicitly repudiated. *Id.*

2012 WL 5838794, 2.

But this section of the opinion was not cited by the SEC which, instead, relied on the holding that *Morrison*'s "domestic transaction" test was met where the parties closed their stock purchase and transferred title in the United States by submitting their transaction documents by courier to Miami. The SEC argues that the district court in *Tourre* held that "[t]here is no question" that the "transfer of title from the ABACUS trustee to [Goldman & [sic] Sachs Co.] at the New York based closing" is a "domestic purchase of securities." (*Notice of Additional Authority,* at 3)[#392].

But *Tourre*, carefully examined, is of no help to the SEC in this case. First, *Tourre* was not a summary judgment case but dealt with the adequacy of the SEC's allegations. And thus, *Tourre* could say that "there is no question that the SEC alleges a domestic purchase of securities...." 2012 WL 5838794, 4. But that domestic transaction was deemed insufficient as the hook for *Tourre*'s 10b-5 note transaction which was deemed to be not a domestic transaction.

More importantly, in *Tourre*, given the structure of the Goldman Sachs transaction, title actually passed in the United States at the closing. The SEC does not explain how that situation is comparable to what occurred here where the purchasers became irrevocably bound in foreign countries and IBI became irrevocably bound upon acceptance at its office in Brazil of the various offers. There was no "closing" at the escrow agent's office in Illinois as there was in New York in *Tourre*. Title did not pass in Illinois. All that occurred was that the escrow agent, upon receipt of the stock certificates, transmitted them to the foreign purchasers. In short, what occurred here is analytically dissimilar from what occurred in *Tourre*. The transactions about which the SEC complains are not domestic transactions and thus are within the gravitational field created by the Supreme Court in *Morrison*.

23

**2.**

**The SEC's Section 15(a) Claims**

In Count V, the SEC charges the defendants with being brokers or dealers who were not registered with the SEC. The defendants argue that *Morrison* applies to the registration requirement as well, and that because the IBI sales were not domestic sales, they were not required to register. This is a question that apparently no court has addressed, so neither party is able to support their positions with any pertinent authority. The question will be dealt with in a separate opinion.

**CONCLUSION**

For the foregoing reasons, the defendants' motion for partial summary judgment [# 344] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 2/15/13