**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 09 C 676 |
| v. | ) ) | Magistrate Judge Cole |
| STEFAN H. BENGER, et al., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Securities Exchange Commission ("SEC") has charged the defendants with having engaged in an international boiler room scheme targeting some 1400 foreign investors. The alleged scheme took in approximately $44 million primarily through the sale of penny stock. Of the proceeds, the defendants skimmed 60% as purported commissions for themselves and the foreign boiler room operators who answered to them. The stock companies in which the investors were investing realized less than 40% of the proceeds.

The SEC alleges that the investors never saw the distribution or escrow agreements that broke down the distribution percentages. They did see the stock purchase agreements, drafted by the movants, but, in those documents, the defendants claimed there were no commissions, and that only 1% of an investment didn't go to the companies – it went to a nominal transaction fee. The foreign boiler room operators used high pressure sales tactics, false identities, and fraudulent misrepresentations to make sales while the defendants distanced themselves, concealing the extent of their involvement and claiming ignorance of the sales process. *See generally S.E.C. v. Benger*, 2013 WL 593952 (N.D.Ill. 2013).

Count IV of the Second Amended Complaint charges the movants – Philip T. Powers, Global Financial Management, LLC ("GFM") and Frank I. Reinschreiber – with having aided and abetted violations of 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 by other defendants ("The defendants"). Mr. Powers and Mr. Reinschreiber controlled GFM, and they and their company acted as escrow agents for several of the issuers of stock sold through the alleged boiler room scheme. (2AC, ¶¶ 14, 15, 22, 49). Mr. Powers was one of the defendants who drafted the template contract documents, including the Escrow, Distribution, and Share Purchase Agreements, signed by each of the foreign purchasers. The defendants approved, adopted, and implemented the documents. (2AC, ¶ 20).

Once investors transferred their funds to the escrow in Illinois, the movants disbursed the funds in accordance with the Escrow and Distribution Agreements. (2AC, ¶ 49). They wired commission payments to accounts in countries like Switzerland and Cypress – nations known to have strong bank secrecy laws. The movants then caused the share certificates received from the sellers of the stock to be sent to the foreign investors in their respective countries. Letters accompanying the certificates noted the number of shares purchased, but never the commissions paid. Instead, the letters said that the issuers of the shares had received "Total Consideration." The movants reaped at least $6.9 million in investor funds for their efforts. (2AC, ¶¶ 31, 50).

The movants also lent an air of legitimacy to the scheme – they were U.S.-based, and Mr. Powers had a law firm. (2AC, ¶ 22). While the movants, therefore, could not maintain their anonymity, it is alleged that they concealed the existence of the other defendants and the sales agents and claimed that they were uninvolved in the scheme beyond the collection of the investors' money. (2AC, ¶ 32). But the SEC claims they knew full well what was going on. Notably, at one point in

the scheme, Mr. Powers allegedly expressed concern over being put in a position to "know" who the brokers were and consequently being liable for their sales practice abuses. (2AC, ¶ 34). Through their efforts, the SEC claims the movants provided knowing and substantial assistance to the other defendants' boiler room scheme. (2AC. ¶ 89).

The movants ask that Count IV be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. They argue that the SEC has: (1) failed to plead a primary violation of Rule 10b-5(b) by failing to allege the Distribution Defendants "made" the fraudulent statements required by Rule 10b-5(b) in the security purchase agreements; (2) failed to allege that they committed violations of Rules 10b-5(a) or 10b-5(c); and (3) failed to allege a duty of disclosure, which is an essential element of a "pure omission" offense under Rules 10b-5(a) or 10b-5(c).

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may e granted. *Christensen v. County of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). Pursuant to the federal notice pleading standards, a complaint need only provide a short and plain statement of the claim showing that the plaintiff is entitled to relief and sufficient to provide the defendant with fair notice of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). When evaluating the sufficiency of a complaint, a district court must construe the complaint in the light most favorable to the nonmoving party. *Id.* "To survive the motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As such, "the threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." *Id*. *See also SEC v. Benger*, 697 F.Supp.2d 932, 937 (N.D.Ill. 2010).

## A.
## The Rule 10b-5(b) Claim

In order to bring an aiding and abetting claim against the movants, the SEC must adequately plead a primary violation of Rule 10b-5. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 194 (1994). Rule 10b–5(b) makes it unlawful for any person, in connection with the purchase or sale of a security, "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 CFR § 240.10b–5(b).

The movants argue that, under *Janus Capital Group, Inc. v. First Derivative Traders*, – U.S. –, 131 S.Ct. 2296 (2011), the SEC has failed to allege that the Distribution Defendants were "makers" of the fraudulent statements in the share purchase agreements since they did not have "ultimate authority" over the statement as *Janus* requires. There, the court said that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S.Ct. at 2301.

The movants submit that there are no allegations in the Second Amended Complaint that any Distribution Defendant had ultimate authority over the statements in the share purchase agreements. The SEC's response looks to nine allegations and "maintains that it has stated a viable claim under subsection (b) of Rule 10b-5." (Dkt. # 362, *SEC's Response*, at 2-3). Of those nine, only one has to do with the any of the defendants putting together the share purchase agreements, and the SEC

4

quotes that one merely as saying that they "drafted the documentation." (Dkt. # 362, *SEC's Response*, at 2). That clearly does not pass muster under *Janus*, which specifically addressed this kind of conduct and concluded that:

> One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

131 S.Ct. at 2302. Drafting or preparing the documentation is akin to drafting a speech and is not enough to make the drafter a "maker."

If this were all the Second Amended Complaint alleged, the defendant's argument might be persuasive. But the Second Amended Complaint alleges not only that all the Distribution Defendants drafted the offending share purchase agreements, but that they "approved, adopted, and collectively implemented" them as well, in concert with the other defendants. (2AC, ¶ 20). The allegation regarding approval is arguably a barely sufficient allegation that the movants had ultimate authority, albeit along with the other defendants, over the content of the fraudulent statements. *See S.E.C. v. Carter*, 2011 WL 5980966, 2-3 (N.D.Ill. 2011)(CEO who approved release before they went public had ultimate authority). The ultimate proof may not end up supporting the allegations, but proof is for another time. For now, the allegations suffice under *Janus*.

One further point. Before capitulating (Dkt. # 362, *SEC's Response*, at 3 (". . . for the present purposes, [the SEC] will focus on subsection (a) and (c) . . . .")), the SEC obliquely says in a footnote: "it is worth noting that this Court and others have questioned whether *Janus* applies to

SEC enforcement actions." (Dkt. # 362, *SEC's Response*, at 3 n.2).[1] While the government's brief does not make clear whether this obstruction is intended as an argument or merely an interesting aside, at oral argument the SEC represented that it was not taking the position that *Janus* does not apply to the SEC.

*Janus* was a suit brought, not by the SEC, but by a private citizen charging a primary violation of Rule 10b-5. Significantly, the Court began its analysis by reminding that neither Rule 10b-5 nor §10(b) expressly creates a private right of action; a private right of action is merely implied. 131 S.Ct. at 2301. The Court went on to say that because "[c]oncerns with the judicial creation of a private cause of action caution against its expansion," it had to be careful to give "narrow dimensions ... to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law." 131 S.Ct. at 2302 (citations omitted). The Court was clearly worried about expanding the implied private cause of action, and the SEC's enforcement rights did not enter into the Court's thinking.

The Court's focus in *Janus* on private rights of action is made even clearer when it discusses the genesis of the rule regarding who can be considered a "maker" of a statement:

> This rule follows from *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164 (1994), in which we held that Rule 10b–5's *private right of action* does not include suits against aiders and abettors. See *id.,* at 180. Such suits—against entities that contribute "substantial assistance" to the making of a

---

[1] *See*, *e.g., S.E.C. v. Carter*, 2011 WL 5980966, 2, 2 n.4 (N.D.Ill. 2011)(noting that *Janus's* concerns over the expansion of private rights of action did not apply to SEC enforcement suits, but assessing the SEC's allegations under *Janus* anyway); *S.E.C. v. Sentinel Management Group, Inc*., 2012 WL 1079961, 15 (N.D.Ill. 2012)(in Section 17(a) suit by SEC, finding that *Janus* was inapplicable because 17(a) did not create a private cause of action); *S.E.C. v. Pentagon Capital Management PLC*, 844 F.Supp.2d 377, 421-22 (S.D.N.Y. 2012)(". . . *Janus* was a private suit, not an enforcement action brought by the SEC. The Court emphasized this difference, . . . There is no indication that the Court or Congress intended for actions brought by the SEC to be so limited.").

6

statement but do not actually make *it—may be brought by the SEC*, see 15 U.S.C.A. § 78t(e), *but not by private parties*. A broader reading of "make," including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*.

131 S.Ct. at 2302 (emphasis supplied).

The question becomes, then, whether, in the wake of *Janus*, the SEC can maintain an aiding and abetting suit if it fails to allege a primary violation by someone who qualifies under *Janus* as a of "maker." It's not a question that need be answered here, however, since the SEC has alleged that the defendants all had the authority to "approve[], adopt[], and collectively implement[]" the statements at issue. (2AC, ¶ 20).[2]

As the movants point out, there have been at least several cases where the SEC has simply conceded that *Janus* applies to its enforcement actions. *See SEC v. Sentinel Management Group, Inc.,* 2012 WL 57579, 5 (N.D. Ill. March 30, 2012) (Kocoras, J.) ("In light of the decision the SEC does not dispute that Bloom was not the maker of the statements .... "); *SEC v. Geswein,* 2011 WL (N.D. Ohio 2011) ("Further, as conceded by the SEC, any conduct alleged against Miller pursuant to Section 10(b) and Rule 10b-5(b) are dismissed . . . . "); *SEC v. Kelly*, 817 F.Supp.2d 340, 342 (S.D.N.Y. 2011) ("In its opposition brief to the defendants' motion, the SEC concedes that *Janus* forecloses a misstatement claim against Rinder and Wovsaniker under subsection (b) of Rule l0b-5 .... "); *SEC v. Daifotos,* 2011 WL 3295139, 2 (N.D. Cal. 2011) ("Both sides agree that this order must reconsider the order granting in part and denying in part defendants' motion to dismiss and

---

[2] Given the way the Second Amended Complaint has been drafted it perhaps could be argued that it charges all of the defendants as makers and therefore it does not effectively charge that the defendants were aiders and abetters. But that argument has not been made. The argument that was made was that the allegations in the Second Amended Complaint were insufficient to charge anyone as a maker.

7

strike ... pursuant to these new principles [from *Janus*]); and *SEC v.Big Apple Consulting USA, Inc.,* 2011 WL 3264512, (M.D. Fla. 2011 (In light of *Janus,* SEC moved for leave to amend its complaint, withdrawing the claim against defendant for primary violation and substituting a claim of aiding and abetting). And, as already noted, the SEC was rather lukewarm about this issue here, consigning it to a footnote.

## B.
## The Claims under Rule 10b-5(a) and (c)

The SEC also claims two additional theories of liability under Rule 10b-5(a) and (c). Rule 10b–5(a) prohibits an individual from employing "any device, scheme or artifice to defraud" investors, and Rule 10b–5(c) prohibits an individual from engaging "in any act, practice, or course of business which operates ... as a fraud or deceit" upon an investor. 17 C.F.R. §§ 240.10b–5(a), (c). The issue here is whether the conduct the SEC has alleged against the defendants falls under subsections (a) and (c) or is limited to the misrepresentations the SEC's complaint already addresses under subsection (b).

The movants argue that there must be a delineation between claims under subsection (b) and claims under subsections (a) and (c). While the issue has not been addressed by the Seventh Circuit, a number of other Circuits have determined that a defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1057 (9th Cir.2011). "[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)[.]" *Lentell v. Merrill Lynch & Co.,* 396

F.3d 161, 177 (2nd Cir.2005). *See also Public Pension Fund Group v. KV Pharmaceutical Co.*, 679 F.3d 972, 987 (8th Cir. 2012)("a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b)."); *S.E.C. v. Brown*, 740 F.Supp.2d 148, 172 (D.D.C. 2010)("to establish primary liability under Rule 10b–5 (a) or (c), the alleged conduct must be more than a reiteration of the misrepresentations underlying the Rule 10b–5(b) misstatement claims."); *S.E.C. v. Lucent Technologies, Inc.*, 610 F.Supp.2d 342, 361 (D.N.J. 2009)(alleged deception must go beyond a failure to disclose the real terms of the deal). The movants contend that the SEC's allegations of scheme and fraudulent practice under subsections (a) and (c) are fundamentally premised on the share purchase agreements' misrepresentation of the distribution and commission structure and therefore must be dismissed.

The SEC doubts that holdings such as these can be squared with what it feels is broad language designed to capture a wide range of fraudulent schemes. (Dkt. # 362, *SEC's Response*, at 9). Subsections (a) and (c) are indeed broader, in the sense that they go beyond the making of an untrue statement, and that shows they do not address conduct identical to that addressed in subsection (b). The holding in *Janus* cannot be skirted simply by artful pleading and rechristening a 10b-5(b) claim as a claim under 10b-5(a) and (c). Not surprisingly, that's exactly what the movants accuse the SEC of doing here.

The SEC argues that it has alleged "boatloads" of "free-standing deceptive conduct" beyond the misrepresentations in the share purchase agreements. (Dkt. # 362, *SEC's Response*, at 9). It cites the following charges from its complaint:

> Extracting an investor's proceeds and channeling more than 60% of it to themselves, and to their boiler room agents using offshore accounts located in countries known for strong bank secrecy laws – all without the investor's knowledge, let alone

9

> consent. (2AC, ¶¶ 30, 49);
>
> Obscuring the identities of every one of the scheme's participants except the lawyers who ably served as the faces of the operation in their capacities as escrow agents. (*Id.* at ¶ 27). One defendant reminded an issuer company not to disclose the defendant's identity to an investor, while another defendant encouraged prospective sales agents to hide from prospective investors their true location. (*Id.* at ¶¶ 46, 58).
>
> Covering their tracks when "the heat" got too "high" and assiduously avoiding learning details about the boiler room agents' sales practice abuses. (*Id.* at ¶ 34).

(Dkt. # 362, *SEC's Response*, at 10).

The SEC argues that this conduct brings its complaint in line with the schemes found to fall under subsections (a) and (c) in cases such as *S.E.C. v. Boock*, 2011 WL 3792819 (S.D.N.Y. 2011); *S.E.C. v. Pentagon Capital Management PLC*, 844 F.Supp.2d 377 (S.D.N.Y. 2012); *In re Global Crossing, Ltd. Securities Litigation*, 322 F.Supp.2d 319 (S.D.N.Y. 2004). It argues that the defendants here "are every bit as culpable as the masterminds" of the schemes in *Boock, Pentagon Capital*, and *Global Crossing*. The schemes involved in these cases were labyrinthine and multi-layered. It is difficult to summarize them in a way that portrays their full complexity. But even an adumbrated version reveals the comparative simplicity of the scheme charged in the instant case and belies the SEC's claimed equivalence.

*S.E.C. v. Boock*, 2011 WL 3792819, 1 (S.D.N.Y. 2011), for example, involved a corporate highjacking scheme. The defendants would take control of defunct companies or incorporate new companies in defunct companies' names. They would then change the companies' names and effect a reverse stock split to reduce the number of outstanding shares and submit fraudulent paperwork in order to obtain new CUSIP identification numbers and stock ticker symbols. When all the

outstanding shares had been registered under the new ticker symbol, the defendants issued new unrestricted and unregistered shares into the marketplace. They also created a market for these shares through bogus press releases. 2011 WL 3792819, 1-6.

In *S.E.C. v. Pentagon Capital Management PLC*, 844 F.Supp.2d 377, 382 (S.D.N.Y. 2012), a case the court characterized as involving issues that were "complicated and controversial," the defendants orchestrated a scheme to defraud mutual funds through late trading and market timing. *Id.* at 382. Market timing is a way to game the system by taking advantage of pricing inefficiencies. The defendants would buy or redeem shares when prices were stale – lagging behind the last fund's last pricing, which is generally calculated at 4 p.m. each business day. The defendants would then reverse the transaction at the start of the next day and make a quick profit with relatively little risk. This tactic could damage the value of the shares held by the mutual funds' other investors. *Id.* at 385-88. The defendants also employed late trading, which proved to be their legal downfall in the case. This part of their scheme involved submitting orders after 4 p.m. and taking advantage of price changes after the price was listed. This, like market timing, could dilute the value of other investors' holdings. *Id.* at 389-90. Again, this is just an oversimplified summary; the defendants' actual execution of these practices was far more complex. *See Id.* at 393-410.

Finally, the defendants in *In re Global Crossing, Ltd. Securities Litigation*, 322 F.Supp.2d 319 (S.D.N.Y. 2004) "created a web of interrelated transactions between [its] clients that had no economic substance but which were used to fool investors into believing that the industry and these companies were growing much faster than the reality." *Id.* at 327. It was a scheme designed "to artificially inflate the price of stocks by creating phantom revenue . . . ." *Id.* at 337. It involved fraudulent accounting and sham swap transactions that inflated the companies' revenues, *Id.* at 336,

11

and a system of accounting that violated numerous GAAPs. *Id.* 2d at 338-43. Assessing the voluminous complaint, which alleged both 10b-5(b) and 10b-5(a) and (c) claims, the court noted that "[c]laims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are . . . distinct claims, with distinct elements." *Id.* at 336.

At its core, the scheme in the instant case was charging investors $100 for stock and saying it was for $99 worth of stock and a $1 transaction fee, when it was only $40 worth of stock, with the remaining $60 going to the defendants as undisclosed "commissions." Obviously, the schemes in the cases the SEC cites go far beyond a single misrepresentation regarding commissions and concealing the identities of participants. Indeed, the alleged conduct of the instant defendants does not begin to approach that involved in the cases in which the SEC relies. According to the SEC, the undisclosed and disguised commissions are but a part of an encompassing scheme that involved more than the misrepresentations in the share purchase agreements. As an example of the scheme's complexity, the SEC points to the defendants having extracted an investor's proceeds and secretly channeling more than 60% of it to themselves and their alleged confederates. But this allegation adds nothing to the misrepresentations charged as a 10(b)-5(b) claim. They simply describe the essence of the scheme in different words.

The claim that the scheme involved obscuring the identities of every one of the participants except the lawyers and "[c]overing their tracks when 'the heat' got too 'high'" merely describes activities designed to conceal the scheme. But that is an inherent part of every illicit scheme. *United States v. Upton*, 559 F.3d 3 (1st Cir. 2009); *United States v. Kontny*, 238 F.3d 815 (7th Cir. 2001). If concealment were sufficient, every 10b-5-(b) violation could be charged as a 10(b)5-(a) and (c) violation as well.

12

The conduct beyond misrepresentations can be found in cases such as *S.E.C. v. Sells*, 2012 WL 3242551, 4 (N.D.Cal. 2012)(claims went beyond misrepresentations where defendants falsely reporting the sales of hospital equipment contrary to the rules the company announced to the public through various means including forgery of signatures of hospital administrators, then folding the inflated sales numbers into a prospectus ahead of the sale of 11.5 million shares of common stock); *S.E.C. v. Mercury Interactive, LLC*, 2011 WL 5871020, 2 (N.D.Cal. 2011)(in addition to misrepresentations, defendants allegedly backdated forty-five different stock options grants to themselves over more than five years, with each one backdated to a carefully selected date corresponding to a relative low point of the company's stock). The SEC's case here is clearly a 10b-5(b) case and, without more amplification from the SEC, the addition of concealed identities and turning a blind eye to sales tactics would not appear to be comparable to the conduct in *Boock*, *Pentagon Capital*, and *Global Crossing*. Accordingly, while the SEC has adequately stated a 10b-5(b) claim against the movants, its 10b-5(a) and (c) claims must be dismissed.

**CONCLUSION**

The defendants' motion to dismiss [# 342] is DENIED as to the SEC's 10b-5(b) claims and GRANTED as to the SEC's 10b-5(a) and (c) claims. The SEC has leave within 21 days to file a third amended complaint.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

DATE: March 21, 2013