**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND | ) | |
| EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 676 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| STEFAN H. BENGER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Securities Exchange Commission ("SEC") requests the imposition of a permanent penny stock bar against defendant, Phillip Powers. In February of this year, Mr. Powers, without admitting or denying the allegations in Count I of the Complaint, agreed to the entry of a Final Judgment against him for having violated the broker dealer registration requirements of the Securities Exchange Act, 15 U.S.C. §78o(b). Under the terms of the Final Judgment, the court would later determine whether Mr. Powers should be permanently barred from participating in an offering of penny stock. Mr. Powers agreed that in those proceedings he could not argue that he did not violate the federal securities laws as alleged in Count I of the SEC's complaint, could not challenge the validity of the judgment he consented to, and that the allegations in Count I of the SEC's complaint would not be contested. [Dkt. #468, at 4-5].

The SEC originally brought this case to address a purported scheme concerning the offer and sale of Regulation S stock in various penny stock issuers.[1] Making a long story short, when investors

---

[1]Penny stocks are low-priced, highly speculative stocks generally sold in the over-the-counter market
(continued...)

purchased shares, only about 40% of what they paid went to the issuing companies. The lion's share went to the defendants in this case, who acted as distribution agents or, in Mr. Powers' case, as escrow agents. In turn, this was disbursed to overseas accounts in the form of commission payments. With the exception of the $50 escrow/transfer fee, all this was unknown to the investors. It should be noted that, along the way, the SEC has filed four versions of its complaint in an effort to charge Mr. Powers and his co-defendants with fraud. Those efforts ultimately failed. [Dkt. #405, 465]. In the end, Mr. Powers conceded that he had failed to register as a broker dealer as charged in Count I.[2]

Mr. Powers is presently operating as an attorney under the strictures of an injunction, which prohibits him from "directly or indirectly, participating in any offering of penny stock (as that term is defined in Rule 3a51-1 of the Securities Exchange Act of 1934 [17 C.F.R. § 240.3a51-1])." [Dkt. #129, at 2]. The terms of the order, as modified by Judge Lefkow, allow Mr. Powers "to engage in advising clients in his capacity as a lawyer concerning securities law compliance that may entail advice about penny stocks." [Dkt. #152]. The SEC, however, wants a more encompassing injunction – one that is not burdened with Judge Lefkow's limitations, but would "permanently bar [Mr. Powers] from participating in an offering of penny stock, including engaging in activities with a broker dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock." [Dkt. #474-1, §IV].

---

[1](...continued)
and generally not listed on an exchange. *SEC v. Bronson,* 2014 WL 1613020, 13 (S.D.N.Y.2014).

[2] Count I of the Third Amended Compliant charged violation of the broker dealer registration requirements. The facts comprising the alleged "international boiler room scheme" were spelled out in Count I.

This would prohibit Mr. Powers from advising clients about penny stocks and thus, impact, *pro tanto*, his ability to practice law. While Mr. Powers does not contest that he violated the securities laws by failing to register as a broker-dealer, 15 U.S.C. §78o(b), he does vigorously object to the SEC's proposed punishment as too draconian.

A lifetime bar is an extraordinary remedy, usually reserved for those defendants who intentionally engaged in prior securities violations under circumstances suggesting the likelihood of future violations. *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978); *SEC v. Boey,* 2013 WL 3805127, 3 (D.N.H.2013); *SEC v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587 (S.D.N.Y.1993), *aff'd, SEC v. Posner,* 16 F.3d 520 (2d Cir.1994). In determining whether a defendant should be permanently enjoined for violations of the securities laws, courts consider a number of non-exclusive, interrelated factors,[3] which include: (1) the "egregiousness" of the underlying securities law violation; (2) whether the defendant is a "repeat offender"; (3) the defendant's role or position when he engaged in the securities law violation; (4) the defendant's degree of scienter;[4] (5) the defendant's economic stake in the violation; and (6) the reasonable likelihood that misconduct will recur.[5] *See SEC v. Patel,* 61 F.3d 137, 141 (2nd Cir. 1995); Jayne W. Barnard, *When is a Corporate Executive "Substantially Unfit to Serve"?,* 70 N.C.L.Rev. 1489, 1492-93 (1992).

---

[3] *See e.g.,SEC v. Mannion,* 2014 WL 2957265, 6 (N.D.Ga.2014)("The "egregiousness" of Defendants' conduct turns largely on whether Defendants acted with scienter.").

[4] Scienter is generally defined as a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. at 185,193 (1976).

[5] In one formulation or another, these factors have been used throughout the Circuits. *See, e.g., SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009)(whether the violation is isolated or recurrent; the sincerity of the defendant's recognition of his transgression, and whether his job would provide further opportunities for violations); *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC,* 289 Fed.Appx. 183, 189 (9th Cir. 2008).

A district court may determine that some of the factors are inapplicable in a particular case, and it may take other relevant factors into account in deciding whether to impose the bar and, if so, its duration. *SEC v. Bankosky,* 716 F.3d 45, 48 (2013). It is not a single factor, but rather the sum of the circumstances surrounding the defendant and his past conduct that governs whether to grant or deny injunctive relief. *SEC v. Zale Corp*. 650 F.2d 718, 720 (5th Cir.1981).

A defendant's past violation of the securities laws, without more, is insufficient to support permanent injunctive relief. *Gann*, 565 F.3d at 940; *SEC v. Commonwealth Chemical Securities, Inc*., 574 F.2d 90, 99-100 (2nd Cir. 1978); *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978). The critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a "'reasonable likelihood' of future transgressions." *Gann,* 565 F.3d at 940. To obtain injunctive relief, the Commission must offer positive proof of the likelihood that the wrongdoing will recur. *Blatt*, 583 F.2d at 1334.

Since the resolution of any legal problem requires "ascertaining the factual background and sifting through the facts with an eye to the legally relevant," *Sandra T.E. v. South Berwyn School Dist*., 100, 600 F.3d 612, 619 (7th Cir.2010), we turn to the factual record in this case. During the relevant period, Mr. Powers was "senior counsel" at the law firm of Handler, Thayer & Duggan, LLC ("Handler Thayer") in Chicago. According to the firm's website, he focused his practice on "business, corporate and securities law with an emphasis on domestic and international private equity formation and related transactions," with experience as a "general counsel to broker-dealers and other financial services firms, focusing on domestic regulatory compliance." [Dkt. #460, ¶ 4]. Mr. Powers was also a principal of Global Financial Management, LLC ("GFM"), a Chicago-based,

finance management company. [Dkt. #460, ¶¶ 4, 6]. GFM touted itself as providing "a complete line of escrow services, including the ability to receive and send funds in any foreign currency."

Through Mr. Powers and another defendant, Frank I. Reinschreiber, GFM acted as an escrow agent for several of the issuers of stock sold through the "scheme" that was the subject of this suit. [Dkt. #460, ¶ 6]. Mr. Powers and other defendants drafted the contract documents for the stock sales. [Dkt. #460, ¶ 16]. They worked with another group of defendants – distribution defendants – who had sales agents located outside the United States. [Dkt. #460, ¶ 20]. Neither GFM, nor Mr. Powers or Mr. Reinschreiber, were registered with the Securities Exchange Commission as a broker-dealer. [Dkt. #460, ¶ 6].

The alleged scheme involved the offer and sale of Regulation S stock in various pennystock issuers, including China Voice Holding Corp., Biomoda, Inc., World Energy Solutions, Inc., Revolutions Medical Corp., Earthsearch Communications, Inc., and Essential Innovations Technology Corp. [Dkt. #460, ¶ 14]. The defendants, other than Mr. Powers, effectuated the sales of shares to foreign investors with sales commission – unbeknownst to the investors – exceeding 60%. [Dkt. #460, ¶¶ 19, 25, 26]. Once an individual agreed to invest, he received a share purchase agreement and, in most cases, would send payment and a signed agreement to an escrow agent like Mr. Powers. [Dkt. #460, ¶ 21].

Mr. Powers and the other escrow agents would then disburse the funds to companies, the distribution agents, and the sales people – generally through accounts in foreign countries with strong banking secrecy laws – while retaining a commission for themselves as well. [Dkt. #460, ¶¶ 23, 25, 36]. The language of the share purchase agreements, however, led the investor to believe that the total investment amount was transferred to the issuing company. [Dkt. #460, ¶ 26]. For example,

a typical China Voice share purchase agreement might list a share price of 56 cents, a volume of 122,000 shares to be purchased, and total consideration for the shares as $68,370, along with a transaction fee of no more than $50.  [Dkt. #460, ¶ 30].

Here, Mr. Power's admitted violation of §17(a)(1) of the Securities Act, 15 U.S.C. §77q(a)(1) – failure to register as a broker-dealer – while not insignificant, is not egregious when compared to the violations that have confronted courts in the other cases on which the SEC relies. Mr. Powers acted as an escrow agent in the transactions in this case, but they did not involve American exchanges or American investors. *SEC v. Benger,* 934 F.Supp.2d 1008, 1011 (N.D.Ill. 2013).  The SEC, unable to make out a fraud claim against Mr. Powers, [Dkt. # 405, 465], abandoned the more serious charges it had originally brought.

Moreover, in its motion for a permanent penny stock bar, it was unable to cite a case in which a failure to register as a broker-dealer was punished with such a sanction.  All of the cases the SEC relies upon involved violations beyond the mere failure to register as a broker-dealer.  *See, e.g., SEC. v. Reynolds*, 2013 WL 3778830, 8 (N.D.Tex. 2013)(securities fraud); *SEC. v. Verdiramo*, 2013 WL 399230, 1 (S.D.N.Y. 2013)(selling illegally issued shares in unregistered, non-exempt transactions); *SEC. v. Elliot*,  2012 WL 2161647, 1 (S.D.N.Y. 2012)(selling unregistered shares); *SEC v. Offill*, 2012 WL 1138622, 6 (N.D.Tex. 2012)(former SEC attorney offering and selling unregistered securities). [Dkt. # 474].

When Mr. Powers pointed this out in his response brief, the SEC, in its reply brief, argued that it is not accurate that no *case law* supports its request for a permanent penny stock bar, and thus cited to reports of *settlements* in which such a bar was agreed to, and one case –  *SEC. v. Sky Way Global*,  2010 WL 3025033, 1 (M.D.Fla. 2010) – in which a bar was imposed in an unreported order.

There are several flaws in this approach. First, reply briefs are for replying – not for citing pertinent authority that ought to and could have been provided in an opening brief. *United States v. Kennedy,* 726 F.3d 968, 974 n.3 (7th Cir. 2013); *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013). To fail to list a case in an opening brief and then take your opponent to task for commenting on your lack of supporting case law in your reply is inappropriate. *Nationwide Ins. Co. v. Central Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013)(arguments not developed until reply brief are deemed waived); *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009)(same).

Beyond the question of waiver, the cases involving settlements fail to inform a decision here, where the defendant contests the imposition of such a bar and the SEC must "specifically" demonstrate "compelling reasons" for it. *Steadman v. SEC.*, 603 F.2d 1126, 1140 (5th Cir. 1979). And, in the case that gave rise to the unreported order imposing a penny stock bar, the conduct was far more egregious than Mr. Powers'. The defendant in *Sky Way Global* actively promoted investment in the company, actively solicited investors for securities transactions, and received about $2 million in commissions. He went on to evade service, failed to appear in court, attempted to conceal his violations of the law, and refused to recognize the wrongfulness of his conduct, *Sky Way Global*, 2010 WL 3025033, 1. Mr. Powers conduct falls far short of this.

There is nothing to suggest he was beating the bushes for investors or actively promoting the shares involved, and he realized just $77,560 for his efforts as an unregistered broker-dealer. While not a pittance, it is a far cry from $2 million. *See Patel*, 61 F.3d at 141 (considering defendant's economic stake in the scheme); *SEC v. Baldassare,* 2014 WL 2465622, 8 (E.D.N.Y. 2014)(imposing lifetime penny stock bar where, as the actual stockholders, defendants stood the most to gain in

scheme to defraud investors of millions of dollars). If the SEC's claims in the instant case are accurate, "tens of millions of dollars" were invested during the scheme. [Dkt. # 474, at 11]. Even if the total were just two "tens of millions" – *i.e., $20,000,000* – Mr. Powers' slice was a minuscule 0.3%. That's hardly any economic stake at all. There is nothing here to convince one to accept the SEC's characterization of his conduct as so egregious as to warrant a life-time bar that makes no allowance for him to practice law in the limited area the SEC objects to. *Compare, Global Express Capital Real Estate Inv. Fund, I, LLC,* 289 Fed.Appx. at 190 (defendant violated the securities laws over an extended period of time, was principal, owner, and manager of each of the entity defendants, violated her duty to fund investors, acted with a high level of scienter, profited from her fraud by diverting millions of dollars to entities that she controlled, and sought to escape responsibility by blaming others).

The SEC seeks to support its arguments for a lifetime penny stock ban by excising statements from a handful of emails from Mr. Powers to his co-defendants during the period charged in the complaint. Mr. Powers' contact information was on the stock purchase agreements, so he would receive on occasion complaints from investors when concerns arose. It should be noted parenthetically that there were only 20 such complaints. He would forward these complaints to someone in charge of distribution for instructions or resolution. Here are the emails from which the SEC has excised the statements on which it relies:

1. "How should I respond to this. I get these kinds of letters several times a month." [Forwarding an inquiry about China Voice stock's potential to be listed on an American stock exchange] [Dkt. # 474-1, Ex. 2]

2. "Another group of aggressive brokers. This is not good when I get all these emails" [forwarding a complaint regarding a promised return on investment; the distribution agent states that "he will get to the bottom of it"] [Dkt. # 474-1, Ex. 3]

3.      There has been an up tick in people complaining of fraudulent schemes in the UK. Hutchinson and Levi come to mind. They both used similar language. Has anyone done UK google search for our deals to see if chatrooms are spreading negative information? If this continues we should probably establish contingency fund to buy these people off if the heat gets to [sic] high. I for one cant [sic] be dragged into UK investigation via my law firm. We have no way of knowing what promises were made to these individuals and buyers remorse is strong motive However the choice of language used in the past couple of letters seem to suggest there is some pot stirring going on and in any event there needs to be some bridge building by the issuers to keep their shareholders informed and not feeling scammed. Thoughts? [Dkt. # 474-1, Ex. 4]

4.      This highlights the problem have seen with some of the broker groups and possibly why we are getting an uptick in unhappy investors.  The tactics described below are unconscionable  These brokers prey on retirees, old ladies and the mentally infirm. And of course they picked one old lady whose daughter is in compliance and might even be barrister.  Obviously we need to reverse this trade.  The question is how given that the commissions have already been paid. I am sure Marcelo wont [sic] have problem sending the funds back.

5.      I have spoken to Frank about adding line to the signature page of the contract note for date of birth and telephone number.  I think to protect ourselves (since unlike will of the wisp brokers we are sitting ducks for regulators) we need to confirm purchases for anyone who is over the age of 65.  We are working with good companies and they don't need the negative publicity of being dragged into an abusive boiler room scandal.

6.      Ironic isn't it that Mrs. Broady's daughter works for an energy trading firm? Going forward have to rethink whether our firm can be involved in paying out to the brokers. I think it puts us in position to "know" who the brokers [sic] and could make us liable for their sales practice abuses. Lets discuss our response on Monday. [Dkt. # 474-1, Ex. 5].

The SEC submits that these emails show Mr. Powers "narcissistically" focusing on himself, and not the plight of investors. [Dkt. #474 at 8].  That might be overstating it a bit.  The full emails quoted above– the SEC's brief quotes only partially from them although it properly included the entire emails as exhibits to its brief – give a more balanced depiction. If Mr. Powers were truly the callous narcissist the SEC contends, the emails would have taken on a very different cast. What they

show, at least in large part however, is a person concerned about aggressive brokers; a concern about the inability to know what promises had been made to U.K. investors; and a recognition of the need to have the issuers of the stocks keep their shareholders informed and not feeling taken advantage of. Another email shows Mr. Powers not as the smirking self-satisfied narcissistic boiler room operator or confederate of those who would prey on retirees, old ladies, and the mentally infirm, but as a concerned person.

The emails reveal Mr. Powers' distress at fraudulent and high pressure tactics directed to those who cannot protect themselves. In one email, the concern is how to reverse a particular trade Mr. Powers found reprehensible. That Mr. Powers' emails expressed some awareness and concern about possible improprieties in sales tactics is as equally susceptible to a favorable reading of his motives as it is to an unfavorable one. Perhaps more so. If Mr. Powers were the self-focused, smirking cheat suggested by the SEC, one would expect the emails not to have had any concern about "unconscionable tactics," shoddy sales practices, and those who prey upon the infirm and the elderly.

Still, the fact remains that although there were apparently isolated instances of suspected impropriety, or at least claimed impropriety by others, Mr. Powers did not extricate himself from the venture. Even if one views the emails in a less tendentious way than does the SEC, that failure is relevant and does bear upon scienter. But, a counterweight is the fact that of the 1400 transactions involved in these targeted offerings, Mr. Powers received just 20 complaints. [Dkt. #490-1, ¶ 33]. In the case of Mrs. Broady – referred to in the final email above – Mr. Powers assisted her in getting her money back. [Dkt. #490-1, ¶ 34]. And, through all these transactions, there was only a single complaint regarding what the SEC based its case on – the high-percentage commissions and low

percentage of funds going to the issuers. [Dkt. #474-1, Ex. 6].[6]

All of this is not to minimize Mr. Powers' violation of the broker-dealer registration requirement. He was a cog in the machinery of the overall scheme the SEC uncovered. But, at $50 a transaction in a deal the SEC claims reaped tens of millions of dollars in ill-gotten proceeds, he was a small cog indeed.[7]

As for the remaining factors, surely, with Mr. Powers' experience as a securities lawyer, it must be concluded that he acted with scienter in failing to register as a broker-dealer. That infraction was an isolated occurrence as was his participation as an escrow agent. While the SEC has not been able to make the multiple fraud charges stick, it hopes to use all the transactions Mr. Powers handled while he was not registered to paint him as a repeat offender and thus likely to commit further violations in the future. But there is a subtle and significant flaw in that mode of analysis. Securities violations are not like bank robberies – isolated events, limited in time and space. They are often complex affairs, spanning extended periods of time, with multiple players. If the SEC's view is right, all securities law violators are automatically repeat offenders on the second and succeeding days of the scheme.

If it be true that "'[t]he soundness of a conclusion may not infrequently be tested by its consequences,'" Posner, Cardozo: A Study in Reputation, 118 (1990), and that an argument may be "scotched" where its acceptance would produce "outlandish consequences," *United Slates v. Cinergy, Corp.*, 458 F.3d 705, 709 (7th Cir.2006), then the SEC's recidivism argument must be

---

[6] The SEC does not dispute any of these facts in its reply brief.

[7] In what the SEC depicts as a 20, 30, or perhaps 40 million dollar pie, Mr. Powers took in, relatively speaking, crumbs. He made about $77,000, meaning he took in approximately $55 per transaction.

rejected. Although the SEC does not concede it, a number of cases, some of which are discussed below, implicitly but necessarily have rejected the SEC's stained and incorrect view that a defendant automatically becomes a recidivist by participating in a multi-faceted scheme.

The SEC does not make a convincing case that Mr. Powers' participation in the violation in this case makes him a repeat offender along the lines of the defendant in *Metcalf* or brings his conduct into line with the defendant in *Sky Way Global*.[8]   *See also In re Reserve Fund Securities and Derivative Litigation,* 2013 WL 5432334, 23 (S.D.N.Y. 2013)("Given that these entities operated for several decades without any significant regulatory sanction, the Court further concludes that the infractions here are 'isolated occurrence[s]. '... While the Commission points to two violations committed more than thirty years ago to argue that RMCI is a repeat offender..., neither case involved 'the same or similar ... illegal conduct.' Because the "Commission has adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation,' ' an injunction is not warranted against [the defendants].")(citations omitted); *SEC v. Metcalf,* 2012 WL 5519358, *5 (S.D.N.Y. 2012)(even where the separate crime of bribery was incident to a fraudulent market-manipulation scheme, the conduct was deemed to be part of a "single scheme" and thus the defendant was not deemed a repeat offender);[9] *S.E.C. v. Dibella,* 2008 WL 6965807, 11 (D.Conn.2008)("Although DiBella acted with scienter, he is not the type of 'repeat

---

[8] The SEC submits that Mr. Powers' inactivity in the face of the 20 complaints  likens him to the character of Colonel Klink from "Hogan's Heroes." [Dkt. # 504, at 11].  The SEC is  likely confusing the Colonel Klink character with Sergeant Schultz, whose standard line throughout the series when things were going wrong was "I know nothing! Nothing!"

[9] The court in *Metcalf*  imposed a five-year penny stock bar, but  the conduct involved was far more egregious than that involved here.  The defendant bribed an undercover agent to effect a $2 million purchase of his company's stock in order to commit a fraud on the market.

offender' for whom an officer/director bar is especially appropriate. The conduct at issue in this case constitutes his first and only violation of the securities law. Applying the factors in *Patel,* the Court finds that there is insufficient evidence that an officer/director bar is warranted.); *SEC v. Boey*, 213 WL 3805127, 3 (D.N.H. 2013)(notwithstanding defendant's participation in a fraud scheme, he was a first time offender); *Patel*, 61 F.3d at 141–42 (reversing district court grant of an officer bar where defendant abused his officer position, showed "some scienter" and was the sole economic beneficiary of his actions, but was a first-time offender).

Finally, we must assess the likelihood of recurrence of wrongdoing by Mr. Powers. This is the critical factor to be considered in the analysis. *See* cases cited *supra* at 4. Of course, it is impossible to forecast the events still "in the womb of time," *Dennis v. United States*, 341 U.S. 494, 551 (1951)(Frankfurter, J., concurring),[10] and so any judgment regarding recurrence of bad behavior is necessarily a prophecy, guided by common sense and ordinary human experience, which always have a role to play in judging. *United States v Montoya De Hernandez*, 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008).

Since the past is prologue, foreshadowing the future, *Pan Am. World Airways, Inc. v. United States,* 371 U.S. 296, 310 (1963); *United States v. Winter,* 22 F.3d 15, 17 (1st Cir.1994), in determining the reasonable likelihood of future violations, recourse must be had to a defendant's history of misbehavior. *See, e.g., United States v. Stoller,* 78 F.3d 710, 723 (1st Cir. 1996). After all, as Wigmore observed, human experience teaches that a "bad" man is more likely to commit crimes than a "good" one. 1 J.Wigmore, *Evidence* § 194 at 646 (3rd. ed. 1940). It is therefore significant that

---

[10] The phrase was of course Iago's in Othello.

Mr. Powers has had no prior violations of the securities or any other laws. Similarly, his decades-long career as a lawyer has been unblemished. His only two prior involvements as an escrow agent in 42 years were without incident.

Mr. Powers has not previously participated in a penny stock offering, aside from advising the issuer in regard to the applicable regulations, and those undertakings were without incident. In short, during the entirety of his long career as a lawyer and during the five-year pendency of this case, Mr. Powers' record is unblemished. Thus, "'the record does not reveal [Mr. Powers' misconduct] to be so pervasively characteristic of [his] method of doing business as to indicate that he will continue to violate the securities laws unless an injunction is issued.'" *SEC v. O'Meally,* 2013 WL 878631, 2 (S.D.N.Y. 2013). "'Given that the SEC has not offered proof of other violations committed by [Mr. Powers it must be] conclude[d] that the [this] episode ... was an 'isolated occurrence.'" *In re Reserve Fund Securities and Derivative Litigation,* 2013 WL 5432334, 23.

Beyond Mr. Powers' unblemished history of law abidingness, is the nature of the violation. Those who involve themselves in the kind of fraudulent, protracted, complicated schemes like those in all of the cases cited by the SEC and act with a callous disregard for the interests of others over a protracted period of time are more likely to be repeat offenders than someone like Mr. Powers. While of course each case must be considered on its own facts, still the SEC's insistence on a lifetime ban that would preclude Mr. Powers from even acting as a lawyer advising a client in a penny stock case is somewhat at odds with its stance in *Thornton v. SEC,* 199 F.3d 440 (5th Cir.1999), which was a penny stock case. There, the evidence showed that the plaintiff "deliberately obfuscate[d]," "use[d] excuses," and "gave blatantly untruthful testimony" at the administrative hearing. The administrative officer found he should be  permanently banned from working in his

chosen profession as a registered representative. Nonetheless, the SEC lessened the sanction to a three-year bar.

In the end, the SEC has failed to show that Mr. Powers' conduct warrants the imposition of a permanent penny stock bar, the scope of which would preclude him from acting as a lawyer in connection with any penny stock transaction. Mr. Powers' past gives no indication that he will repeat the kind of behavior involved in this case. What the court said in *S.E.C. v. Dibella,* 2008 WL 6965807, 11 (D.Conn.2008) applies equally to Mr. Powers:

> Although DiBella acted with scienter, he is not the type of "repeat offender" for whom an officer/director bar is especially appropriate. The conduct at issue in this case constitutes his first and only violation of the securities law. Applying the factors in *Patel,* the Court finds that there is insufficient evidence that an officer/director bar is warranted. *See, e.g. Patel,* 61 F.3d at 141–42 (reversing district court grant of an officer bar where defendant abused his officer position, showed "some scienter" and was the sole economic beneficiary of his actions, but where defendant was a first-time offender and the SEC failed to demonstrate the likelihood of future misconduct); *Snyder*...(applying the *Patel* factors and holding that although the defendant acted with scienter and had an economic stake in the violation, an officer/director bar was "unnecessary and unwarranted" in light of "[t]he lack of egregiousness, the isolated nature of Defendant's actions, and the strong unlikelihood of Defendant's ever obtaining another officer/director position or committing future violations") *SEC v. Shah,* ... (...finding an officer/director bar unwarranted where defendant was an officer during his illegal conduct and pled guilty in related criminal case, but was not a repeat offender, his gain of $121,340 not egregious in comparison with other insider trading schemes, the circumstances of Defendant's actions did not evidence a high degree of scienter, and defendant was sufficiently punished by other remedies).

*See also Boey*, 213 WL 3805127, 3 (finding a lifetime bar unnecessary in light of the defendant's role in a widespread fraud, his modest economic stake in the violation, his first time offender status, and the small risk of recidivism).

Finally, there appear to be insufficient incentives to prompt Mr. Powers to embark on future illegal enterprises. Why would he risk another violation of the securities laws, be hailed into federal

court as a defendant in an inevitably protracted proceeding lasting years, face the most formidable of adversaries – the SEC – suffer thousands of dollars in legal fees or in lost income,[11] be forced to disgorge any gains, and be subject to an injunction, with the certainty of far harsher sanctions if he were to be found liable. To ask the question is to answer it.

## CONCLUSION

The SEC's motion for a permanent penny stock bar [# 474] is DENIED. However, some bar is appropriate, so long as it permits Mr. Powers to be able to act as a lawyer advising clients. That is what Judge Lefkow's injunction does, and that injunction, modified as necessary to comport with the requirements of this Opinion, will be continued for a period of five years from the date of its entry.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/13/14

---

[11] Although Mr. Powers represented himself, every hour spent on his own case was an hour he could not devote to earning a living as a lawyer.