**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES | ) | |
| AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 676 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| STEFAN H. BENGER et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

This protracted litigation over the violation of the defendants' operation of a "boiler room" scheme is at last coming to a close. The SEC's cases against all of the defendants, except Stephan von Hase and CTA Worldwide Services, have been resolved, and there remains only the SEC's motion for default judgment against Mr. von Hase and CTA Worldwide, [Dkt. #451] – their motions to vacate the defaults against them having been denied. *See United States Securities and Exchange Commission v. Benger,* 2014 WL 2198325, 2 (N.D.Ill.2014) [Dkt. ##506, 507].

The SEC now seeks entry of default judgment against the Default Defendants and the following remedies under the federal securities laws:

(1) Disgorgement of the proceeds from the boiler-room scheme [Amended Complaint, Dkt. # 234-4] in the amount of $6,357,966.25, with prejudgment interest, calculated according to the underpayment rate used by the Internal Revenue Service (IRS), in the amount of $1,423,077.08, for a total disgorgement of $7,781,043.33.

Alternatively the SEC would be content with a disgorgement figure of $3,031,999.45, which represents monies paid the Default Defendants and von Hase's wife from December 5, 2007 through January 9, 2009. [Dkt. #538 at 7];[1]

(2) "substantial" civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act (15 U.S.C. §§ 77t(d) and 78u(d)(3));

(3) an order permanently barring the Default Defendants from participating in future penny stock offerings, pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act (15 U.S.C. §§ 77t(g) and 78u(d)(6)); and

(4) an injunction permanently barring the Default Defendants from engaging in conduct that violates Section 17(a) of the Securities Act, (15 U.S.C. § 77q(a)), Section 10(b) (and the related Rule 10b-5) of the Exchange Act, (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5), and Section 15(a) of the Exchange Act, (15 U.S.C. § 78o(a)), pursuant to Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act (15 U.S.C. §§ 77t(b), 78u(d)(1)).

[Dkt. ##451, 525, 538].

Default Defendants do not deny that they are jointly and severally liable for some amount of disgorgement, some amount of prejudgment interest and a civil penalty in some amount. They do, however, object to the imposition of "significant" civil penalties. [Dkt. #451 at 8-10]. Accordingly, the only aspect of the Commission's request for relief that Default Defendants take issue with is the amounts of the monetary remedies.

For the reasons discussed below, Plaintiff's Motion for Default Judgment Against Defendants Stephan Von Hase and CTA Worldwide Services, S.A., [Dkt. 451], as to all of the forms of relief sought, is granted, with the modifications and exceptions discussed below. Jurisdiction is retained to set the proper amount of a civil penalty, upon motion by the SEC requesting a specific penalty amount, made within 7 days from the issuance of this Opinion.

---

[1] Imposition of this amount would alter the prejudgment interest calculation to a number smaller than $1,423,077.08.

# I.
## FACTUAL BACKGROUND

The facts of this case have been extensively discussed in previous opinions. *See S.E.C. v. Benger,* 64 F.Supp. 3d 1136 (N.D.Ill. 2014); *S.E.C. v. Benger,* 2013 WL 593952 (N.D.Ill.2013); *S.E.C. v. Benger,* 931 F.Supp.2d 908 (N.D.Ill.2013); *S.E.C. v. Benger,* 931 F.Supp.2d 904 (N.D.Ill.2013); *S.E.C. v. Benger,* 931 F.Supp.2d 901 (N.D.Ill.2013); *S.E.C. v. Benger,* 934 F.Supp.2d 1008 (N.D.Ill.2013); *S.E.C. v. Benger*, 2010 WL 724416 (N.D.Ill. 2010). Thus, only the pertinent facts will be recounted here.

The SEC filed suit in connection with an alleged "boiler room" scheme on February 3, 2009, initially naming the Default Defendants as relief defendants only. [Dkt. #1]. The SEC amended its Complaint several times, first converting the Default Defendants from relief defendants to full defendants with the Amended Complaint of April 1, 2010. [Dkt. # 238, 333]. The penny stock offerings at issue are those relating to China Voice Holding Corp. ("China Voice"), Biomoda, Inc. ("Biomoda"), Pharma Holdings Inc. ("Pharma Holdings"), World Energy Solutions, Inc. ("World Energy"), Revolutions Medical Corp. ("Revolutions"), Earthsearch Communications, Inc. ("Earthsearch"), and Essential Innovations Technology Corp. ("Essential Innovations"). [*See* Dkt. ##333, 451-1].

The SEC charged that the defendants operated a boiler room scheme whereby they engaged foreign sales agents using high-pressure sales tactics and misrepresentations to prey on unsophisticated investors, including the elderly. The high-pressure tactics employed included "falsely representing that the price of the stock being offered was about to rise sharply, urging potential investors to liquidate savings and other investments, purporting to offer discounted pricing, and, on at least one occasion,

threatening to sue investors if they did not purchase the full amount of shares initially agreed upon." [Dkt. ##144, 263].

The Default Defendants further misrepresented the division of funds received from investors. In some instances, boiler room agents misrepresented the fact that over 60% of the funds received from investors were not going to the issuing company, by falsely stating that "only nominal transaction fees would be charged," and that the boiler room operatives would receive a commission only if the investor sold their shares for a profit. [Dkt. ##144, 333]. In reality, the majority of the funds collected from the victims was to be paid to the Default Defendants pursuant to the Escrow & Settlement and Distribution Agreements that the Default Defendants had with each stock issuer and the escrow agents – 71% in most cases. [Dkt. # 538-1, 538-2]. These agreements, and the commissions they contemplated, were never disclosed to, and in some instances were actively concealed from, the investor-victims. [Dkt. #333, ¶¶ 2–4, 23, 35–50]. A number of the Default Defendants' boiler room agents, some of whom were barred from conducting business in the United Kingdom, also misrepresented themselves as employed or otherwise associated with reputable financial services firms operating in the United Kingdom. [Dkt. # 333, ¶ 25].

The scheme was wildly successful, raising upwards of $44 million from more than 1,400 investors. [Dkt. # 333].

The Default Defendants answered the Complaint more than a month after the extended deadline granted by the court, [Dkt. # 159, 180], and more than three months after the original July 14, 2009 deadline to answer had expired.

The SEC filed its first Amended Complaint on April 1, 2010, [Dkt. #238], and, though the deadline to respond was May 6, 2010, [Dkt. #239], the Default Defendants did not do so. [*See* Dkt. #253]. The SEC moved for default judgment, [Dkt. #253], and the court granted the motion on June 22, 2010. [Dkt. #261]. However, the Default Defendants received leave to file an answer to the Amended Complaint *instanter* on November 18, 2010, gaining a brief respite from default. [Dkt. ##282–284, 314].

This belated submission essentially marked the conclusion of the Default Defendants' meaningful and responsible participation in the case. The court granted the SEC's motion to compel the Default Defendants to answer the Second Amended Complaint. [Dkt. #442]. When the Default Defendants failed to respond, the SEC again moved again for entry of default. [Dkt. ##447, 451]. And a second time, the SEC's motion was granted, [Dkt. #447], not to be vacated again.

Three months passed before the Default Defendants filed a motion to vacate the default, claiming that a sudden thirteen-day hospitalization for alcoholism prevented Mr. von Hase from even "communicating" with counsel for several months. [Dkt. ##457, 507]. This motion, coincidentally, came only a few days after the SEC filed its motion for the entry of final default judgment. [Dkt. #451]. The motion to vacate was denied. [Dkt. #507]. *See United States Securities and Exchange Commission v. Benger*, 2014 WL 2198325 (N.D.Ill. 2014).

## II.
## ANALYSIS

As a result of the defaults entered against the Default Defendants on October 13, 2013, the factual allegations in the SEC's Second Amended Complaint [Dkt. # 442] are deemed admitted and not open to challenge. *See Thomson v. Wooster*, 114 U.S. 104,

110–11 (1885); *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994)*; Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).

Though the facts are admitted, a question still exists as to the remedies sought by the SEC. *See Thomson*, 114 U.S. at 111. Thus, while default judgment precludes challenge as to the well-pleaded factual allegations in the plaintiff's complaint, the amount of any monetary relief not identified as liquidated or otherwise calculable from the record must be proved-up separately; conclusions of law contained in the complaint are not admitted. *See Pope v. United States*, 323 U.S. 1, 12 (1944); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007); *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010). A separate evidentiary inquiry to ascertain the proper amount of a monetary judgment is not necessary where, as here, the amounts are "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *e360 Insight*, 500 F.3d at 602; *S.E.C. v. Michel,* 521 F. Supp. 2d 795, 830–31 (N.D.Ill. 2007).

As to the injunctive relief sought by the SEC, "judgment is immediately given . . . where the thing demanded is certain." *Thomson*, 114 U.S. at 111. *See also S.E.C. v. Management Dynamics, Inc.*, 515 F.2d 801, 813–814 (2nd Cir. 1975); *Ramm Industries Co. v. Chapman Performance Products, Inc.*, 1978 WL 21741, *4–5 (N.D.Ill. 1978). The civil penalties sought by the SEC involve an exercise of the court's substantial discretion, and the record here is sufficient to permit an informed exercise of that discretion. *See* 15 U.S.C. § 78u(d)(3); *S.E.C. v. Church Extension of the Church of God, Inc.*, 429. F. Supp. 2d 1045, 1050–51 (S.D.Ind. 2005). *See also*, *S.E.C. v. Sargent*, 329 F.3d 34, 38, 41–42 (1st Cir. 2003); *S.E.C. v. Michel*, 2008 WL 516369, *1–2 (N.D.Ill. 2008). Finally, the

factual record is sufficient to establish that injunctive relief is appropriate, and the Motion for Default Judgment can be decided without any further factual inquiry beyond the documentary record and the parties' filings. Each form of relief the SEC seeks is considered in turn.

## A.
### Disgorgement

### 1.

Disgorgement is available to the SEC chiefly to make violations of the securities laws unprofitable, to prevent a defendant from being unjustly enriched by his fraud, to divest wrongdoers of their ill-gotten gains, and to deter future violations. *See Randall v. Loftsgaarden*, 478 U.S. 647, 671–72 (1986); *Montford and Co., Inc. v. S.E.C.*, 793 F.3d 76, 83 (D.C.Cir. 2015); *S.E.C. v. Teo*, 746 F.3d 90, 104 (3rd Cir. 2014); *S.E.C. v. JT Wallenbrock & Associates,* 440 F.3d 1109, 1113 (9th Cir. 2006); *S.E.C. v. Lipson*, 278 F.3d 656, 661–63 (7th Cir. 2002). Disgorgement is designed to be remedial and not punitive. *FTC v. Trudeau*, 579 F.3d 754, 774 (7th Cir. 2009).

As the Default Defendants concede, [Dkt. #525 at 4], because disgorgement is an equitable remedy, a court has broad discretion not only in determining whether to order disgorgement, but also in calculating the amount to be disgorged. *S.E.C. v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1474–75 (2nd Cir. 1996); *S.E.C. v. Michel*, 521 F. Supp. 2d 795, 830–31 (N.D.Ill. 2007). When calculating disgorgement, separating legal from illegal profits exactly may, at times, be difficult. Thus, "disgorgement need only be a reasonable approximation of profits causally connected to the violation. *Montford and Co., Inc.*, 793 F.3d at 84. The touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the amount sought to be disgorged. *Id.* To

order disgorgement, the "district court....need find only that [the defendant] has no right to retain the funds illegally taken from the victims." *JT Wallenbrock & Associates*, 440 F.3d at 1113.

As admitted by virtue of the defaults, the Default Defendants profited from the investor-victims by securing purchases of various stock offerings while concealing the exceedingly high commissions they stood to receive, and this pecuniary gain was directly related to their fraudulent sales practices. *Cf. S.E.C. v. Lorin*, 76 F.3d 458, 462 (2nd Cir. 1996)("because the purpose and effect of the scheme was to manipulate and stabilize the prices of the Haas stocks, appellants likely profited from the scheme in all of their trades in those securities."). If the Default Defendants had disclosed the steep commissions they stood to receive, or if they had refrained from employing the coercive sales tactics alleged in the Complaint, the defrauded investors would likely not have bought stocks from the Default Defendants at all. *Compare Trudeau*, 579 F.3d at 773 & n16 ("if the customers had known the truth, they might not have bought any [goods] at all").

**2.**

The SEC has requested disgorgement from the Default Defendants in the amount of $7,781,043.33, reflecting claimed ill-gotten profits of $6,357,966.25, and prejudgment interest of $1,423,077.08. [Dkt. # 451]. The defendants do not object to "some amount of disgorgement." But, they say it should only be $360,779.76 which is the amount they admit they actually received. [Dkt. #525 at 7]., The contention is insufficiently supported and how the Default Defendants arrived at the amount is contrary to established principles regarding the computation of disgorgement.

Taking the facts alleged in the SEC's Second Amended Complaint as true, as we must in light of the defaults, *see supra* at 5; *S.E.C. v. Razmilovic,* 738 F.3d 14, 19 (2nd Cir. 2013); *O'Rourke v. Palisades Acquisition XVI, LLC,* 635 F.3d 938, 940 (7th Cir. 2011), the Default Defendants "offered to deploy their overseas boiler room sales force to sell the company's shares to foreign investors in exchange for sales commissions exceeding 60%," [Dkt. #333, ¶ 23]; the information was "carefully hid[den] . . . from the defrauded investors," [Dkt. #333, ¶ 23], and the Default Defendants "raised at least $16.7 million from investors." [Dkt. # 333, ¶ 62].

Some of these proceeds came from a stock offering which has previously been held outside the scope of the SEC's enforcement authority, [*see* Dkt. ##405, 404, 344]; *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). But, at least in most cases, the SEC is not required to "trace every dollar of proceeds misappropriated by the defendants . . . nor is [the SEC] required to identify monies which have been commingled by them." *S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996). *Accord*, *S.E.C. v. Seven Palm Investments, LLC*, 2014 WL 1292377, *2 (N.D.Ill. 2014)("Any ambiguities in the SEC's calculation should be resolved against the defendants, and the SEC is not required to trace every dollar of the a [sic] defendant's gains.")(internal citations omitted); *S.E.C. v. First Pacific Bancorp*, 142 F.3d 1186, 1192 & n 6 (9th Cir. 1998); *S.E.C. v. Solow*, 554 F. Supp. 2d 1356, 1363 (S.D.Fla. 2008)(citing *S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004))("Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.").[2]

---

[2] This is but a particular application of the "wrongdoer doctrine," under which courts are willing to accept a degree of uncertainty because "it does not come with very good grace' for the wrongdoer

(continued...)

Delila Helpingstine, [Dkt. ##451-1, 538-1], an SEC staff accountant, analyzed the financial records of Handler Thayer & Duggan, LLC ("Handler Thayer"), Global Financial Management, LLC ("Global Financial"), and Henry K. Becker ("Becker"), escrow agents for various offerings connected to the boiler room scheme, and various documents provided to the SEC during discovery. [Dkt. # 451-1]. The financial records Helpingstine examined "summarized the weekly receipt of funds from investors and calculated the amount payable to each . . . distribution agent." [Dkt. #451-1, ¶¶ 7–9]. Helpingstine arrived at the figure of $6,357,966.25 by aggregating the amounts due to the Default Defendants under the distribution agreements in connection with the offerings at issue here. [Dkt. #451-1].

Following the SEC's Motion for Default Judgment, the Memorandum of Defendants Von Hase and CTA Worldwide in Opposition to the SEC Motion for Entry of Default Judgment was filed. [Dkt. #525]. In it, the Default Defendants assert that the appropriate amount of disgorgement to be ordered is $360,779.76, which they claim reflects "the actual amount of funds paid to CTA and von Hase from the sales of the securities that are the subject of this case." [Dkt. #525, ¶ 7]. It is first useful to note that the amount Mr. von Hase claims he received is less than 15% of the price that was paid to Mr. Benger to buy his business contacts and succeed to his place in the boiler room scheme. [Dkt. # 333, ¶ 54]. It defies common sense and ordinary human experience –

---

[2](...continued)

to insist upon specific and certain proof of the injury which it has itself inflicted."J. *Truett Payne Co., Inc.,* 451 U.S. 557, 566, (1981). *See also DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.,* 990 F.2d 1186, 1201 (11th Cir.1993); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir. 1980). *Compare, United States v. Cohen*, 145 F.2d 82, 88 (2d Cir. 1944) (L. Hand, J.) ( "It is particularly unreasonable for the accused to...complain of that confusion of which they were the authors.").

which always have a role to play in legal analysis, *United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir. 1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009); Posner, How Judges Think at 116 (Harv. Univ. Press 2008) – to suggest that the Default Defendants would have agreed to pay, and that Mr. Benger would have agreed to accept a $2.5 million payment, even one structured as an "earn out" (where Mr. Benger would be paid out of the Default Defendants' share of the proceeds from the boiler room scheme), if the amount the Default Defendants stood to take in was but an infinitesimally small fraction of the cost of the business. [Dkt. # 333, ¶ 54].

But we need not rely on circumstances alone, for the basis of the Default Defendants' proffered disgorgement figure is an unreliable and thus unacceptable spreadsheet prepared by Frank Reinschreiber, a co-defendant and principal of Global Financial Management, LLC, who also served as an escrow agent for several of the issuers connected with the Default Defendant's boiler room scheme. [Dkt. # 333, ¶ 15].

**3.**

The Default Defendants find significant that funds were not sent directly to them by the investor-victims. [Dkt. #525]. As they tell it, again without any legal authority to support the distinction, they are only liable to disgorge the funds that they actually received, the contrary distribution agreements notwithstanding. [*See, e.g.,* Dkt. # 538-1, 538-2]. Not only is the argument at odds with established and uniform precedent, it is a veiled and impermissible attempt to re-litigate the facts they have admitted. [*See* Dkt. #525, ¶ 7]. Indeed, they maintain that the facts the SEC alleges, [*See* Dkt. #333, ¶¶ 30, 36, 49, 55, 56, 62, 69], are untrue despite their defaults. [*See* Dkt. #525]. The distribution

agreements under which the Default Defendants were due enormous commissions [*see, e.g.,* Dkt. #333, ¶ 1], required that the escrow agents comply with the percentages specified in them. The defendants are deemed to have admitted these facts and that the distribution agreements were complied with. [*See, e.g.,* Dkt. #333, ¶ 30].

In arguing for a *de minimus* amount to be disgorged, the Default Defendants rely on the affidavit of Mr. von Hase, who, in turn, relies on a spreadsheet purportedly prepared by Mr. Reinschreiber. Even if I were to ignore years of consistent precedent that runs contrary to the legal arguments of the Default Defendants regarding the calculation of disgorgement, Mr. Reinschreiber's spreadsheet is plainly insufficient to support the argument that disgorgement should be only $360,779.76.

As the SEC points out in its Amended Reply, the Default Defendants admit that they assumed the operation of the boiler room in at least March of 2008. [Dkt. #538 at 5, *see also* #525 at 9]. However, the spreadsheet attached to Mr. von Hase's Declaration only begins accounting for the funds due to the Default Defendants as of May 30, 2008. [Dkt. #525-2]. Other examples of inexplicable omissions totaling more than $2 million are set forth in the SEC's Amended Reply Brief. *See id.* at 6.

This careful exclusion of earnings received prior to the beginning of the period on the spreadsheet, which the SEC shows are upwards of $3 million, rather seriously undermines the spreadsheet's reliability. [Dkt. #538 at 5–6]. And reliability is the touchstone for most evidentiary questions. *Estate of Anderson v. Strohman*, 2015 WL 4920313, at *2 (D.Md.2015). Indeed, the law's insistence on evidentiary reliability helps to ensure the integrity of the judicial process, *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.1989), which is of such transcendent

importance that judges can *sua sponte* prohibit testimony that does not pass muster under *Daubert. See O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1094 (7th Cir. 1994).

The spreadsheet on which Mr. von Hase bases his computations for purposes of disgorgement is unreliable having been prepared by Mr. Reinschreiber, who has not provided an affidavit or declaration regarding the preparation of the spreadsheet, even though without appropriate substantiation and explanation it cannot be concluded that the spreadsheet is sufficiently trustworthy or reliable to permit a court to rely on it or to conclude that it is complete, accurate, and reliable. Indeed, overlooked by the Default Defendants is the significant fact that Mr. Reinschreiber invoked the Fifth Amendment in response to questions about the spreadsheet during his deposition. [Dkt. #538 at 6]. It is permissible to draw a negative inference from Reinschreiber's assertion of the Fifth Amendment, *Baxter v. Palmigiano,* 425 U.S. 308 (1976); *Evans v. City of Chicago*, 513 F.3d 735, 740 (7th Cir. 2008), and I do so. And since Mr. Von Hasse's assertions depend on the accuracy of Mr. Reinschreiber's schedule, it must be concluded that there is no credible evidence to support Mr. Von Hasse's factual conclusions.

By contrast, the SEC has provided sworn affidavits that analyze financial records from the escrow agents to whom the defrauded investors' funds were sent and compare them to the distribution agreements, delineating the percentages of each pool of money received to which the Default Defendants were entitled as commissions. [Dkt. # 451-1, 538-2–4]. This evidence, which is I find reliable, clearly permits me to come to a "reasonable approximation" of the appropriate amount of disgorgement. *See, e.g., Michel*, 521 F. Supp. 2d at 831

# 4.

The Default Defendants claim they are not responsible for funds paid from their share of the ill-gotten gains, to those whom they were contractually obligated to pay. Thus, they say they may deduct the funds paid to their agents from the amount they should be ordered to disgorge. [Dkt. #525 at 6]. The SEC argues that the "overwhelming weight of authority" holds that securities law violators may not offset their disgorgement liability with the expenses of their fraud. *See S.E.C. v. United Energy Partners, Inc.*, 88 Fed.Appx. 744, 746 (5th Cir. 2004); *S.E.C. v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998); *S.E.C. v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214-15 (E.D. Mich. 1991); *S.E.C. v. TLC Investments and Trade Co.*, 179 F. Supp. 2d 1149, 1157 (C.D. Cal. 2001)("Expenses in carrying out a fraudulent scheme … are hardly appropriate or legitimate deductions").

Here, Default Defendants entered into agreements with the issuers giving themselves the bulk of investor money. For example, pursuant to the "Disbursement Instructions" set forth in Default Defendants' Escrow and Settlement Agreement with issuer Essential Innovations Technology Corp., investor proceeds were "allocated as follows:

> 1. An amount equal to 1.0% of the Proceeds from each Purchase Agreement with respect to which closing occurred, plus $50/Buyer in expenses, to the Escrow Agent;
>
> 2. 28% of proceeds to be distributed to the Issuer;

3. 71% of the proceeds to the Distribution Manager [*i.e.*, Defendant CTA]."

Thus, after the escrow agent obtained money from an investor (through Default Defendants' fraud), 71% of it was allocated to Default Defendants.

Default Defendants' escrow agreements with other issuers contained similar provisions and instructions. Default Defendants retained foreign sales agents to help them carry out their scheme. It was the sales agents' job to locate the victim-investors. Per Default Defendants' separate distribution agreements with the issuers, Default Defendants were responsible for paying the sales agents out of their own share of the scheme's proceeds. [Dkt. #538-3]. ("The Distribution Manager shall be responsible for all other costs of the Distribution including the fees of any subagents, introducing parties or brokers.").

Default Defendants could have collected all their money (the 71%) from the escrow agents and then paid the sales agents themselves. But instead – perhaps as a matter of convenience or possibly in an attempt to limit their potential exposure – Default Defendants instructed the escrow agents to pay the foreign sales agents directly.

The Default Defendants are not entitled to deduct from the disgorgement their obligations incurred in furtherance of the perpetration of the fraud. "It would be unjust to permit the defendants to offset against investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place." *JT Wallenbrock & Associates*, 440 F.3d at 1114. *See also Kenton Capital, Ltd.*, 69 F. Supp. 2d at 16; *Great Lakes Equities Co.*, 775 F. Supp. at 215 ("a tipper must disgorge not only his own profits but also any profits made by his tippees, even if the tipper did not receive any tangible kickback from those tippees . . . Moreover, . . . where the expenditures are to defray obligations of the wrongdoer, the wrongdoer is benefitted by those expenditures.")(internal citations omitted).

In sum, where the perpetrator of a successful fraud is benefitted thereby, the core purposes of disgorgement require that disgorgement should be ordered in the amount by which the wrongdoer was benefitted, regardless of whether he retained the funds or spent them for his own purposes. *See S.E.C. v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987).

**5.**

There is, however, a snag. The SEC concedes that its disgorgement figure is overstated to the extent it includes money attributable to the IBI offering which the court previously excluded under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2013). [*See* Dkt. #538 at 7, n.4]. The SEC says it's the defendants' burden to demonstrate reliably how much pertains to the IBI and that they have not done so. But no cases are cited in support of this particular assertion, and it is not enough to invoke the general proposition that "all lingering doubts and uncertainties must be resolved against" the Default Defendants. Given the SEC's admission that the $3 million plus sought by the SEC is overinclusive, I prefer to use the SEC's alternative disgorgement figure of $3,031,999, which represents amounts "that were actually paid to CTA, Stephen von Hase, and von Hase's wife from the various bank accounts maintained by the three escrow agents retained to assist in these boiler room offerings." [Dkt. #538 at 7].

In sum, the Default Defendants have failed to rebut the SEC's (alternative) calculation of the appropriate amount of disgorgement, and have provided no credible evidence to sustain their calculations and counter-arguments. The SEC has shown that

$3,031,999.45 is a "reasonable approximation" of the appropriate amount of disgorgement.

## B.
### Prejudgment Interest

"In an SEC enforcement action, a disgorgement order should include all gains flowing from the illegal conduct, including prejudgment interest, to ensure that the wrongdoer does not make any illicit profits." *Michel*, 521 F. Supp. 2d at 831. Prejudgment interest is routinely calculated according to the IRS' underpayment rate. *S.E.C. v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D.Ill. 2007)("the majority of courts apply the IRS underpayment rate to SEC disgorgements"). Prejudgment interest is a matter left to the discretion of this Court. *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir. 1985). Thus, the SEC seeks an order requiring the payment of $1,423,077.08 in prejudgment interest on the $6,357,966.25 disgorgement amount. [Dkt. # 451 at 7]. But since that figure has been rejected, the SEC shall submit the appropriate calculation based on $3,031,999.45 and shall do so within 7 days of this Opinion.

## C.

### Civil Penalties

The SEC further requests "significant" civil penalties be imposed on the Default Defendant, but does not request a specific amount. [Dkt. 451 at 7-8]. In a securities-fraud case, if the defendant's actions "resulted in substantial losses or created a significant risk of substantial losses to other persons[,]" the court may impose civil penalties up to the greater of $100,000 or "the gross amount of pecuniary gain to [the] defendant as a result of the violation[.]" 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). *S.E.C. v. Zada*, 787 F.3d 375, 383 (6th Cir. 2015). The maximum civil penalty is based on the egregiousness of the

violation, divided into three tiers. 15 U.S.C. §§ 77t(d), 78u(d)(3); 17 C.F.R. § 201.1003. The amount of the penalty is for the court to decide. *Lipson*, 278 F.3d at 664.

Two general methods used in determining the appropriate amount of a civil penalty to be assessed are the "per violation" approach, and the "proportional" approach, assessing civil penalties based on the number of violations alleged, or in proportion to the amount of disgorgement ordered, respectively. *See Koenig*, 532 F. Supp. 2d at 995. However, given the discretion afforded a court in setting the appropriate amount of a civil penalty, comparison to penalties assessed in other cases while helpful is of limited utility. "'The very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates." *McCleskey v. Kemp*, 753 F.2d 877, 891 (5th Cir. 1985), *aff'd, McCleskey v. Kemp*, 481 U.S. 279, 289-290 (1987). *See also Mejia v. Cook County, Ill.,* 650 F.3d 631, 635 (7th Cir.2011).

Exercising discretion requires a consideration of the factors relevant to that exercise. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). In determining civil penalties for violations of the securities laws, courts consider several factors as informative of the appropriate amount of a civil penalty to award. *Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d at 1050–51; *S.E.C. v. Cavanagh*, 2004 WL 1594818, *31 (S.D.N.Y. 2004). The factors are: (1) the seriousness of the violations; (2) the defendant's intent; (3) whether the violations were isolated or recurring; (4) whether the defendant has admitted wrongdoing; (5) the losses or risks of losses caused by the conduct, (6) any cooperation the defendant provided to enforcement authorities, and (7) other sanctions the defendant faces, whether criminal or civil. *Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d at 1050–51.

Application of these factors support an exercise of discretion in favor of a civil penalty. The entire boiler room scheme netted over $44 million, $29 million of which was paid to overseas accounts as commissions, and at least $16.7 million was attributable to the efforts of the Default Defendants. [Dkt. # 333, ¶¶ 1, 30, 62]. The Default Defendants were critical players in the scheme.

The SEC contends that the Default Defendants have not cooperated with authorities and that their conduct throughout this litigation has not been compliant with that required of any litigant. The SEC further submits, and this court finds no contradicting evidence, that the Default Defendants "are not facing any sanctions or penalties" connected to the boiler room operation.

The SEC has not requested a specific amount that the court should order as a civil penalty. The case law supports the idea that a request from the SEC for a specific amount of civil penalties is useful in guiding the court's exercise of discretion. Indeed, that input can be critical. *Collins v. S.E.C.*, 736 F.3d 521, 526 (D.C. Cir. 2013). While the SEC has provided an analysis of the factors employed in arriving at such an amount, it has not proposed a specific number as it should. *See, e.g., Michel,* 521 F. Supp. 2d at 830; *S.E.C. v. Collins*, 2003 WL 21196236, *8 (N.D.Ill. 2003).

Thus, within 7 days of the date of this Order, the SEC should specify a specific amount for a civil penalty, *with a thorough explanation of how it arrived at this figure*.

### D.
### Lifetime Penny Stock Bar

The SEC also seeks an order permanently barring the Default Defendants from participating in future offerings of penny stocks pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act. [Dkt. 451]; 15 U.S.C.§§ 77t(g),

19

78u(d)(6). A lifetime bar is an extraordinary remedy, usually reserved for those defendants who intentionally engaged in prior securities violations under circumstances suggesting the likelihood of future violations. *S.E.C. v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978); *S.E.C. v. Boey,* 2013 WL 3805127, at *3 (D.N.H.2013); *S.E.C. v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587 (S.D.N.Y.1993), *aff'd, S.E.C. v. Posner,* 16 F.3d 520 (2nd Cir.1994). In determining whether a defendant should be permanently enjoined from future violations of the securities laws, a number of non-exclusive, interrelated factors, must be considered, including: (1) the "egregiousness" of the underlying securities law violation; (2) whether the defendant is a "repeat offender"; (3) the defendant's role or position when he engaged in the securities law violation; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the reasonable likelihood that misconduct will recur. *See S.E.C. v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015); S.E.C. *v. Patel,* 61 F.3d 137, 141 (2nd Cir.1995); Jayne W. Barnard, *When is a Corporate Executive "Substantially Unfit to Serve"?,* 70 N.C.L.Rev. 1489, 1492–93 (1992).

As discussed above, based on the Default Defendants' pervasive misconduct, the egregiousness of their violations, the absence of any contest about scienter, the Default Defendants' stake in the violation, the receipt, actual or constructive, of steep commissions, their lack of acceptance of responsibility, the large returns they realized on their fraud, and their refusal to participate responsibly in the litigation support the conclusion that there is a reasonable likelihood of future violations by the Default Defendants. The instant case is one where it can confidently be said that the "past is

prologue foreshadowing the future." *Pan Am. World Airways, Inc. v. United States,* 371 U.S. 296, 310 (1963); *United States v. Stoller*, 78 F.3d 710, 723 (1st Cir.1996).

In sum, even if the Default Defendants had not waived their right to contest the permanent penny stock bar by failing to argue it in their Response to the SEC's Motion for Default Judgment, on this record the imposition of a lifetime bar from participating in future offerings of penny stocks is appropriate.

### E.
### The SEC's Request for a Permanent Injunction Against Future Violations of the Securities Laws

The SEC also seeks to permanently enjoin the Default Defendants from violating Section 17(a) of the Securities Act, (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act, (15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, (17 C.F.R. § 240.10b-5), and Section 15(a) of the Exchange Act (15 U.S.C. § 78o(a)). The SEC is entitled to permanent injunctive relief so long as the well-pleaded facts contained in the SEC's Second Amended Complaint, which are taken as true by virtue of the defaults, show that it is warranted. *See Thomson*, 114 U.S. at 111; *Ramm Industries Co.*, 1978 WL 21741, at *4–5.

Permanent injunctions under the Securities Act and the Exchange Act are "primarily intended to protect the investing public from future misconduct." *S.E.C. v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984). Because this remedy is derived from statute, there is no requirement that the SEC demonstrate irreparable harm. *Management Dynamics, Inc.*, 515 F.2d 808; *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 383 & n 9 (S.D.N.Y. 2007). The SEC is entitled to a permanent injunction if it has demonstrated a violation of the securities laws and a reasonable likelihood that the violations will recur.

*Holschuh*, 694 F.2d at 144; *C.F.T.C. v. American Bd. of Trade, Inc.*, 803 F.2d 1242, at 1250–51 (7th Cir. 1986); *S.E.C. v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2nd Cir. 1978).

"In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation." *Holschuh*, 694 F.2d at 144; *United States v. Kaun*, 827 F.2d 1144, 1149–50 (7th Cir. 1987). In doing so, five, nonexclusive factors are generally considered: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Holschuh*, 694 F.2d at 144.

As with the penny stock bar, the facts show that a permanent injunction is warranted. The harm caused by the defendants' conduct was serious, and they were the animating force behind the fraudulent sales practices during the time they were active. The Default Defendants have heretofore only marginally and sporadically participated in this litigation. That defiant attitude reflects their unwillingness to acknowledge their responsibility for the misconduct amply shown on this record and is a persuasive datum of the likelihood of future securities related misbehavior. But even if they faithfully discharged their obligations as litigants in this case, that is not cooperation with authorities in the sense the cases have used that term. It would mean no more than they did what every party to litigation is obligated to do: they complied with the Federal Rules of Civil Procedure. The Default Defendants have never acknowledged their culpability,

and have given no assurances that there will not be future violations. The SEC has amply proven that a reasonable likelihood of future violations exists, and thus that it is entitled to a permanent injunction.

The Default Defendants will be permanently enjoined from engaging in conduct that violates Section 17(a) of the Securities Act, (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act, (15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, (17 C.F.R. § 240.10b-5), and Section 15(a) of the Exchange Act (15 U.S.C. § 78o(a)).

## CONCLUSION

"[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996). Mr. von Hase was at all relevant times "the sole owner and officer of CTA" and thus "controlled" CTA. CTA has never had any employees other than von Hase. (von Hase Dep. Tr., at 23-24). Mr. von Hase entered into the distribution agreements and retained the sales agents on behalf of CTA to solicit investors, was in regular contact with the sales agents, and personally assured at least one of them that he would help "establish leads" and that he would "set up the technology needed to obscure the location from which their calls were originating." (*Id.*, ¶¶ 52-62). He also took pains to conceal his and CTA's involvement from investors. For example, von Hase cautioned an issuer that the investor "does not know any think [sic] about CTA

or myself, please keep it so." (Docket No. 333, ¶46). These examples of von Hase's approach to the enterprise are significant since honesty of purpose prompts frankness of statement; concealment is indicative of fraud. *Crosby v. Buchanan*, 90 U.S. 420, 457 (1875).

Consistent with the limitations in this Opinion, the SEC's motion for default judgment against Stephen von Hase and CTA Worldwide Services, S.A., [Dkt. #451] is granted. CTA and von Hase are Jointly and Severally Liable for the monetary obligations hereunder including disgorgement, prejudgment interest, and civil penalties.

The Default Defendants are ordered to disgorge $3,031,999.45 with prejudgment interest, calculated according to the IRS' underpayment rate, in an amount to be provided to the court and defense counsel within 7 days of this Opinion. The Default Defendants are ordered to pay a civil penalty, with this Court retaining jurisdiction to set the amount of such penalty within 7 days of this Opinion. The Default Defendants shall have 7 days to respond. There will be no reply brief.

The Default Defendants will be permanently barred from participating in the offering of penny stocks and permanently enjoined from violating Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act, (15 U.S.C. § 78j(b)), Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and Section 15(a) of the Exchange Act (15 U.S.C. § 78u(d)(1)).

A Final Judgment and Permanent Injunction will be issued following receipt and consideration of the SEC's recommendation for a civil penalty and its calculation of interest due on the amount to be disgorged by the Default Defendants as calculated above.

ENTERED: _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 11/9/15